**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
350 5th Avenue, Suite 5508
New York, New York 10118
Tel: (212) 686-1060
Fax: (212) 202-3827
email: lrosen@rosenlegal.com
email: pkim@rosenlegal.com



Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOSEPH S. GELMIS, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

        Plaintiff,

        vs.

EARL W. COLE, III, MICHAEL L. FALCONE,
WILLIAM S. HARRISON, MARK K. JOSEPH,
MELANIE M. LUNDQUIST, GARY A.
MENTESANA, ROBERT J. BANKS, CHARLES
C. BAUM, RICHARD O. BERNDT, EDDIE C.
BROWN, ROBERT S. HILLMAN, DOUGLAS A.
McGREGOR, ARTHUR S. MEHLMAN, FRED N.
PRATT, JR., and MUNICIPAL MORTGAGE &
EQUITY, LLC,

        Defendants.

-----------------------------------------------------------X

CASE No.

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff, Joseph S. Gelmis ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the

following based upon personal knowledge as to himself and his own acts, and information and

belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

his attorneys, which included, among other things, a review of the defendant's public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Municipal Mortgage & Equity, LLC. ("MMA", "MuniMae", or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the common stock of MMA between January 30, 2003 through January 28, 2008, seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). The Company maintains offices in this District and has also engaged in substantial financial transactions in this District. In addition, many of the acts and transactions alleged herein, including the preparation and dissemination of matcrially false

and misleading information, occurred in substantial part in this District. Plaintiff resides in New York.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, Joseph S. Gelmis, as set forth in the accompanying certification, incorporated by reference herein, purchased MMA securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant MMA is a Delaware limited liability company which provides debt and equity financing to various parties, invests in tax-exempt bonds and other housing-related debt and equity investments, and is a tax credit syndicator that acquires and transfers low-income housing tax credits. MMA maintains offices at 99 Park Ave., Ste 2010, New York, NY 10016.

8.      Defendant Earl W. Cole, III served as Executive Vice President responsible for the corporate credit and portfolio risk management group for the Company during the Class Period.

9.      Defendant Michael L. Falcone served as a director of the Company during the Class Period, Chief Executive Officer and President of the Company since January 1, 2005, and President and Chief Operating Officer of the Company from 1997.

10.     William S. Harrison served as Executive Vice President and Chief Financial Officer for the Company from 2001 until his resignation effective as of December 31, 2005 and, between 2001 and October 2003, as Corporate Secretary of the Company.

11.     Mark K. Joseph served as a director of the Company during the Class Period, Chairman of the Board of the Company since 1996 and Chief Executive Officer of the Company from 1996 to December 31, 2004.

12.     Melanie M. Lundquist served as the Company's Chief Financial Officer from January 1, 2006 through July 10, 2007, and previously served as the Company's Senior Vice President and Chief Accounting Officer beginning March, 2005.

13.     Gary A. Mentesana served as Executive Vice President of the Company responsible for the Company's debt group. He has been an executive officer of the Company since 2003. Prior to his appointment as Executive Vice President, Mr. Mentesana served as the Company's Chief Capital Officer as well as the Company's Chief Financial Officer. He is currently the head of the Company's debt group and is responsible for both the tax exempt and taxable lending businesses.

14.     Defendant Charlie M. Pinckney served as executive vice president during the Class Period.

15.     Defendant Robert J. Banks served as a director during the Class period.

16.     Defendant Charles C. Baum served as a director during the Class period.

17.     Defendant Richard O. Berndt served as a director during the Class period.

18.     Defendant Eddie C. Brown served as a director during the Class period.

19.     Robert S. Hillman served as a director during the Class Period.

20.     Douglas A. McGregor served as a director of the Company during the Class Period.

21.     Arthur S. Mehlman served as a director of the Company during the Class Period.

22.     Fred N. Pratt, Jr. served as a director of the Company during the Class Period.

4

23.     During the Class Period, defendants set forth in ¶¶16-23, purportedly served as "disinterested" members of the Company's Board of Directors and actively reviewed, authorized and affirmed, in accordance with the Company's Operating Agreement, certain of the transactions giving rise to the litigation and numerous Annual Reports containing the materially false and misleading financial information.

24.     Defendants set forth in ¶¶9-23 are collectively referred to hereinafter as the "Individual Defendants."

25.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of MMA and its subsidiaries and affiliates, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors

meetings and committees thereof and via reports and other information provided to them in connection therewith.

27.   It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers and directors of MMA and its subsidiaries and affiliates, by virtue of their positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

28.   As officers, directors and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded

securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with MMA, each of the Individual Defendants had access to the adverse undisclosed information about MMA's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about MMA and its business issued or adopted by the Company materially false and misleading.

30.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

31.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MMA securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme

(i) deceived the investing public regarding MMA's business, operations, management and the intrinsic value of MMA securities; and (ii) caused Plaintiff and other members of the Class to purchase MMA securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of MMA between January 30, 2003 to January 28, 2008 (the "Class Period"), and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MMA's securities were actively traded on the NYSE. According to the Company's quarterly report filed with the SEC on Form 10-Q on August 1, 2006, the Company had approximately 38,519,096 shares outstanding at June 30, 2006 While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by MMA or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

35.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MMA; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

37.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## Substantive Allegations

## Background

38.    Defendant MMA provides debt and equity financing to developers of multifamily housing and other types of commercial real estate. The Company invests in tax-exempt bonds, or interests in bonds, issued by state and local governments or their agencies or authorities to

finance multifamily housing developments. Interest income derived from the majority of the Company's bond investments is exempt income for Federal income tax purposes.

39.     The Company is also a tax credit syndicator.   As a syndicator, the Company acquires and transfers to investors interest in partnerships that receive and distribute to investors low-income housing tax credits.

40.     During the Class Period, defendants issued numerous statements concerning the Company's financial performance and the quality of the assets comprising its bond portfolio. Throughout this period, it has misrepresented the true value of these assets in contravention of GAAP, SEC guidance, and its own internal policies.

41.     The numerous statements concerning these matters issued by the Company during the Class Period were each materially false and misleading because they failed to disclose and misrepresented the true financial condition and operations of the Company. The following adverse facts which were known to Defendants or recklessly disregarded by them are:  (1) that the Company has maintained artificially inflated asset values on a significant portion of its tax-exempt bond portfolio and has not properly recognized other-than-temporary impairments in its loan portfolio; and (2) that the Company has failed to maintain adequate internal accounting controls and procedures, and has, in fact, overridden controls and procedures.

<u>**Materially False and Misleading Statements**</u>
<u>**Made During the Class Period**</u>

42.     On February 27, 2003, the Company announced the financial results for its fourth quarter and fiscal year 2002.   In the press release, entitled "MuniMae Reports 2002 Cash Available for Distribution Increases 16%; Closes Year with 24th Consecutive Increase in

Distributions," the Company reported net income allocated to common shares of $28,796,000, an increase from $23,847,000 for 2001, and stated the following, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA) reported today that total Cash Available for Distribution ("CAD") for the year ended December 31, 2002 increased 16% compared to 2001. CAD per common share increased 4% to $2.00 from $1.92. Basic earnings per share and diluted earnings per share for the year were $1.16 and $1.13, respectively. These compared to 2001 results of $1.12 per share for basic earnings and $1.09 per share for diluted earnings. The Board of Directors previously raised the quarterly dividend to common shares for the fourth quarter to $0.4425, the 24th consecutive increase in the quarterly distribution. For the year, MuniMae paid distributions totaling $1.755 per share, a 2% increase over 2001 total distributions of $1.715.

> MuniMae Chairman and CEO Mark K. Joseph, commenting on the results, stated, "I am pleased to report that MuniMae has again met its major business objectives. Our 2002 CAD per common share of $2.00 just exceeded the analyst consensus of $1.99, and over the course of the year we increased our assets under management by 15%, to $3.5 billion at year-end. Earlier this month we completed a $76 million common equity offering, which will support our 2003 business plan. We remain committed to providing great service to our developer clients and investors and look forward to continuing to implement our established strategy of steady CAD growth through expanding our investment portfolio and our sources of fee income."

* * *

> Fourth Quarter Distribution Results

> MuniMae's fourth quarter distribution to common shareholders of $0.4425 annualizes to $1.77 per share. Based on today's closing share price of $23.49, MuniMae common shares have an annualized yield to shareholders of 7.5%. Assuming the Company's income during the year is 85% exempt from Federal income tax, and assuming a 38.6% tax bracket, the taxable equivalent yield would be 11.6%. 2002 tax information on Form K-1 will be mailed to shareholders in early March.

43.     In the same press release, the Company also provided that its "impairments and valuation allowances related to investments" were $730,000 for its fiscal year 2002, down from $3,256,000 for its fiscal year 2001.

44.    On March 27, 2003, the Company filed its annual report for its fiscal year 2002 ("2002 Annual Report") with the SEC on Form SEC 10-K. The annual report repeated and affirmed the financial results announced in the February 27, 2003, press release as well as prior quarterly periods comprising fiscal year 2002.

45.    The 2002 Annual Report provided the following with regard to the Company's management of defaulted assets:

> Management of Defaulted Assets
> In certain circumstances involving the Company's tax-exempt bonds, borrowers have defaulted on their debt obligations to the Company. In such circumstances the Company has, after evaluating its options, chosen not to foreclose on the property. Instead, the Company has negotiated the transfer of a property's deed in lieu of foreclosure to, or replaced the general partner of a property with, an entity affiliated with the Company. The Company has done so in order to preserve the original tax-exempt bond obligations and its participation in cash flow from the property, consistent with its overall goal of providing tax-exempt income to its shareholders.

46.    Included in the 10-K were certifications by defendants Harrison and Joseph attesting to the accuracy of the financial report and the integrity of the Company's internal controls and accounting applications.  One such certification attested to the following:

> 1. I have reviewed this annual report on Form 10-K of Municipal Mortgage & Equity, LLC;
> 2. Based on my knowledge, this quarterly report  does not contain any untrue statement of material  fact or omit to state a material  fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;
> 3.  Based on my knowledge, the financial statements, and other financial information  included in this quarterly report,  fairly present in all material respects the financial  condition, results of operations and  cash flows of the registrant as of, and for, the periods presented in this quarterly report;
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:
>    a.    designed such disclosure controls and procedures to ensure that material  information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c. presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors:

a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this quarterly report whether here were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

47.     Also included in the 10-K filed March 27, 2003, were certifications, made

pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, of defendants Harrison and Joseph

attesting to the following:

Each of the undersigned officers of Municipal Mortgage & Equity, LLC, a Delaware limited liability company (the "Company"), hereby certifies that (i) the Company's Quarterly Report on Form 10-K for the year ended December 31,2002 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2002 fairly presents, in all material respects, the financial condition and results of operations of the Company, at and for the periods indicated.

48.     On July 17, 2003, the Company issued a press release announcing the financial

results for its fiscal 2003 second quarter that stated, in relevant part:

Municipal Mortgage & Equity, LLC (NYSE: MMA - News), known as MuniMae, reported net income allocated to common shares of $30.6 million for the quarter ended June 30, 2003, compared to $2.9 million for the same period in 2002. Diluted earnings per share were $1.05 for the quarter, compared to $0.11 for the same period in 2002.

13

Cash Available for Distribution ("CAD"), the primary measure of the Company's distribution paying ability, increased 18% for the quarter ended June 30, 2003 compared to the same period in 2002. CAD per common share increased 6% compared to the same period in 2002. The Board of Directors raised the quarterly distribution to common shares to $0.4475, an increase of 2% over the same period in 2002.

49.    In the press release, defendant Joseph was attributed with the following comments regarding the Company's financial results:

> We are pleased to announce the 26th consecutive increase to our dividend. We are pleased with our second quarter performance as well. MuniMae continues to diversify its product base, and as announced previously, has purchased the Housing and Community Investing (HCI) unit of Lend Lease Real Estate Investments, formerly known as Boston Financial Group. HCI is a market leader in the syndication of low-income housing tax credits and we expect their strong franchise to contribute meaningfully to our continuing efforts to increase our cash available for distribution, or CAD, and shareholder value."
>
> During the second quarter, the Company also experienced a significant increase in GAAP earnings due to the sale of a bond. For CAD, a large portion of the income generated by the sale of the bond was offset by the Company's sale of certain interest rate swaps. However, because of a previous GAAP write-off of a portion of this bond, the GAAP net income resulting from these two transactions was significantly greater than the CAD net income.

50.    On August 13, 2003, the Company filed its quarterly report for its fiscal 2003 second quarter with the SEC on Form 10-Q.  The quarterly report essentially repeated and confirmed the financial results presented in the Company's July 17, 2003 press release.  The quarterly report provided additional details concerning the sources of the Company's revenues and income.

51.    The report was certified pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 by defendants Harrison and Joseph that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," among other certifications.

52.     The Form 10-Q also included certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by defendants Harrison and Joseph that stated:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

53.    Every quarterly and annual report filed with the SEC by the defendants during the

Class Period contained similar, if not the same, certifications pursuant to the Sarbanes-Oxley Act

of 2002.

54.    On March 1, 2004, the Company issued a press release entitled "MuniMae

Completes $1.6 Billion in Production for 2003; Company Exceeds Prior Year Production by

16%" that provided, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae,
> announced today that it structured approximately $1.6 billion of financing in
> 2003.
>
> MuniMae Chairman and CEO Mark K. Joseph, commenting on the results, stated,
> "I am pleased to announce 16% growth over 2002 production levels. MuniMae
> continues to grow as a full service provider with over $8 billion in assets under
> management. As a result of the acquisition of a major tax credit syndication
> business last July, our equity business accounted for over 30% of total production
> for 2003. The contributions of this new business as well as the existing products
> are expected to provide the revenues necessary to position the Company to take
> advantage of future opportunities."
>
> Investment Activity Summary
>
> Highlights of 2003 investment activity include:

| millions) | Fourth Quarter Volume (in millions) | Fiscal 2003 Volume (in |
|---|---|---|
| - | --------------- | -------------- |
| Taxable Construction/Permanent Lending | $212.3 | $602.9 |
| Tax-exempt Bonds Construction/Permanent | 209.3 | 408.1 |
| Supplemental Loans | 15.6 | 57.9 |
| Equity Syndications/Investments | 278.4 | 515.6 |
| - | --------------- | -------------- |
| Total | $715.6 | $1,584.5 |
|  | =========== | =========== |

==========

2003 production activity represents approximately 197 communities and 13,106 units located throughout the United States.

Capital Activity Summary

In the fourth quarter of 2003, the Company raised $336.0 million of tax credit equity from two new third-party investors as well as our existing partners, bringing the year-to-date total to $555.1 million in equity raised.

55.     On March 1, 2004, the Company announced financial results for its fourth quarter

and fiscal year 2003 ended December 31, 2003.  The press release, the headline of which lauded

that the Company "Closes Year with 28th Consecutive Increase in Distributions," stated, in

relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, reported net income allocated to common shares of $72.5 million for the year ended December 31, 2003, compared to $28.8 million for the same period in 2002. Diluted earnings per share were $2.44 for the year, compared to $1.13 for the same period in 2002. The substantial changes in GAAP earnings resulted primarily from a $25.7 million transaction recorded as discontinued operations and a $21.2 million decrease in losses on derivative securities.
>
> Cash Available for Distribution ("CAD") to common shares, the primary measure of the Company's distribution paying ability, increased 26% for the year ended December 31, 2003 compared to the same period in 2002. (The Company uses CAD as its primary measure of performance and believes it to be illustrative of its distribution-paying ability. CAD differs from net income because of variations between GAAP income and actual cash received. These variations are described in the note to the attached calculation of CAD statement.) CAD per common share for the year ended December 31, 2003 of $2.13 increased 6.5% compared to the same period in 2002. The Board of Directors raised the quarterly distribution to holders of our common shares to $0.4525, an increase of 2% over the same period in 2002. For the year, MuniMae paid distributions totaling $1.795 per common share compared to $1.755 per common share in 2002.
>
> *       *       *
>
> MuniMae's fourth quarter distribution to common shareholders of $0.4525 annualizes to $1.81 per share. Based on the February 27, 2004 closing share price of $25.99, MuniMae common shares have an annualized yield to shareholders of 7.0%. Based on the assumption that the Company's income is 75% - 80% exempt from Federal income tax, absent the impact of capital gains and assuming a 35% tax bracket, the taxable equivalent yield would be 9.8% - 10.0%. The over-all tax-

exempt percentage for 2003 was 80% absent the impact of capital gains. Tax information for 2003 on Form K-1 was mailed to shareholders beginning in late February.

56.    On March 1, 2004, the Company announced financial results for its fourth quarter and fiscal year 2003 ended December 31, 2003.  In the press release, the headline of which lauded that the Company "Closes Year with 28th Consecutive Increase in Distributions," defendant Joseph is quoted commenting on the Company's performance as follows:

> I am pleased to report that MuniMae has marked 2003 as another year of growth for the Company. Year-end CAD per share exceeded analyst consensus of $2.10, while our total production rose 16% over 2002. MuniMae has successfully progressed from $230 million in total assets since listing in 1996 to over $2 billion at year-end 2003, with an 18% average annual total return to shareholders over the same period.

57.    On March 12, 2004, the Company filed its annual report for its 2003 fiscal year ended December 31, 2003 with the SEC on Form 10-K ("2003 Annual Report").  The annual report essentially repeated and reaffirmed the financial results presented in the Company's quarterly reports comprising its fiscal year 2003 and the March 1, 2004 press release.  The annual report provided additional details concerning the sources of the Company's revenues and income.

58.    In the 2003 Annual Report, the section entitled "Investment in Tax-Exempt Bonds and Residual Interest in Bond Securitizations" provides the following information purportedly describing the method utilized the Company in determining the fair value of certain investment interests:

> Investment in tax-exempt bonds and residual interests in bond securitizations (collectively, "investments in bonds") are accounted for under the provisions of Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). All investments in bonds are classified and accounted for as available-for-sale debt securities and are carried at fair value. Unrealized gains or losses arising during the period are recorded through other comprehensive income in shareholders' equity, while

realized gains and losses and other-than-temporary impairments are recorded through operations. The Company evaluates on an ongoing basis the credit risk exposure associated with these assets to determine whether any other-than-temporary impairments exist in accordance with the Company's policy discussed in the Other-Than-Temporary Impairments section of this discussion. Future adverse changes in market conditions or poor operating results from the underlying real estate could result in losses or an inability to recover the carrying value of the investments.

The Company determines the fair value of participating bonds (i.e., bonds that participate in the net cash flow and net capital appreciation of the underlying properties) that are wholly collateral dependent and for which only a limited market exists by discounting the underlying collateral's expected future cash flows using current estimates of discount rates and capitalization rates. The Company selected discount rates ranging from 11.0% to 13.3% and capitalization rates ranging from 8.2% to 12.0% for the year ended December 31, 2003. Increasing the discount rates by 50 basis points and the capitalization rates by 100 basis points would result in decreasing the recorded asset on the Company's balance sheet by approximately $11.1 million, with an offsetting decrease to other comprehensive income.

The Company bases the fair value of non-participating bonds and residual interests in bond securitizations, which also have a limited market, on quotes from external sources, such as brokers, for these or similar bonds or investments. Net operating income is one of the key assumptions used to value the non-participating bonds and residual interests in bond securitizations. Had net operating income been decreased by 10% and 20%, the fair value of the bonds and residual interests in bond securitizations would have decreased by approximately $2.6 million and $4.7 million, respectively.

Because the Company's investment in tax-exempt bonds and residual interests in bond securitizations are secured by non-recourse mortgage loans on real estate properties, the value of the Company's assets is subject to all of the factors affecting bond and real estate values, including macro-economic conditions, interest rate changes, demographics, local real estate markets and individual property performance. Further, many of the Company's investments are subordinated to the claims of other senior interests and uncertainties may exist as to a borrower's ability to meet principal and interest payments.

59.    Directly underneath the aforementioned section, the 2003 Annual Report provides the following description of how the Company accounts for certain valuation adjustments to certain assets:

Other-Than-Temporary Impairments and Valuation Allowances

The Company evaluates on an ongoing basis the credit risk exposure associated with its assets to determine whether other-than-temporary impairments exist or a valuation allowance is needed. When the Company believes that it is probable that it will not collect all amounts due, including principal and interest, under the terms of an investment, it records an other-than-temporary impairment or valuation allowance. The Company bases its measure of impairment of an investment on the present value of expected future cash flows discounted at the investment's effective interest rate, or the fair value of the collateral if the investment is collateral dependent.

60.     The Company's 2003 Annual Report provides the line-item details regarding the various impairments the Company had recognized on its various assets.   This included the following other adjustment listed as part of the annual report's "Selected Financial Data" to its income statement data:

| (in thousands) | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| Impairments and valuation allowances related to investments | (6,983) | (730) | (3,256) | (1,508) | (1,120) |

*       *       *

Impairments and Valuation Allowances Related to Investments

In accordance with the Company's valuation and impairment policies, the Company recorded $7.0 million in impairments and valuation allowances in 2003 related primarily to: (1) two bonds and eight taxable loans with an aggregate face amount of $39.0 million; and (2) advances to two tax credit equity funds with outstanding balances of $9.3 million. In 2002, the Company recorded $0.7 million in impairments and valuation allowances related to four bonds and one taxable loan with an aggregate face amount of $57.6 million. In 2001, the Company recorded other-than-temporary impairments of $3.3 million on two bonds with an aggregate face amount of $21.5 million.

61.     The 2003 Annual Report provided the following line item for impairment in a table reconciling the Company's GAAP net income to CAD for its fiscal years 2001 through 2003, along with the corresponding note:

| (in thousands) | 2003 | 2002 | 2001 |
|---|---|---|---|
| (5) Valuation allowances and other-than-temporary impairments | 4,134 | 730 | 3,256 |

20

\*       \*       \*

(5) For GAAP reporting, the Company records valuation allowances and other-than-temporary impairments on its investments in loans, bonds and other bond-related investments. Such non-cash charges do not affect the cash flow generated from the operation of the underlying properties, distributions to shareholders, the tax-exempt status of the income or the financial obligation under the bonds. Therefore, these items are not included in the calculation of CAD.

62.     The 2003 Annual Report further discussed its other-than-temporary impairments

and valuation allowances on investments as follows:

Other-Than-Temporary Impairments and Valuation Allowances on Investments

The Company evaluates on an ongoing basis the credit risk exposure associated with its assets to determine whether other-than-temporary impairments exist or a valuation allowance is needed. When the Company believes that it is probable that it will not collect all amounts due, including principal and interest, under the terms of an investment, it records an other-than-temporary impairment or valuation allowance. The Company bases its measure of impairment of an investment on the present value of expected future cash flows discounted at the investment's effective interest rate, or the fair value of the collateral if the investment is collateral dependent. Other-than-temporary impairments and valuation allowances are reported in Note 3 and Note 4, respectively. The Company also evaluates other receivables and advances for collectibility on an ongoing basis. When the Company believes it is probable that is will not collect all amounts due, the balance is written down to its realizable value. For the years ended December 31, 2003, 2002 and 2001, the Company recorded other-than-temporary impairments on tax-exempt bonds of $3.8 million, $0.4 million and $3.3 million, respectively. For the years ended December 31, 2003 and 2002, the Company recorded an allowance for loan losses of $0.6 million and $0.3 million, respectively. No allowance for loan losses was recorded in 2001. For the year ended December 31, 2003, the Company recorded an allowance of $2.5 million for other receivables and advances. No allowance for other receivables and advances was recorded during 2002 or 2001.

63.     The 2003 Annual Report provides the following discussion of investments with

unrealized losses:

Investments with Unrealized Losses

The following table shows unrealized losses and fair value aggregated by length of time that the tax-exempt bonds have been in a continuous loss position at December 31, 2003.

(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $200,034 | $(12,793) | $133,428 | $(21,210) | $333,462 | $(34,003) |

At December 31, 2003, there were 22 tax-exempt bonds in a continuous unrealized loss position for more than twelve months, and 26 tax-exempt bonds in a continuous unrealized loss position for less than twelve months. As discussed in Note 1, the fair value of tax-exempt bonds is determined by external quotes or a discounted cash flow analysis. Both methodologies are based on current market conditions including occupancy and net operating income of the underlying properties. An other-than-temporary impairment is only recorded when the Company believes it is possible that it will not collect all amounts due under the terms of the tax-exempt bond. The Company expects to receive payments in excess of its investment over the life of the bonds in the above table. These bonds are not considered to be other-than-temporarily impaired at December 31, 2003.

Other-than-Temporary Impairments

In 2003, the Company recorded other-than-temporary impairments totaling $3.8 million on two bonds. In 2002, the Company recorded other-than-temporary impairments totaling $0.4 million on four bonds.

In 2001, the Company assumed the obligation to purchase two bonds for their face amount ($21.5 million). In consideration for assuming this obligation, the Company received $1.9 million in cash and a $2.0 million (face amount) taxable note with a fair value of $1.4 million. The Company recognized a $3.3 million other-than-temporary impairment upon the assumption of this obligation. This amount represented the difference between the fair value of the bonds and the face amount of the bonds at the time the Company assumed the purchase obligation. Upon the purchase of the bonds, the Company recognized $3.3 million in income that represented the value of the cash and taxable loan consideration received.

Investments on Non-Accrual Status

In accordance with the Company's policy discussed in Note 1, the Company places delinquent bonds on non-accrual status for financial reporting purposes when collection of interest is in doubt, which is generally after 90 days of non-payment. At December 31, 2003, 2002 and 2001, there were $102.8 million, $102.9 million and $71.7 million (face value), respectively, of tax-exempt bonds on non-accrual status. Interest income recognized on these bonds was $5.0

million, $7.7 million and $4.9 million for the years ended December 31, 2003, 2002 and 2001, respectively. Additional interest income that would have been recognized by the Company had these bonds not been placed on non-accrual status was approximately $2.4 million, $1.0 million and $1.2 million for the years ended December 31, 2003, 2002 and 2001, respectively.

Tax-Exempt Bonds Pledged

In order to facilitate the securitization of certain assets at higher leverage ratios than otherwise available to the Company without the posting of additional collateral, the Company has pledged additional bonds to various pools that act as collateral for senior interests in certain securitization trusts. From time to time, the Company also pledges bonds as collateral for letters of credit, lines of credit, warehouse lending arrangements, CAPREIT investments and other derivative agreements. At December 31, 2003 and 2002, the total carrying amount of the tax-exempt bonds pledged as collateral was $452.3 million and $372.9 million, respectively.

64.     In summary, the Company took impairments and valuation allowances of $6.983 million in 2003, $730,000 in 2002, and $3.256 million in 2001. The 2003 Annual Report itemized by business segment the impairments and valuation allowances related to investments for the Company's fiscal year 2003, 2002, and 2001 as follows:

| (in thousands) | | 2003 | | | | 2002 | | |
|---|---|---|---|---|---|---|---|---|
| | Investing | Operating | Adjustments | Total Consolidated | Investing | Operating | Adjustments | Total Consolidated |
| Impairment and valuation allowances related to investments | (4,198) | (2,785) | -- | (6,983) | (730) | -- | -- | (730) |
| | | | 2001 | | | | | |
| | -- | (3,256) | -- | (3,256) | | | | |

65.     The 2003 Annual Report also provides a summary of quarterly results which includes the impairment amounts for each quarter. The Company's impairments charged for its Fiscal Year 2003 included $1.144 million in the second quarter and $5.839 million for the fourth quarter. During its Fiscal Year 2002, the Company took impairment charges for the first quarter of $110,000 and $620,000 for the fourth quarter.

66.     The 2003 Annual Report provided the following with regard to the Company's management of defaulted assets:

### Affiliate Management and Control of Defaulted Assets

From time to time, borrowers have defaulted on their debt obligations to the Company. Some of these obligations were incurred in connection with the development of properties that collateralize the Company's tax-exempt bonds. These properties are sometimes referred to as "defaulted assets." In a number of these circumstances the Company has, after evaluating its options, chosen not to foreclose on the property. Instead, the Company has negotiated the transfer of a property's deed in lieu of foreclosure to, or replaced the general partner of an original borrowing partnership with, an entity controlled by and affiliated with certain officers of the Company. Following the transfer of a property to, or the replacement of the general partner with, an affiliated entity, that entity controls the defaulted asset, which serves as collateral for the debt to the Company. The Company refer to all transferees as "affiliated entities" for purposes of this discussion. These affiliated entities include partnerships in which Mr. Joseph has an interest and 501 (c) (3) corporations that have Board members and officers who are also executive officers of the Company. These officers acting as Board members and officers of the affiliated entities do not have a personal financial interest in the entities. Only Mr. Joseph has a personal financial interest in these partnerships, as described above in the section entitled "Related Party Transactions." The Company has taken this action to preserve the value of the original tax-exempt bond obligations and to maximize cash flow from the defaulted assets. This result is consistent with the Company's goal of providing tax-exempt income to its shareholders. The following table outlines these affiliate relationships at December 31, 2003:

| (in thousands) Affiliate Entity | Number of Properties Owned (directly or indirectly) | Carrying Value of Company's Investment at December 31, 2003 |
|---|---|---|
| SCA Successor, Inc. (1) | 3 | $46,253 |
| SCA Successor II, Inc. (1) | 12 | 60,331 |
| MMA Affordable Housing Corporation (2) | 2 | 44,727 |
| MuniMae Foundation, Inc.(3)/MMA Successor I, Inc. (1) | 2 | 11,022 |
| Total | 19 | $162,333 |

(1)   These corporations are general partners of the operating partnerships whose property collateralizes the Company's investments. All of these general partner investments are 1% interests in the related operating partnerships. See above for a discussion of Mr. Joseph's interest in these general partners.

(2)   MMA Affordable Housing Corporation ("MMAHC") is a 501(c)(3) non-profit entity organized to provide affordable housing. No part of its earnings

inures to the benefit of any individual or for-profit entity. Executive officers of the Company serve as directors of MMAHC.

(3) MuniMae Foundation, Inc. is a private non-profit entity organized to facilitate non-profit parts of the Company's business. No part of its earnings inures to the benefit of any individual or for-profit entity. Executive officers of the Company serve as directors of the Foundation.

The affiliated entities that own and operate the defaulted assets could have interests that do not fully coincide with, or could even be adverse to, the interests of the Company's tax-exempt bond business. If any of these entities chose to act solely in accordance with their ownership interest in the defaulted assets, such as selling a property or filing a bankruptcy, the interests of the tax-exempt bondholders could be adversely impacted. In making decisions relating to the defaulted assets, the Company, by direction to its affiliates and officers, has, consistent with its overall strategy of providing largely tax-exempt income to its shareholders, elected to manage the defaulted assets in such a manner as to preserve to the greatest extent possible, the tax-exempt interest income that flows from the projects. The Company could, therefore, make a decision to defer the capital needs of a defaulted asset in favor of paying the debt service, which could adversely impact the value of the Company's collateral.

As part of the sale of certain taxable notes in 1998 and 1999, the Company provided a guarantee on behalf of the operating partnerships that hold these defaulted assets for the full and punctual payment of interest and principal due under the taxable notes. The face amount of these notes at December 31, 2003 was $16.2 million. The Company's obligation under this guarantee is included in the summary of the Company's guarantees in Note 14.

67.     In addition to the affirmations of accuracy and internal controls made by defendants Harrison and Joseph, and submitted with the 2003 Form 10-K filing, pursuant to the Sarbanes-Oxley Act of 2002, Item 9A of the 2003 Form 10-k provided the additional affirmation concerning the Company's internal controls and procedures:

Under the direction of the Company's Chief Executive Officer and Chief Financial Officer, management evaluated its disclosure controls and procedures and internal control over financial reporting and concluded that (i) its disclosure controls and procedures were effective as of December 31, 2003 and (ii) no change in internal control over financial reporting occurred during the quarter ended December 31, 2003 that has materially affected, or is reasonably likely to materially affect, such internal control over financial reporting.

68.     On March 2, 2004, the Company issued a press release announcing a "follow-on offering of its common stock" that stated, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, announced today that it entered into an agreement to sell 1,950,000 common shares to RBC Capital Markets and Legg Mason Wood Walker, Inc. In addition, the Company granted the underwriters the option to purchase an additional 195,000 shares to cover any over allotments.
>
> MuniMae expects to use the net proceeds from this offering to fund future investment opportunities, to reduce outstanding indebtedness and for general corporate purposes.

69.     On September 23, 2004, the Company issued a press release announcing a revision  to its 2004 interim financial statements due to the Company's failure to account for deferred compensation expenses.  The press release stated, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, today announced revisions to its previously reported results for the three months ended March 31, 2004 and six months ended June 30, 2004 to reflect the GAAP effect of $3.0 million in deferred compensation expense which had not previously been recorded. The impact of the revisions on the Company's net income and earnings per share are as follows:

|  | Previously Reported | Revised |
|---|---|---|
| Three Months ended March 31, 2004 |  |  |
| Net Income (Loss) ($ millions) | $1.2 | ($1.3) |
| Earnings per Share, Basic | $0.04 | ($0.04) |
| Earnings per Share, Diluted | $0.04 | ($0.04) |
| Six Months ended June 30, 2004 |  |  |
| Net Income ($ millions) | $12.4 | $9.9 |
| Earnings per Share, Basic | $0.37 | $0.29 |
| Earnings per Share, Diluted | $0.37 | $0.29 |

> Since the payments to which this expense relates will be spread over three years beginning in July 2005, the expenses do not affect the Company's cash flow for either period.
>
> Description of Restatement
>
> As previously disclosed as part of the Company's Annual Report on Form 10-K for 2003, during the first quarter of 2004, following review and approval by the Compensation Committee of the Board of Directors, the Company entered into a

number of employment agreements with senior executives. One of these agreements provided for deferred compensation payments, totaling $3.0 million and payable ratably over 36 months beginning in July 2005, to the Company's Chairman and Chief Executive Officer, who is expected to retire as Chief Executive Officer on June 30, 2005. Based on the terms of his employment agreement, the discounted value ($2.5 million for the three-month period ended March 31, 2004 and $2.6 million for the six-month period ended June 30, 2004) of these payments is reflected as compensation expense for those periods. The failure to timely record this expense was an oversight due to inadequate internal communications at the time the contract was executed.

In connection with its ongoing internal controls initiatives relating to the Sarbanes-Oxley Act of 2002, management of the Company is revising and enhancing its controls relating to the approval of material contracts in order to prevent similar errors in the future.

70.    On October 27, 2004, the Company issued a press release entitled "MuniMae

Announces Investment Grade Rating of Subsidiary" which stated, in relevant part:

Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, today announced that Moody's Investors Services, Inc. has assigned an A2 Issuer Rating to MuniMae TE Bond Subsidiary, LLC. In addition, Moody's assigned ratings to each series of preferred shares issued by MuniMae TE Bond Subsidiary. This is the first investment grade rating obtained by MuniMae for one of its subsidiary companies and for the tax-exempt preferred shares.

The tax-exempt preferred share ratings are as follows:

| Rating | Preferred Shares |
| ------ | ---------------- |
| A3 | $120 million Series A, A-1, A-2 |
| Baa1 | $82 million Series B, B-1, B-2 (subordinate) |
| Baa2 | $39 million Series C, C-1, C-2 (subordinate) |

The Moody's report published on September 22, 2004 stated, "The ratings reflect MuniMae TE Bond Subsidiary's strong financial condition as reflected in their strong coverage and conservative leverage ratios; satisfactory portfolio composition and performance; and sophisticated real estate management."

The investment grade rating will improve MuniMae's ability to have one of its subsidiary companies sell preferred equity as investors prohibited from investing in unrated securities can now invest in MuniMae TE Bond Subsidiary. MuniMae Chairman and CEO Mark K. Joseph, commenting on the ratings, stated, "This is a strong testament to what we have collectively built up over the past several years. The ratings affirm that our investment and management decisions have created

value for MuniMae's investors." Mr. Joseph added, "The reduced financing cost of rated preferred shares relative to the cost of comparable unrated shares benefits both the preferred shareholders of TE Bond Subsidiary and the common shareholders of MuniMae."

71.     On November 10, 2004, the Company announced the financial results for its fiscal 2004 third quarter ended September 30, 2004.  For the quarter, the Company reported net income of $11.6 million, or $0.33 per share, compared to $18.1 million, or $0.62 per share, for the same period in 2003.  The Company reported CAD per common share of $0.72 for the quarter as compared to $0.53 for the same period in 2003.   In the press release announcing the results defendant Joseph stated:

> MuniMae is pleased to continue its long history of steady growth in cash generated by our businesses. The Company has recently declared its 31st consecutive increase in its distribution to common shareholders. Despite higher regulatory and compliance costs, particularly those related to the Sarbanes-Oxley Act of 2002 our management team continues to deliver strong results.

72.     On November 9, 2004, the Company filed its quarterly report for its fiscal 2004 third quarter with the SEC on Form 10-Q.  The quarterly report essentially repeated and confirmed the financial results presented in the Company's November 10, 2004 press release. The quarterly report provided additional details concerning the sources of the Company's revenues and income.

73.     On March 16, 2005, the Company filed its annual report for its 2004 fiscal year ended December 31, 2004 with the SEC on Form 10-K ( "2004 Annual Report").  The annual report essentially repeated and reaffirmed the financial results presented in the Company's quarterly reports comprising its fiscal year 2004 and the March 16, 2005 press release.  The

annual report provided additional details concerning the sources of the Company's revenues and income.

74.     In the 2004 Annual Report, the section entitled "Investment in Tax-Exempt Bonds and Interests in Bond Securitizations" provides the following information purportedly describing the method utilized the Company in determining the fair value of certain investment interests:

> Investment in tax-exempt bonds and interests in bond securitizations (collectively, "investments in bonds") are accounted for under the provisions of Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). All investments in bonds are classified and accounted for as available-for-sale debt securities and are carried at fair value. Unrealized gains or losses arising during the period are recorded through other comprehensive income in shareholders' equity, while realized gains and losses and other-than-temporary impairments are recorded through operations. The Company evaluates on an ongoing basis the credit risk exposure associated with these assets to determine whether any other-than-temporary impairments exist in accordance with the Company's policy discussed in the Other-Than-Temporary Impairments on Bonds section of this discussion. Future adverse changes in market conditions or poor operating results from the underlying real estate could result in losses or an inability to recover the carrying value of the investments.

> The Company bases the fair value of non-participating bonds (i.e., bonds that do not participate in the net cash flow and net capital appreciation of the underlying properties) and interests in bond securitizations, which also have a limited market, on quotes from external sources, such as brokers, for these or similar bonds or investments. Net operating income is one of the key assumptions used to value the non-participating bonds and interests in bond securitizations. Had net operating income been decreased by 10% and 20%, the fair value of the bonds and interests in bond securitizations would have decreased by approximately $35.7 million and $69.2 million, respectively.

> The Company determines the fair value of participating bonds that are wholly collateral dependent and for which only a limited market exists by discounting the underlying collateral's expected future cash flows using current estimates of discount rates and capitalization rates. The Company selected discount rates ranging from 10.1% to 12.9% and capitalization rates ranging from 7.8% to 10.75% for the year ended December 31, 2004. Increasing the discount rates by 50 basis points and the capitalization rates by 100 basis points would result in decreasing the recorded asset on the Company's balance sheet by approximately $12.6 million, with an offsetting decrease to other comprehensive income.

Because the Company's investment in tax-exempt bonds and interests in bond securitizations are secured by non-recourse mortgage loans on real estate properties, the value of the Company's assets is subject to all of the factors affecting bond and real estate values, including macro-economic conditions, interest rate changes, demographics, local real estate markets and individual property performance. Further, many of the Company's investments are subordinated to the claims of other senior interests and uncertainties may exist as to a borrower's ability to meet principal and interest payments.

75.    Directly underneath the aforementioned section, the 2004 Annual Report provides the following description of how the Company accounts for certain valuation adjustments to certain assets:

Other-Than-Temporary Impairments on Bonds

The Company evaluates on an ongoing basis the credit risk exposure associated with its assets to determine whether other-than-temporary impairments exist or a valuation allowance is needed. The Company considers the credit risk exposure of the investment, the Company's ability and intent to hold the investment for a period of time to allow for anticipated recoveries in market value, the length of time and extent to which the market value has been less than carrying value, the financial condition of the underlying collateral including the payment status of the investment and general economic and other more specific conditions applicable to the investment, other collateral available to support the investment and whether the Company expects to recover all amounts due under its mortgage obligations on a net present value basis. Third party quotes of securities with similar characteristics or discounted cash flow valuations are used to assist in determining if an impairment exists on investments. If the fair value of the investment is less than its amortized cost, and after assessing the above-mentioned factors, it is determined that an other-than-temporary impairment exists, the impairment is recorded currently in earnings and the cost basis of the security is adjusted accordingly.

76.    The Company's 2004 Annual Report provides the line-item details regarding the various impairments the Company had recognized on its various assets.  This included the following other adjustment listed as part of the annual report's "Selected Financial Data" to its income statement data:

| (in thousands) | 2004 | 2003 | 2002 | 2001 | 2000 |
| --- | --- | --- | --- | --- | --- |

| Impairments and valuation allowances related to investments | (7,141) | (6,983) | (730) | (3229)[1] | (1,508) |

\*     \*     \*

## Impairments and Valuation Allowances Related to Investments

In accordance with the Company's valuation and impairment policies, the Company recorded $7.1 million in impairments and valuation allowances in 2004 related primarily to: (1) $5.5 million on five bonds and five taxable loans with an aggregate face amount of $37.0 million as of December 31, 2004; and (2) $1.6 million in impairment charges on fixed assets of one consolidated Project Partnership. The Company recorded $7.0 million in impairments and valuation allowances in 2003 related primarily to (1) two bonds and eight taxable loans with an aggregate face amount of $39.0 million; and (2) advances to two tax credit equity funds with total outstanding balances of $9.3 million. In 2002, the Company recorded $0.7 million in impairments and valuation allowances related to four bonds and one taxable loan with an aggregate face amount of $57.6 million.

77.     Along with the 2004 Annual Report as part of the Form 10-K filed with the SEC, the Company filed an Exhibit entitled "Schedule II" which was described as a financial statement schedule of valuation and qualifying accounts.  The schedule, which in part broke out the various impairments and valuation allowances recorded by the Company, provided the following:

Valuation and Qualifying Accounts
December 31, 2004

| (in thousands) Description | Balance at Beginning of Period | Charged to costs and expenses | Additions Charged to Other Accounts – Describe | Deductions – Describe | Balance at end of period |
|---|---|---|---|---|---|
| Loan Loss Reserve | | | | | |
| 2004 | $(1,679) | $(1,411) | -- | $130 a | $ (2,960) |
| 2003 | (1,072) | (610) | -- | 3 a | (1,679) |
| 2002 | (835) | (297) | -- | 60 b | (1,072) |

a     Represents amounts collected for loan previously determined as uncollectible
b     Represents amounts adjusted to loan receivable and loan loss reserve to properly reflect loan loss reserve balance

| | |
|---|---|
| $(1,411) | Amount per above |
| (4,170) | Other-than-Temporary Impairments Related to Bonds |
| (1,582) | Impairment of Fixed Assets |
| 22 | Other Impairments/Write offs |
| $(7,141) | Impairments and Valuation Allowances per 2004 |

---

1 This was represented as (3,256) in the 2003 Annual Report. Impairment and valuation allowances related to investments according for 1999 was (1,120) according to the 2003 Annual Report.

|  |  |
|---:|:---|
| ---------- | Consolidated Statement of Income |
| $(610) | Amount per above |
| (3,831) | Other-than-Temporary Impairments Related to Bonds |
| (2,542) | Other Impairments/Write offs |
| $(6,983) | Impairments and Valuation Allowances per 2003 |
| ---------- | Consolidated Statement of Income |
| $(297) | Amount per above |
| (433) | Other-than-Temporary Impairments Related to Bonds |
| $(730) | Impairment and Valuation Allowances per 2002 |
| ---------- | Consolidated Statement of Income |

78.     The 2004 Annual Report further discussed its other-than-temporary impairments

and valuation allowances on investments as follows:

> The Company evaluates on an ongoing basis the credit risk exposure associated with its assets to determine whether other-than-temporary impairments exist or a valuation allowance is needed. The Company considers the credit risk exposure of the investment, the Company's ability and intent to hold the investment for a period of time to allow for anticipated recoveries in market value, the length of time and extent to which the market value has been less than carrying value, the financial condition of the underlying collateral including the payment status of the investment and general economic and other more specific conditions applicable to the investment, other collateral available to support the investment and whether the Company expects to recover all amounts due under its mortgage obligations on a net present value basis. Third party quotes of securities with similar characteristics or discounted cash flow valuations are used to assist in determining if an impairment exists on investments. If the fair value of the investment is less than its amortized cost, and after assessing the above-mentioned factors it is determined that an other-than-temporary impairment exists, the impairment is recorded currently in earnings and the cost basis of the security is adjusted accordingly. Other-than-temporary impairments and valuation allowances are reported in Note 3 and Note 4, respectively. The Company measures impairment of a loan in accordance with the provisions of FAS 114. FAS 114 requires a creditor to base its measure of loan impairment on the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the collateral if the loan is collateral dependent. The Company provides an allowance for loan losses based upon management's evaluation of all loans in the portfolio. In management's judgment, consideration has been given to overall loss experience, loan-to-value ratios, delinquency data, economic market conditions, debt service coverage, indemnification agreements, and other factors that warrant recognition in reviewing the portfolio for impairment. The Company also evaluates other receivables and advances for collectibility on an ongoing basis. When the Company believes it is probable that it will not collect all amounts due,

the balance is written down to its realizable value. For the years ended December 31, 2004, 2003 and 2002, the Company recorded other-than-temporary impairments on tax-exempt bonds of $4.2 million, $3.8 million and $0.4 million, respectively. For the years ended December 31, 2004, 2003 and 2002, the Company recorded allowances for loan losses of $1.3 million, $0.6 million and $0.3 million, respectively. For the year ended December 31, 2003, the Company recorded an allowance of $2.5 million for other receivables and advances. No allowance for other receivables and advances was recorded during 2004 or 2002.

Long-Lived Assets

The Company evaluates its long-lived assets for possible impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. If the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the long-lived asset is less than the carrying amount at the date of the evaluation, an impairment loss is recognized. The impairment loss is measured as the amount by which the carrying amount exceeds the fair value of the long-lived asset. During the fourth quarter of 2004, it was determined that long-lived assets of certain Project Partnerships were impaired. As a result, the Company recorded an impairment of $1.5 million for the year ended December 31, 2004. The Company recorded no such impairment losses during the years ended December 31, 2003 and 2002.

79.    The 2004 Annual Report provides the following discussion of investments with

unrealized losses[2]:

Investments with Unrealized Losses

The following table shows unrealized losses and fair value aggregated by length of time that the tax-exempt bonds or interests in bond securitizations have been in a continuous loss position at December 31, 2004 and 2003.

December 31, 2004
(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $210,880 | $(12,862) | $293,147 | $(45,547) | $504,027 | $(58,409) |

December 31, 2003
(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $206,947 | $(13,820) | $203,352 | $(39,757) | $410,299 | $(53,577) |

---

2 The value of investments with unrealized losses for the period ended December 31, 2003 set forth in the 2004 Annual Report is marginally different than the values set forth in the 2003 Annual Report, as set forth in ¶88.

There were 37 and 29 tax-exempt bonds or interests in bond securitizations in a continuous unrealized loss position for more than twelve months, and 25 and 28 tax-exempt bonds or interests in bond securitizations in a continuous unrealized loss position for less than twelve months at December 31, 2004 and 2003, respectively. As discussed in Note 1, the fair value of tax-exempt bonds or interests in bond securitizations is determined by external quotes or a discounted cash flow analysis. Both methodologies are based on current market conditions including occupancy and net operating income of the underlying properties. An other-than-temporary impairment is only recorded when the Company believes it is possible that it will not collect all amounts due under the terms of the tax-exempt bond or interests in bond securitizations. The Company expects to receive payments in excess of its investment over the life of the bonds or interests in bond securitizations in the above table. These bonds or interests in bond securitizations are not considered to be other-than-temporarily impaired at December 31, 2004.

Included in the table above there are twelve and nine tax-exempt bonds as of December 31, 2004 and 2003, respectively, with other-than-temporary impairment charges in the past.

Other-than-Temporary Impairments
In 2004, the Company recorded other-than-temporary impairments totaling $4.2 million on five bonds. In 2003, the Company recorded other-than-temporary impairments totaling $3.8 million on two bonds.

Investments on Non-Accrual Status
In accordance with the Company's policy discussed in Note 1, the Company places delinquent bonds on non-accrual status for financial reporting purposes when collection of interest is in doubt, which is generally after 90 days of non-payment. At December 31, 2004, 2003 and 2002, there were $108.1 million, $102.8 million and $102.9 million (face value), respectively, of tax-exempt bonds on non-accrual status. Interest income recognized on these bonds was $5.4 million, $5.0 million and $7.7 million for the years ended December 31, 2004, 2003 and 2002, respectively. Additional interest income that would have been recognized by the Company had these bonds been on accrual status was approximately $3.2 million, $2.4 million and $1.0 million for the years ended December 31, 2004, 2003 and 2002, respectively.

Tax-Exempt Bonds Pledged

In order to facilitate the securitization of certain assets at higher leverage ratios than otherwise available to the Company without the posting of additional collateral, the Company has pledged additional bonds to various pools that act as collateral for senior interests in certain securitization trusts. From time to time, the Company pledges bonds as collateral for letters of credit, lines of credit, warehouse lending arrangements, CAPREIT investments and other derivative

agreements. In addition, at times the Company pledges collateral when providing a guarantee in connection with the syndication of tax credit equity funds. At December 31, 2004 and 2003, the total carrying amount of the tax-exempt bonds pledged as collateral was $537.0 million and $452.3 million, respectively.

80.     In summary, the Company took impairments and valuation allowances of $7.141 in 2004, $6.983 million in 2003, $730,000 in 2002, and $3.256 million in 2001.

81.     The 2004 Annual Report also provides a summary of quarterly results which includes the impairments recorded for each quarter. The Company's impairments charged for its Fiscal Year 2004 included $300,000 in the first quarter, $430,000 in the second quarter, $2.646 million in the third quarter and $3.765 million in the fourth quarter. The Company's impairments charged for its Fiscal Year 2003 included $1.144 million in the second quarter and $5.839 million for the fourth quarter. During its Fiscal Year 2002, the Company took impairment charges for the first quarter of $110,000 and $620,000 for the fourth quarter.

82.     The 2004 Annual Report provided the following with regard to the Company's management of defaulted assets:

Affiliate and Non-Profit Management and Control of Defaulted Assets

From time to time, borrowers have defaulted on their debt obligations to the Company. Some of these obligations were incurred in connection with the development of properties that collateralize the Company's tax-exempt bonds. These properties are sometimes referred to as "defaulted assets." In a number of these circumstances the Company has, after evaluating its options, chosen not to foreclose on the property. Instead and in lieu of foreclosure, the Company has negotiated the transfer of a property's deed in lieu of foreclosure to, or replaced the general partner of an original borrowing partnership with, an entity controlled by and affiliated with certain officers of the Company. The Company has taken this action to preserve the value of the original tax-exempt bond obligations and to maximize cash flow from the defaulted assets. Following the transfer of a property to, or the replacement of the general partner with, an affiliated entity, that entity controls the defaulted or previously defaulted asset, which serves as collateral for the debt to the Company. The Company will refer to all transferees as "affiliated entities" for purposes of this discussion. These affiliated entities include partnerships in which Mr. Joseph has interests, for purposes of this discussion, affiliate entities also include a 501(c)(3) corporation and a non-

35

501(c)(3) corporation that have Board members and officers who are also executive officers of the Company. These officers acting as Board members and officers of the affiliated entities do not have a personal financial interest in the entities. Only Mr. Joseph has a personal financial interest in these partnerships, as described above in the section entitled "Related Party Transactions." A portion of the defaulted assets subsequently ceased to be in default. This result is consistent with the Company's goal of providing tax-exempt income to its shareholders. The following table outlines these affiliate relationships at December 31, 2004:

| (in thousands) [sic][3] Affiliate or Non-Profit Entity | Number of Properties Owned (directly or indirectly) | Carrying Value of Company's Investment at December 31, 2003 |
| --- | --- | --- |
| SCA Successor, Inc. (1) | 2 | $39,781,869 |
| SCA Successor II, Inc. (1) | 12 | 65,339,156 |
| MMA Affordable Housing Inc. and MMA Successor I, Inc. (2) | 1 | 5,991,217 |
| MuniMae Foundation, Inc.(3) | 3 | 52,178,159 |
| Total | 18 | $163,290,401 |

(1)   These corporations are general partners of the operating partnerships whose property collateralizes the Company's investments. All of these general partner investments, except for the Company's Creekside project, are 1% interests in the related operating partnerships. See above for a discussion of Mr. Joseph's interest in these general partners. The property partnerships in which the SCA Successor entities are the general partners include the partnerships in which the umbrella LLC described above is the limited partner.

(2)   MuniMae Affordable Housing, Inc. ("MMAH"), formerly known as MuniMae Foundation, Inc., is a private non-profit entity organized to promote affordable housing. No part of its earnings inures to the benefit of any individual or for-profit entity. Executive officers of the Company serve as directors of MMAH. MMA Successor I, Inc. is a for profit entity owned and controlled by Mr. Joseph. MMAH and MMA Successor I, Inc. are, respectively, the 99% limited partner and the 1% general partner in a partnership whose property collateralizes one of the Company's investments.

(3)   MuniMae Foundation, Inc. ("MMF"), formerly known as MMA Affordable Housing Corp. ("MMAHC"), is a 501(c)(3) non-profit entity organized to provide affordable housing. No part of its earnings inures to the benefit of any individual or for-profit entity. Executive officers of the Company serve as directors of MMF.

The affiliated entities that own and operate the defaulted or previously defaulted assets could have interests that do not fully coincide with, or could even be adverse to, the interests of the Company's tax-exempt bond business. If any of these entities chose to act solely in accordance with their ownership interest in the defaulted or previously defaulted assets, such as selling a property or filing a

---

3 Although the chart in the 2004 Annual Report provides that the amount is "in thousands," yearly comparisons indicate that the numbers are not "in thousands" but are as provided.