**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH S. GELMIS, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EARL W. COLE, III, et al.,<br><br>Defendants. | **CASE NUMBER: 08-CV-00980**<br><br>**JUDGE RICHARD M. BERMAN** |

(Captions continued on following pages)

**DECLARATION OF KIM E. MILLER IN SUPPORT OF THE MOTION OF THE KREMSER GROUP TO CONSOLIDATE RELATED ACTIONS; TO BE APPOINTED LEAD PLAINTIFF; AND TO APPROVE PROPOSED LEAD PLAINTIFF'S CHOICE OF COUNSEL**

| | |
|---|---|
| JULES ROTHAS, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MUNICIPAL MORTGAGE & EQUITY, LLC, et al.,<br><br>Defendants. | **CASE NUMBER: 08-CV-01120**<br><br>**JUDGE RICHARD M. BERMAN** |
| ARNOLD J. ROSS, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EARL W. COLE, III, et al.,<br><br>Defendants. | **CASE NUMBER: 08-CV-01299**<br><br>**JUDGE RICHARD M. BERMAN** |
| ALEX D'ANGELO, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MUNICIPAL MORTGAGE & EQUITY, LLC, et al.,<br><br>Defendants. | **CASE NUMBER: 08-CV-01331**<br><br>**JUDGE RICHARD M. BERMAN** |

| | |
|---|---|
| JUDITH GREENBERG, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL L. FALCONE, et al.,<br><br>Defendants. | **CASE NUMBER: 08-CV-02005**<br><br>**JUDGE RICHARD M. BERMAN** |
| NAOMI RAPAHEL, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MUNICIPAL MORTGAGE & EQUITY, LLC, et al.,<br><br>Defendants. | **CASE NUMBER: 08-CV-02190**<br><br>**JUDGE RICHARD M. BERMAN** |

I, Kim E. Miller, hereby declare as follows:

1. I am member of the law firm of Kahn Gauthier Swick, LLC ("KGS").

2. Movant seeks appointment as Lead Plaintiff pursuant to Section 21D of the Securities Exchange Act of 1934 and Section 27(a) of the Securities Act of 1933 in the above-captioned actions.

3. I submit this Declaration, together with the attached exhibits, in support of the Motion of the Kremser Group for appointment as Lead Plaintiff and approval of Movant's choice of KGS and Brower Piven, A Professional Corporation, as Co-Lead Counsel. I am fully familiar with the facts set forth herein.

4. Attached hereto are true and correct copies the following:

Exhibit A Transcript of April 10, 2008 Status Conference in this Action;

Exhibit B Elk Meadows Investments, LLC Operating Agreement;

Exhibit C *In re Optionable Securities* Litigation, 1:07-cv-03753-LAK, Order dated October 31, 2007;

Exhibit D *In re Optionable Securities* Litigation, 1:07-cv-03753-LAK, Order dated October 16, 2007;

Exhibit E *Slater v. Thornburg* Class Action Complaint; 1:07-cv-00815;

Exhibit F *KT Investments, LLC v. Michael Strauss et. al.*, 2:07-cv-03388-TCP-ETB (E.D.N.Y), Declaration of Kevin Slater;

Exhibit G *Mahler v. Bausch & Lomb, Inc., et al*, 6:01-cv-06190-CJS-JWF, Docket;

Exhibit H Plaintiffs Tom Sneva, Lynne Harrison, Kenneth Z. Slater and Walter Ryan's Motion to Consolidate all Related Shareholder Subprime Derivative Actions and Appoint Lead Counsel for Derivative Plaintiffs in *In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*, 2:08-mdl-01919-MLP;

Exhibit I *Slater v. Central Parking Corporation* Class Action Complaint for Violations of Federal Securities Laws**;** 03-CV-0546;

Exhibit J *Brooks et. al. v. Interlink Electronics, Inc., et. al.*, CV 05-8133 PA Civil Minutes dated July 14, 2006;

Exhibit K Chart of Daryl Bonyor's Trade Data Discrepancies;

Exhibit L Message posted 29 January, 2008 by The Rosen Firm, entitled INVESTOR NOTICE – Attorney Advertisement, at website http://messages.finance.yahoo.com/Business_%26_Finance/Investments/Stocks_%28A_to_Z%29/Stocks_M/threadview?bn=11773&tid=1058&mid=1058;

I declare under penalty of perjury under the laws of the state of New York that the foregoing facts are true and correct. Executed this 17th day of April, 2008, at New York, New York.

/s/ Kim E. Miller
Kim E. Miller

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

JOSEPH S. GELMIS, et al.,

Plaintiffs,

v. 08 Civ. 980 (RMB)

EARL W. COLE, et al.,

Defendants.

------------------------------x

JULES ROTHAS, individually and on behalf of all others similarly situated; and KREMSER GROUP,

Plaintiffs,

v. 08 Civ. 1120 (RMB)

MUNICIPAL MORTGAGE AND EQUITY, L.L.C., et al.,

Defendants.

------------------------------x

ARNOLD J. ROSS, individually and on behalf of all others similarly situated; and KREMSER GROUP,

Plaintiffs,

v. 08 Civ. 1299 (RMB)

EARL W. COLE, III, et al.,

Defendants

------------------------------x

ALEX D'ANGELO, individually and on behalf of all others similarly situated; and KREMSER GROUP,

Plaintiffs,

v. 08 Civ. 1331 (RMB)

MUNICIPAL MORTGAGE & EQUITY, LLC, et al.,

Defendants.

------------------------------x

New York, N.Y.
April 10, 2008
11:45 a.m.

Before:

HON. RICHARD M. BERMAN,

District Judge

APPEARANCES

THE ROSEN LAW FIRM
Attorneys for Plaintiff Joseph Gelmis and Movants MMA Investors Group
BY: PHILLIP KIM
TIMOTHY BROWN

COUGHLIN STOIA GELLER RUDMAN & ROBBINS
Attorneys for Plaintiff Jules Rothas and The Yates Group
BY: DAVID A. ROSENFELD
-and-
BERGER & MONTAGUE
BY: ERIC LECHTZIN

BROWER PIVEN
Attorneys for Plaintiff The Kremser Group
BY: DAVID A.P. BROWER

LAW OFFICES OF CURTIS V. TRINKO
Attorneys for Plaintiff Judith Greenberg
BY: CURTIS V. TRINKO

SPECTOR ROSEMAN & KODROFF
Attorneys for Movant The Rawden Group
BY: DAVID FELDERMAN
-and-
LABATON SUCHAROW
BY: ANDREI RADO
WOLF HALDENSTEIN ADLER FREEMAN & HERZ
Attorneys for Plaintiffs First Affirmative and Kenneth Slater
BY: THOMAS H. BURT
GEORGE PETERS
CLIFFORD CHANCE
Attorneys for Defendant Municipal Mortgage and Equity, L.L.C.
BY: JAMES B. WEIDNER

RICHARDS KIBBE & ORBE
Attorneys for Defendant Melanie Lundquist
BY: NEIL S. BINDER

(In open court)

THE COURT: As I understand where things stand here, we were in the middle of a briefing schedule for lead plaintiffs and lead counsel with the initial briefs having been filed on or before March 31 and opposition briefs are due April 17.

Let me see at the outset, are there going to be opposition briefs?

MR. ROSENFELD: Yes, your Honor.

MR. KIM: Yes, your Honor.

THE COURT: And then replies are due by April 28. So, I would like in everybody's subsequent filing, and I mean everybody who has filed already, whether they put it in I guess in the reply if they're plaintiffs that we're talking about, I would like every plaintiff to indicate who they think is the lead plaintiff under the PLSRA, because I didn't think there was as much room for debate in these matters, and it is only the initial set of briefing. But so now that you all have seen the other briefs, and I would like everybody's view as to who is or should be the lead plaintiff.

And has anybody so far or is anybody planning such that they would say so publicly to not be considered further as a lead plaintiff?

I take that as a no. I think I must have misread. I didn't read them in detail, but I must have misread some of the

motions. So everybody here still thinks they are lead plaintiff. Is that right?

MR. KIM: Yes, your Honor.

THE COURT: Let's hear, for example, what the loss is of your client and how that makes you the lead plaintiff.

MR. KIM: Your Honor, my name is Phillip Kim and we represent the movants MMA Investors. We have --

THE COURT: This is just a partial, but I'm just curious so you --

MR. KIM: Based --

THE COURT: Your firm is?

MR. KIM: We are the Rosen Law Firm and we've moved on behalf of the MMA Investors. We have claimed losses of a little over a million dollars. I believe there are two movants ahead of us that claim higher losses, however, we believe that it will play out in the briefing that these claimed losses are not compensable losses.

THE COURT: How do you aggregate your losses?

MR. KIM: We have five clients.

THE COURT: Yes.

MR. KIM: The way we aggregated the losses --

THE COURT: Under the law. Not the way you aggregate. I know how you aggregated, you added them together. But how under statute, how did you aggregate them?

MR. KIM: There were five clients of ours who wanted

to work together.

THE COURT: I didn't read that anywhere in the statute that there is a want-to-work-together provision that calls for -- I'm serious about this. I'm dead serious. Because if you submit motions, and I'm not suggesting that you are, that's why I'm saying that in the next submission I expect everybody to have the next submission, that they say to me and explain with cases how they are the lead plaintiff. And I don't mean this personally, I think it is a good example, but apart from this notion of wanting to work together, I don't know how legally your losses are aggregated.

MR. KIM: Sure. We'll address those issues. There are also other aggregated groups as well.

THE COURT: This is a good time. So it will help me.

MR. KIM: Under the PSLRA contemplates that the lead plaintiff can be a person or a group of persons. There is a body of case law that allows the aggregation of investors who even may be unrelated.

THE COURT: Who want to work together?

MR. KIM: Yes, who have no prior existing relationship.

THE COURT: I'm not familiar with those cases.

MR. KIM: There are also a line of cases that say that's not okay. That will be up to the Court to decide.

THE COURT: No, no. I don't think people are hearing

me in this room. I'm saying that I want briefs that don't say on the one hand and on the other hand. I want briefs that -- and if there is no valid legal basis for your not being lead plaintiff, I suggest you say that --

MR. KIM: All right.

THE COURT: -- in your brief. I'm not looking for throw it up against the wall and see what sticks. I'm looking for a legal analysis. And that's why I say to you, and I'm only midway through the briefing schedule. But I'm not interested in wasting your time, counsel, if in fact there is no viable basis for you to claim you have the lead plaintiffs. Get it?

MR. KIM: Understood, your Honor. We believe we do.

THE COURT: I hope so because you made a filing to that effect.

MR. KIM: Yes.

THE COURT: But I am suggesting, I don't know if you're hearing me even yet, that you take a hard look at your position when you come to file the reply.

MR. KIM: We will, your Honor. We will.

THE COURT: Who else, anybody else in this same category? Which group do you represent?

MR. ROSENFELD: David Rosenfeld on behalf of the Yates Group. The firm Coughlin Stoia. PSLRA does contemplate that a group of plaintiffs can be appointed appropriately as lead

Transcript-April 10 Hearing
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8
84A3ROTC Conference

plaintiff. The number of courts --
THE COURT: Those that want to work together, the same theory he has?
MR. ROSENFELD: That's correct, your Honor. And a number of courts have actually favored groups, given that it provides for a diverse representation. Better chances of surviving class certification and --
THE COURT: You have a court of appeals case from the Second Circuit?
MR. ROSENFELD: No. The Second Circuit has not addressed the issue, your Honor. But there is a split among the district courts, judge specific, not only southern and eastern, but judge specific, about whether or not groups of lead plaintiffs are appropriate.
THE COURT: What does the statute provide?
MR. ROSENFELD: The statute is not clear. The statute says group of plaintiffs. So it does give you the option to allow groups of plaintiffs. And because of that, courts have appointed groups of individuals who wanted to work together. And a number of courts have actually required a showing that these investors have spoken prior to the filing of their motions and they have a plan in place to work together. We've actually submitted a joint declaration of our clients to that effect showing that they did have a conference call.
THE COURT: If you didn't aggregate, you would not be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9
84A3ROTC Conference

the lead plaintiff; isn't that right?
MR. ROSENFELD: Not necessarily, your Honor.
THE COURT: How would you be if you didn't aggregate?
MR. ROSENFELD: Aside from the actual size of the financial interests, there is also --
THE COURT: Financial interest or is it the loss?
MR. ROSENFELD: Well, it is financial interest is what it required for lead plaintiff. It is the movant who represents --
THE COURT: Not the loss sustained?
MR. ROSENFELD: Well, there is a difference between financial interest and damages.
THE COURT: I am not talking damages. I am talking about losses sustained. You don't think that's relevant?
MR. ROSENFELD: Well, it depends how you calculate losses.
THE COURT: How do you calculate them and then you get to be lead plaintiff if you don't aggregate in your case?
MR. ROSENFELD: Well, your Honor, putting aside the number for a moment, it is not only who represents the largest financial interest, but there are also issues with respect to the adequacy and typicality of the lead plaintiff movants.
THE COURT: I am not there. I'm somewhere else. I am trying to figure out how, if you don't aggregate, you become the lead -- your client becomes -- which one of your clients

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10
84A3ROTC Conference

becomes the lead plaintiff?

Page 5

MR. ROSENFELD: Well, your Honor, Mr. Yates, who is the namesake of our group, he represents the largest financial interest from our members with a loss of $237,000.

THE COURT: He would be the lead plaintiff?

MR. ROSENFELD: If the Court was inclined to appoint only one investor --

THE COURT: You don't think anybody else that submitted a motion has a greater loss than Mr. Yates?

MR. ROSENFELD: They may have reported a greater loss.

THE COURT: What?

MR. ROSENFELD: They may have reported initially a greater loss. We do believe they have issues either with respect to their adequacy or typicality or the way they calculate their losses.

For example, some of the movants sold their entire position prior to the slowage of the fraud, so they would have great -- tremendous issues demonstrating loss causation.

THE COURT: You think on an individual basis Mr. Yates is the lead plaintiff?

MR. ROSENFELD: I think he has a good shot.

THE COURT: I don't know what "good shot" means.

MR. ROSENFELD: Well, your Honor --

THE COURT: This is not a crap shoot.

MR. ROSENFELD: I understand that.

THE COURT: No, you don't. I don't think you do. It doesn't sound like I'm making myself clear here, you know. I don't think this is a lottery. I think this is a lot more objective than maybe you all think.

And so if you're thinking that you have a shot, as it were, I don't understand that idea. I only understand the idea that you can persuade me legally. And I am trying to understand how you can persuade me legally that Robert Yates would be the lead plaintiff if you don't aggregate.

MR. ROSENFELD: Well, your Honor, in addition to having the largest financial interest, as I was saying beforehand, there is also a requirement to show that the other movants are adequate and typical.

THE COURT: Talking about Mr. Yates, tell me why Mr. Yates would be the lead plaintiff in this case.

MR. ROSENFELD: Well, Mr. Yates is --

THE COURT: Do you know him?

MR. ROSENFELD: I've spoken with him.

THE COURT: Yes. You ever met him?

MR. ROSENFELD: Personally, no. But I've spoken with him on the phone. He is very interested in this case.

THE COURT: Once, twice?

MR. ROSENFELD: Two or three times.

THE COURT: Okay.

MR. ROSENFELD: And other attorneys from my firm have

spoken with him as well.

THE COURT: Right.

MR. ROSENFELD: But we believe that he has a very strong financial incentive to pursue this case. He is very motivated to pursue this case. He wants to pursue this case.

THE COURT: Motivation, I bet you every one of these

people sitting in this room, I bet you every one of them has spoken to a client who is motivated.

MR. ROSENFELD: I'm sure that's correct.

THE COURT: Motivation probably be a wash, I would say.

MR. ROSENFELD: It would be a wash.

THE COURT: It wouldn't be?

MR. ROSENFELD: It would be a wash.

THE COURT: So give me something more tangible than motivation.

MR. ROSENFELD: Your Honor, we are in the process right now of evaluating the other movants, and going through our analysis of their numbers, the way they have arrived at their numbers, and the issues with respect to their adequacy and typicality. If we determine that there is a legitimate basis for pursuing the motion further, we will file an opposition brief. If after reviewing the information we come up with nothing, we realize there is no opportunity for our clients to be lead plaintiffs, we will not file a motion. A

brief.

THE COURT: Well, I am expecting -- what I am trying to say is I am expecting everybody to file something.

MR. ROSENFELD: That's right. I know. I meant in further support.

THE COURT: To tell me whether they're still in or whether they're not in --

MR. ROSENFELD: That's correct, your Honor. That's correct.

THE COURT: That's what I am expecting.

MR. ROSENFELD: That's exactly what we intend to do.

THE COURT: Anybody else want to be heard?

MR. BROWER: David Brower. We represent the Kremser Group. I am going to try to answer some of the questions you posed to my colleagues because I don't think they completely answered.

First of all, the statute provides that it is the plaintiff with the largest financial interest in the relief sought by the class. I think your Honor understands the relief sought by the class, which would certainly be the damages in the case and the recovery of what has been lost in the litigation, which may have nothing to doing with market losses, but clearly the course --

THE COURT: Which of your clients?

MR. BROWER: Mr. Kremser, who has $555,000.

Mr. Kremser, if you look at the papers, and I'm going to answer the Court's question now, if you look at the papers, right now there are three movants who have the largest claimed losses among all of the rest of the movants. Okay. Those are the First Affirmative Financial Network, who is the Wolf Haldenstein client, Mr. Burt's client. KT Investments and Kendall Investments, which are I believe are claimed to be the same entity, they've put them together. If you treat them separately one has 423 and one has 267.

THE COURT: So your Mr. Kremser would be larger than all but one of those. You would be number two to FAFN?

MR. BROWER: Correct. You are going to say why don't I step aside.

THE COURT: I am not urging anybody to step aside. Because I haven't read all the papers. But now that you've raised the question, it is an interesting hypothetical.

MR. BROWER: Happy to respond. As my colleague from Mr. Coughlin's firm was trying to explain to the Court, there are three requirements to be the lead plaintiff. One is that you have the largest financial interest.

THE COURT: You would lose on that by $200,000.

MR. BROWER: Correct. Second, that you are typical of the members of the class and that you will adequately represent the class. We believe we will demonstrate beyond gain set that Affiliated -- whatever it is calling itself -- cannot and is

not a member of the class. Never mind adequate or typical, they have to -- to move, the first step before you start looking at the financial loss and that sort of stuff, are they a member of the class. We are going to demonstrate that entity is not a member of the class.

And even if it were a member, arguably a member of the class, it is not typical nor adequate to represent the class. That's going to be the fight. And I think your Honor knows from experience --

THE COURT: The fight is between two of you.

MR. BROWER: What I've heard is I'm going to see motions from everybody saying everybody is no good.

I should point out to the Court there is an elephant, there is one of these 800 pound elephants in the room. Everyone sitting here are experienced lawyers. There is case law out there that says you cannot reconstitute your group after the motions are made. And everyone is kind of afraid to bring that up. What people are concerned about is once Mr. Berger Montague's firm moved with this group of six people to carve out Mr. Yates, is contrary to some of the case law that says you can't redo your motion after you make it, you're stuck with your group.

It doesn't allow, for instance, the two groups to go talk to Mr. Burt and say we have the two largest people, let's not make defendants happy and have a big fight, let's put

together our two largest people and go forward with that, which would in this case be almost $2 million, would be a million and a half bigger than everybody else, and frankly not subject to -- ours is not subject to any meaningful attack. You can make up anything you want. There are very creative lawyers here. At the end of the day there is going to immaterial sort picky stuff. But people are afraid to do that. They are afraid what the Court is going to do is look at those cases. The one person who doesn't do it who comes in third or forth is going to say this case in the Southern District of Florida or this case in the Northern District of California where someone tried to reconstitute a group, and boom, they were thrown out automatically. Because the argument under those cases is your motion is your motion when you meet the 60-day deadline, and anything you do after that is a new motion, and that makes it moot because it's too late.

That's the 800 pound gorilla in the room.

The problem is, your Honor, except for one movant who I am not sure counsel is even here today representing that movant, who has a $43,000 loss, everyone is a group of unrelated people. There is no debate about that. Every one of these groups was aggregated. Aggregation is appropriate under lots of the case law. The statute kind of suggests that an aggregation has been going on since 1995. And there are tests for what's proper aggregation and not proper aggregation. And

it is pretty clear now you don't have to have people who are related to have proper aggregation, but you do have to meet certain requirements when you make your motion to demonstrate your group is really a group. Because we go back to what I said earlier with regard to Affiliated whatever it's called, Mr. Burt's client, you have to be a, quote, member of the class when you make your motion. That's step one.

Then you go into whether you have largest financial interest and otherwise meet the requirements of Rule 23. You also have to be a proper group, as that term is understood under the PSLRA when you make the motion. You can't repair your group later.

At the same time, if the Court is kind of indicating to the parties it wants to hear from the largest individual members of each of these groups, and why that person or entity is the proper lead plaintiff as opposed to the other lead plaintiffs, because we all know what everybody claims each member's losses are, they are in all the papers, your Honor had those numbers, they're there. Well, then, I am sure the parties are happy to talk to the members of their groups and give them the Court's inclinations on this and advise them like we advise any other clients.

But the moving plaintiffs here are in sort of a Catch-22 circumstance. To satisfy the Court, what the Court seems to be indicating it's interested in hearing --

THE COURT: No, no. You would have me wrong because I'm not giving you any direction. I'm just giving the direction that you have to comply with the statute.

MR. BROWER: I understand.

THE COURT: I will do my best to figure out who is the lead plaintiff in compliance with the statute. I am not pushing you in one direction or another.

MR. BROWER: I understand. I will note courts have sua sponte or at invitations of parties, typically at footnotes, reached in and taken the largest satisfactory members of a group or groups and appointed them as lead plaintiff in cases, because the Court's obligation is obviously to the class at the end of the day.

THE COURT: Yes, but I'm not going to do your work for you, so to speak. That's not my intention. So I'm looking for a brief that explains and does so to the best that I understand the law and in compliance with the law. That's who I'll pick as lead plaintiff.

MR. BROWER: I hope I answered the Court's questions.

MR. RADO: I'm Andrei Rado. My firm represents the Rawden Group. I don't want to get into the motion. I've heard

Transcript-April 10 Hearing

what the Court has said. I can assure the Court we won't be wasting anyone's time. If there is no basis to continue with our motion, we won't do so.

I think the real elephant in the room is there are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

84A3ROTC Conference

parallel proceedings in the District of Maryland.

THE COURT: So far, I can only deal with one case at a time. I've got enough on my hands with this case in the Southern District for the moment.

So if counsel is right that everybody has submitted a group, then why is it -- well, I am not really asking that question. You are saying if all other things were equal, I would just add up the size of the group and the largest group would win.

MR. BROWER: That --

THE COURT: If the other criteria were met, if they were members of the class and they were typical.

MR. BROWER: If you're a member of the class, if the people, you look at the loss, you look at when they lost their money.

THE COURT: Do you think all these groups are legal groups under the statute? You are saying everybody's a group.

MR. BROWER: The answer is no.

THE COURT: You are saying you are allowed a group --

MR. BROWER: No. But they're not, and I will tell you why without pointing fingers today.

THE COURT: I understand.

MR. BROWER: But I will tell you why. The threshold question has to be are you a member of the class in order to be in the group.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

84A3ROTC Conference

THE COURT: Right.

MR. BROWER: And because we believe there are several members of various groups who are not legitimate class members as a matter of standing under federal securities laws, they're out. You throw them out, and then readd up the losses of the groups.

THE COURT: Got it.

MR. BROWER: They're back with the individual movant with 42,000. Some of them are back behind those guys.

THE COURT: You think the case law is such that if they're in the class you can group as you wish?

MR. BROWER: If they're in the class you can group as you wish, provided they have met the requirements to be an appropriate group as that term has been interpreted by the courts that allow groups. And as was indicated, there is some split, but there is some very, very well reasoned lengthy case law on this issue. It is now 12, 13 years under the statute. There are a lot of cases, there has been a lot of litigation of groups, and there is a lot of law on the issue both in this district, within this circuit, and all over the country. And everybody looks to everybody else on this issue. We're dealing with federal statute after all.

And what you need -- there was some discussion of the kinds of things courts have looked to to determine whether the group is a cohesive, functioning entity. Because at the end of

SOUTHERN DISTRICT REPORTERS, P.C.
Page 10

Transcript-April 10 Hearing
(212) 805-0300
21
84A3ROTC Conference

the day the idea is to find the, quote, most adequate plaintiff. When it is a group, you need to know it can function as a plaintiff like a human would function, give instructions to his lawyer, control the litigation, supervise the litigation.

Aggregations of hundreds of people, which were done in 1995 and 1996, people would get hundreds of people with 10 shares. Courts have said no, that's not happening.

THE COURT: How about aggregation of a husband and wife?

MR. BROWER: Aggregation of a husband and wife is the classic aggregation, but they are two people. They would be treated as two. Because they're not a single entity. Husbands and wives are no longer considered a single entity in this country. You have to demonstrate they can work together. That both of them are bringing their business acumen to the table, to instruct the lawyers. Otherwise you have one person who is actually the plaintiff and one person who is a tool. And the statute is you can't have a member of a group who is a non-entity, who is there for show.

But assuming they are both willing to do their job, married people are the classic related aggregated group of two. And then they can join other people if those other people have a mechanism for working together.

Another perfect example is Fidelity. That's what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22
84A3ROTC Conference

Congress had in mind, if you look at the legislative history, it is the mutual funds, we're going to come in as plaintiffs in securities cases. Putting aside the naivete of Congress when they thought those would be the lead plaintiffs, what they were thinking is a family of mutual funds that were controlled by Fidelity, and all purchased the same stock, would come in together as a group. So that would be another example of the classic related group.

Again, none of the groups here as currently constituted are groups of related persons.

THE COURT: I get it. So do the Rawdens get along?

MR. RADO: Yes. As far as I know, the Rawdens get along quite well.

THE COURT: Neither one of them is a tool?

MR. RADO: Not my tool in any event. The judge in Maryland is presiding over the same motions as are before this Court. It is the same action, the same litigation, the same class action, the same defendants.

THE COURT: Right.

MR. RADO: There is going to be -- the venue issue will have to be resolved before this case proceeds to any point.

THE COURT: Right.

MR. RADO: What some Courts have done is simply hold off until that venue issue is resolved either by 1404 motions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23
84A3ROTC Conference

filed with the district courts or an MDL panel motion. And I just want to mention that to the Court, if that's something

Page 11

that could be done.

THE COURT: Wouldn't it be sensible to figure out who the lead plaintiff is and then to invite that person to, if they want to, make a motion to transfer the case to Maryland or not, to entertain it at that point?

MR. RADO: That would be one way to do it.

THE COURT: If you did it now, there might be a wide difference of opinion among all of you.

MR. RADO: Right. There is nothing preventing the judge in Maryland from also ruling on the motions before him.

THE COURT: I recommend it. No. That's a little too strong. But I certainly have no opposition -- I have no, actually, no position on what the judge in Maryland should do. I think the judge in Maryland should be free to do whatever he or she thinks is appropriate.

So, but what are you trying to say?

MR. RADO: What I am suggesting is the best course may be to wait until these issues are resolved. Maybe we can hear from defendant.

THE COURT: Wait until they are resolved by who?

MR. RADO: By either defendants who may file an MDL motion. That's often how they are resolved. Or by the plaintiffs themselves who may wish to transfer the action. Or

maybe we can hear about where they think the case should be.

THE COURT: I get that. There is an issue I am trying to think how does it happen. We could wait. I am sure something will happen if you wait long enough.

MR. RADO: The defendants can move for an MDL in a situation like this. We have five cases or six cases in one jurisdiction, I think five in another. It make sense to do that as opposed to have every case transferred under 1404.

MR. WEIDNER: I'm James Weidner from Clifford Chance. We represent the corporate defendant. We have no dog in this particular fight here. Where we did have a dog --

THE COURT: Which fight?

MR. WEIDNER: Lead client.

THE COURT: You don't care about that. Do you care about venue?

MR. WEIDNER: Yes. What we care about is all the cases -- all of them -- be consolidated before one Court. Since the plaintiffs don't seem to have any inclination for filing a motion in that respect, we will within the next week file a motion under 1407 before the MDL panel.

THE COURT: You are going to make an application to have all the cases -- are they pending in any other jurisdictions?

MR. WEIDNER: No. Just two jurisdictions, Judge.

THE COURT: How many cases all together?

MR. WEIDNER: 14 I believe.

MR. BROWER: There are 11.

MR. WEIDNER: There are 11 now? Judge, apparently my chart is out of date. There are 11.

THE COURT: You will be doing that --

MR. WEIDNER: Within the week.

THE COURT: Well, that answers your question.

MR. RADO: Yes.
MR. WEIDNER: Probably this venue.
THE COURT: Anybody else?
MR. BURT: Your Honor, Thomas Burt, Wolf Haldenstein. I represent the First Affirmative and Ken Slater Group. As you already heard --
THE COURT: He says you are not even a class member. Should I let you talk?
MR. BURT: I think you should, Judge.
THE COURT: You may not have standing even.
MR. BURT: As Mr. Brower said, Congress did intend investment advisors like Fidelity. First Affirmative is an investment advisor. And has --
THE COURT: You are talking about FAFN?
MR. BURT: FAFN is First Affirmative Financial Network, Judge. I'll answer a question you asked somebody else. I know those folks for six years now.
THE COURT: Which folks?

MR. BURT: First Affirmative. I know their CEO, I know his right-hand man, I know --
THE COURT: No tool in that group, huh?
MR. BURT: I have met them. These are not people that I've only known for three weeks. I've known them for several years.
First Affirmative has the standing to pursue the lawsuit. That's going to come out in the briefing. And we'll deal with it.
THE COURT: How does he think you're not in the class? I won't hold you or them to it.
MR. BROWER: Me?
THE COURT: No. You are the one who thinks it. You're confident that FAFN is a class member?
MR. BURT: Yes, Judge. It is -- unless Mr. Brower has thought of something so creative that it is outside of my imagination.
THE COURT: He may have.
MR. BURT: Whether the investment advisor can pursue losses. When he looks into it, he'll find that we have dotted our i's and crossed our t's.
THE COURT: So you think that -- you have a group too in addition to FAFN?
MR. BURT: We do, Judge. Interestingly enough, depending on how you count the class period, whether you count

the last day or not, which there is a difference of one day. Kenneth Slater, and Mr. Brower said before that Slater is two entities. Not really. It is all his mother's money.
THE COURT: Where is he? I'm looking.
MR. BURT: The FAFN Slater Group. The other half is Ken Slater on behalf of family money, two trusts that are simply the assets of one person.
THE COURT: I see.
MR. BURT: It is all his mom's money.
If you include the last day of the class period, there his losses go up so that -- I don't have it right in front of me, but it is almost a tie with the Rawdens together. I

thought the Court should know the lay of the land is really Affirmative Slater, the Rawdens if taken as a couple, and everybody else much further back, Kremser being fourth.

That's about all I have to say, Judge.

MR. BROWER: Your Honor, I didn't say advisors. Mr. Burt reworded what I said. I said mutual funds. Mutual funds are corporations that own the securities they purchase. And you buy shares in mutual funds. Investment advisors, particularly FN whatever.

THE COURT: FAFN.

MR. BROWER: Doesn't own the shares. That's why he has no standing. They are individual accounts belonging to individual customers. Whether or not they have authority to

bring lawsuits -- whether your broker, Merrill Lynch, can take your brokerage account, and if you lost money, go off and where it has some discretion to trade for you, go and off and bring lawsuits for you under a statute that also has a fee shifting provision, is a real question. And I'm pretty sure --

THE COURT: What's the answer to it?

MR. BROWER: I haven't seen -- the papers were not attached to the motions as they often are.

MR. BURT: Judge, the answer to that is courts have required a few different things. But if you have express permission or express power of attorney as an investment advisor, you can pursue the loss of your beneficial owners as you act as an attorney in fact, even without a express provision. You definitely can. There are some cases that say mere investment discretion is enough. I don't know if those cases have the better of the law. Mr. Brower can brief it.

THE COURT: What's the basis for FAFN?

MR. BURT: Express power.

THE COURT: You have written authorization from --

MR. BURT: They have either been executed or will be executed. Either have been executed or will be executed, the beneficial owner --

THE COURT: How did the "will be executeds" come into play?

MR. BROWER: We'll need some discovery if they do

this.

MR. BURT: Will be executed comes into play in that after checking with the beneficial owners to make sure they wanted First Affirmative to pursue the loss in this forum, they were going to execute limited powers of attorney to make it clear they had the power to do so, to forestall any objection to their standing. And whether those have actually been signed or in the process I think doesn't matter. By the time the opposition comes in, it will be done. If they have the express power to do it from the beneficial owners, then they can do it. I don't think Mr. Brower is going to tell you that it is not the law that if they have an express power of attorney to go forward that they have it.

MR. BROWER: I will tell him he's too late.

THE COURT: How much worth of losses do you have in your hand now, express powers?

MR. BURT: I don't know.

MR. BROWER: The question is when this motion was filed.

THE COURT: You don't know?

MR. BURT: I don't know. I don't know what's been signed.

THE COURT: That's puzzling. How could you not know it?

MR. BURT: Because I'm dealing with First Affirmative,

the head office in Colorado Springs.

THE COURT: Yes.

MR. BURT: Then there is a rep, then there's several clients who are beneficial holders.

THE COURT: Yes?

MR. BURT: So --

THE COURT: So to your knowledge nobody's signed.

MR. BURT: I don't reach out directly to the clients of First Affirmative.

THE COURT: I am trying figure out what you know. To your knowledge nobody has authorized you to --

MR. BURT: To my knowledge, everybody has told First Affirmative that they have the authority to go forward. Who has actually signed the limited power of attorney, I don't know. And who just hasn't signed it, knows that they want First Affirmative to do it and has received the piece of paper, signed it and returned it, I don't know. But I know that everybody's told First Affirmative to go ahead.

THE COURT: "Everybody" being how many people?

MR. BURT: I don't know exactly. It is between two reps. One of whom it's entirely family money, and I know the rep and the family. And the other one is another broker with several investors. How many is "several," I don't know. A handful. It is not 300 people, Judge. It is one rep with family money and one broker with several clients, but "several"

being not hundreds. "Several" being a small number.

MR. BROWER: Your Honor, of course the issue is when they made a motion.

THE COURT: I get it.

MR. BROWER: Moreover, if you look at their numbers --

THE COURT: I think this is a very helpful conversation.

MR. BROWER: I think Mr. Burt made the point his numbers are also very weird because what they did is they took separate accounts and they aggregated them as though they were one account.

THE COURT: I'll read all this in the oppositions.

MR. BURT: In any event, Judge, Mr. Slater also has losses that are far larger than Mr. Kremser.

THE COURT: How about big are Mr. Slater's losses?

MR. BURT: If you don't count the last day, they're 690, Judge. If you do count the last day I believe they are 794. That's all one person's money.

MR. BROWER: But not Mr. Slater's, apparently, according to Mr. Burt.

MR. BURT: Judge, Mr. Slater is attorney in fact for his mother's affairs. And in fact Mr. Brower's previously

Transcript-April 10 Hearing

represented Mr. Slater. I think he knows that.

MR. BROWER: I have no idea.

THE COURT: Okay. I've heard enough. So I'll look

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

84A3ROTC Conference

forward to the additional briefing in this case.

Nice to see you.

oOo

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 16

# EXHIBIT B

# *OPERATING AGREEMENT*

**OF**

**ELK MEADOWS INVESTMENTS, LLC**

THIS OPERATING AGREEMENT is made and entered into this 8th day of December, 1995, by and between the members whose signatures appear on the signature page hereof.

The following Articles, together with any amendments hereafter made, shall constitute the Operating Agreement of Elk Meadows Investments, LLC, a Colorado limited liability company (hereinafter "Company"). Unless otherwise contravened or superseded by statutory mandate, these Articles shall control and direct all aspects of the relationship of the Company's members to the Company and to each other, and shall control the operation of the Company throughout its duration. To the extent this Agreement is silent on any operating issues, the provisions of the Colorado Limited Liability Company Act which pertain to such issues, if any, shall control.

## ARTICLE I

Formation of Company and Records

Section 1.1 Formation and Purpose. The Company was formally organized under the laws of the State of Colorado on December 8, 1995, upon the filing of Articles of Organization with the Colorado Secretary of State in accordance with and pursuant to the Colorado Limited Liability Act. The purpose for which the Company is formed is to hold investments of all kinds, including real estate, cash, marketable securities and other intangibles property. The Company may carry on any and all activities relating to such purpose.

Section 1.2 Name, place of business and registered agent. The name of the Company is ELK MEADOWS INVESTMENTS, LLC, a Colorado limited liability company. The principal office and place of business of the Company shall be located at 784 Yankee Creek Road, Evergreen, CO 80439. Other offices may be established either within or outside the state of Colorado as the manager may designate or as the business of the Company may from time to time require. The initial registered agent of the Company as required by the Colorado Limited Liability Company Act is DAVID A. KREMSER. The manager (or managers by consensus if there are two or more managers) may, at any time, designate any other person of the minimum age of twenty-one years to act as registered agent. Any such change shall be reported to the Colorado Secretary of State within fifteen days of such action.

Section 1.3 Business and tax records. The managers shall insure that business and financial records appropriate to the business being conducted by the Company are maintained from year to year, which records shall be in accordance and compliance with the requirements of the Colorado Limited Liability Company Act. The managers shall be authorized to hire and compensate accountants and other professional advisers for such purpose from time to time. Copies of annual financial statements shall be furnished to any member upon request, however the managers shall make reasonable efforts to ensure that tax reporting information, such as K-1 schedules, shall be prepared and sent to all members not later than March 31 of each year. If at any time the Company shall have more than ten members, then DAVID A. KREMSER shall act as the IRS Tax Matters Partner with respect to all federal tax compliance and audit matter.

## ARTICLE II

### Members, Meetings & Voting

Section 2.1 Names of initial members. There shall be one class of membership in the Company, with all membership interests having the same rights and obligations. The initial members of the Company are:

DAVID A. KREMSER
HOLLY M. KREMSER
MICHAEL P. KREMSER
STANLEY A. KREMSER
BERNICE E. KREMSER

Additional or substituted members may be admitted to the Company as hereinafter provided. Any new or substituted member shall become a party to, and shall execute, this Agreement by subscribing his or her name hereto in such manner as the managers shall direct. Any member may withdraw from the Company at any time, however such member's rights, liabilities and obligations upon withdrawal shall be controlled by Colorado law and the terms and conditions set forth within this Operating Agreement.

Section 2.2 Member meetings. An annual meeting of members shall not be required. The managers of the Company may, however, call for an annual or more frequent meeting from time to time as they may deem necessary or advisable. The notice of any such meeting may be issued by telephonic message, or in a writing mailed or faxed, to each member at least ten days prior to the meeting date. Any such meeting shall be held at such time and place as the managers may designate in the notice of meeting. Meetings may also be held by telephonic conference if the managers so request. Special meetings of members may be called at any time or times by a Company manager, or by at least one-half of the then members who are eligible to vote. Verbal or written notice stating the time, place and manner of the special meeting and the purpose for which the meeting is called shall be given or delivered not less than ten days before the date of the meeting. Such notice may be by telephonic message, mail or fax, by or at the direction of any manager or person calling the meeting to each member of record entitled to vote at such meeting.

Section 2.3 Waiver of notice. Any member shall be deemed to have waived notice of any meeting if he or she attends such meeting in person, or if he or she has participated in a telephonic meeting; such attendance shall further constitute a waiver of any objection to lack of notice or defective notice unless such objection is stated at the outset of such meeting.

Section 2.4 Action by members without a meeting. Any actions required or permitted to be taken at a meeting of members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each member entitled to vote and delivered to the managers of the Company for inclusion in the minutes or for filing with the Company records.

Section 2.5 Voting. Each member shall be entitled to vote, based upon his or her percentage of capital interest in the Company, in person or by proxy, in regard to all actions or matters requiring the vote of the members. For purposes of simplicity and convenience, each member shall be deemed to posses that number of votes which equals his/her/its percentage of capital interest, rounded to the nearest whole number. Thus, a member possessing a capital interest of 37.10% shall have 37 votes, while a member possessing a 4.60% capital interest shall have 5 votes. A majority of the members entitled to vote shall constitute a quorum at any meeting of members. If a quorum is present, unless a greater vote is required by terms of this Agreement, the affirmative vote of the majority in interest of the members represented at the meeting and entitled to vote on the subject matter shall be the act of the members. If the members have signed a consent to any action without a meeting, such consent shall constitute the vote of such member's interest in the Company in the manner described in such consent.

Section 2.6 Member right to information and accounting. Any member shall have the right at reasonable times to inspect and copy any and all records pertaining to the Company, including, but not limited to, tax records and tax returns, minutes of meetings, bank records and any contracts or other documents creating legal relationships between members and the Company, or the Company and third parties.

## ARTICLE III

### Membership Certification and Transfer Restrictions

Section 3.1 Membership certification. The ownership interest of each member shall be evidenced by a "Certification of Ownership Interest" which shall be appended to this Operating Agreement as Exhibit A. Such Certification shall be updated whenever there is any change in membership or ownership interests. In their discretion, in addition to the required Exhibit A, the managers may also issue separate "certificates of ownership" evidencing the membership units of ownership held by each member. Such certificates, if issued, shall be in the form depicted in Exhibit B hereto. All affected members shall submit their certificates for cancellation upon the request of a manager whenever ownership interests change. Any transferee who does not become a member, as hereinafter provided, shall have his/her interest in the Company reflected in the

Certification of Ownership Interest in such manner as the managers may elect. In all events, the record of membership and transferee interests as reflected in the most recently executed Certification of Ownership Interest, as attached to this Operating Agreement as Exhibit A, shall control and shall constitute binding evidence as to the interest of all members in the Company.

Section 3.2 Membership transfers to "qualified transferees." Any member may, without member consent, sell, assign, gift or bequeath all or any portion of his or her membership interest in the Company to any "qualified transferee." A "qualified transferee" shall mean any person or entity who is already a voting member of the Company at the time of the transfer. A member may also transfer his/her interest to an inter-vivos trust, or bequeath to a testamentary trust, in compliance with this section if such trust does or will eventually distribute its corpus to or for the benefit of a person who is a qualified transferee. Any such sale, assignment or gift shall be in writing (or shall be evidenced by a writing), a copy of which must be delivered to the managers of the Company within fifteen days following the date of execution of such sale, assignment or gift. In the case of a transfer by bequest or intestate succession, the personal representative or administrator of the deceased member's estate (or his trustee) shall notify the Company managers in writing of the fact of such transfer, and shall include therewith documentary evidence of the entitlement of the transferee to the interest so transferred.

Section 3.3 Effect of transfers to non-qualified transferees. In the absence of member consent, any assignment to a person or entity who is not a qualified transferee shall constitute an assignment of economic interest only. The transferee shall not thereby become a member of the Company except as provided in the remaining provisions of this Agreement. The transferee shall be entitled only to the share of Company profits, income and distributions that the disposing member would have been entitled to pursuant to the Operating Agreement or any contract with the Company. In all events, the transfer or assignment of a Company interest shall not cause a termination of the Company's existence.

Section 3.4 Disposition of member interests during life - right of first refusal. Any member who desires to sell, or in any other manner dispose of, all or any portion of his or her interest in the Company to any person who is not a qualified transferee may do so, provided he or she first complies with the following provisions of this section 3.4:

(a) The disposing member shall first offer his/her entire interest to the Company and the remaining members at a price, and upon terms, as set forth in section 3.6 of this Article.

(b) The Company shall have a first right of refusal to acquire all or any portion of the disposing member's interest, which option shall be exercisable within thirty (30) days of the date of its receipt of written notice of proposed sale or transfer from the disposing member. To the extent the Company does not exercise its option, the remaining members shall, on a basis pro rata to their capital interests or on a basis pro-rata to the capital interests of those remaining members exercising their right of first refusal, have the co-equal right to exercise a right of first refusal to purchase all or any portion of the remaining interest of the disposing member. If any member declines to exercise his or her pro rata share of any option to purchase within the time

permitted, the remaining members shall have the right to exercise the declining member's option in the proportion which each member's Company percentage interest bears to the total percentage interests of those desiring to exercise the option, or in such other proportions as may be agreed upon by the members exercising their option.

(c) Each member exercise of a right of first refusal must be in writing, and must occur within thirty (30) days after the Company has given written notice of its declination to exercise all or any portion of its option, or within thirty (30) days after the expiration of the Company's option period, whichever first occurs. If a member subsequently declines to exercise his or her option, then the remaining members shall have thirty (30) days from the date of notice of such declination, or from the expiration of the member option period, as appropriate, within which to exercise their default options.

(d) If less than all of the disposing member's interest in the Company shall be spoken for pursuant to the options granted in this section 3.4, the disposing member may proceed to dispose of his or her remaining interest to any third party without further restriction. However, unless member consent has been obtained pursuant to section 3.2 of this Article, the transferee of the disposing member's interest shall not become a member of the Company, but rather shall be deemed to be an assignee/transferee only of the disposing member's interest. The transferee shall be entitled to receive, as of the effective date of the transfer, only those allocations and distributions which are attributable to the disposing member's interest from and after the date of transfer.

(e) The terms of any sale or other transfer of a membership or economic interest shall not violate any provisions of this Agreement, and all required notices and copies of transfer documents must be promptly delivered to the Company managers following the completion of any transaction.

Section 3.5 Disposition of deceased member's interest - right of first refusal. If a member shall become deceased without having bequeathed his/her membership interest to a qualified transferee in accordance and compliance with section 3.2 of this Article, and if the interest held by such deceased member will not otherwise pass by intestacy (or trust) to a qualified transferee, then such deceased member's interest shall be subject to the following provisions:

(a) The Company, and the members, shall have a first right and option to purchase all or any portion of the decedent's interest in the Company. The order and manner of exercise of such rights and options shall be as set forth in section 3.4 of this Article, except that: the "disposing member" shall be the personal representative of the decedent's estate (or his trustee). To the extent that less than all of the decedent's interest is spoken for, his or her estate (or trustee) shall be free to dispose of the decedent's remaining interest in the manner provided in the decedent's will or trust, or if the decedent was intestate, as provided under the laws of the state of residence of the decedent. However, the recipient of the deceased member's interest shall not become a member of the company except as otherwise provided in this Operating Agreement.

(b) The option price and payment terms for a deceased member's interest shall be as established under the provisions of section 3.6 of this Article.

Section 3.6 Option price and payment terms. The price and terms of payment that shall apply with respect to the exercise of any options granted pursuant to sections 3.4 or 3.5 of this Article shall be as follows:

(a) The option price shall be derived from the gross market value of the Company's assets as determined at the time of exercise of the option. The value as so determined shall then be reduced by any debts or liabilities of the Company. The resulting value shall then be multiplied by the percentage which represents the share that the interest being sold or acquired pursuant to the options herein granted bears to the value of the entire Company. The resulting proportionate value of the interest being sold or acquired shall then be further reduced to reflect any marketability and minority interest discount that would be applicable to the interest if the valuation principles of Internal Revenue Ruling 59-60 were applied thereto.

(b) The net value of the interest being sold or acquired as described in subsection a. above shall be determined by a CPA or CPA firm to be selected by the manager, which person or firm shall be reasonably well qualified to perform valuations of interests in Companies with assets and structure similar to Elk Meadows Investments, LLC.

(c) If any member, including the disposing member, disagrees with the value determination as made by the CPA or CPA firm as retained by the managers, then the managers shall be authorized to retain the services of a second highly qualified CPA or business valuation expert to make a second determination. Such second determination shall be final and binding for purposes under this Article. The fees for the second valuation, and any related costs, shall be charged against the interest or interests of the dissenting members unless the final valuation determination of the second expert varies by more than five percent (5%) from the first valuation determination. If a variation greater than five percent occurs, the Company shall pay the costs and fees.

(d) The terms for payment of any option price shall be as the parties are able to agree among themselves. If the parties cannot reach an agreement as to the payment terms, then the payment terms shall be as follows:

(i) A down payment of 10% shall be made at the time of exercise of an option.

(ii) The balance of the purchase obligation shall be paid by way of a promissory note. Such note shall be amortized over a period not to exceed ten years, with a principal and interest payment being made at least annually on January 1 of each year. The interest rate of said note shall be set thirty days prior to the transaction closing date based on the then published New York prime interest rate.

   (iii) Unless such condition is waived by the selling party, the note described above shall be secured by the interest being acquired.

  Section 3.7 Methods of obtaining membership. Any transferee of a member's interest in the Company shall be granted member status, or may acquire member status, in one of the follows ways:

   (a) Prior to consummating any transfer of his or her interest to a person or entity who is not a qualified transferee as described in section 3.2, the disposing member may petition the Company for formal approval of the proposed sale, transfer, gift, assignment etc.. Provided that all of the other then existing members vote to approve the transaction, the transferee or assignee shall receive and be entitled to exercise all of the rights and privileges of the disposing member, including (in the case of a non-member) membership in the Company and the right to vote. If the existing members do not approve the transfer, then the result of any such transfer shall be that the transferee or assignee does not become a member of the Company, and shall be entitled only to the share of Company profits, income and distributions that the disposing member would have been entitled to pursuant to the Operating Agreement or any contract with the Company.

   (b) Any transferee of an interest in the Company may, at any time, petition the Company to become a member. Upon the unanimous vote of the existing members of the Company, the transferee shall be granted full membership status.

   (c) If a member sells, assigns gifts or bequeaths all or any portion of his or her interest in the Company to a person or entity who is already a full voting member, then the transferee shall continue to be a member with respect to the entire interest he owns following the transfer in question.

   (d) In all events, no person or entity shall be admitted as a member without first complying with all requirements of this Operating Agreement. Any new member shall be bound by the terms of this Agreement, and shall subscribe his or her name to this Agreement in such manner as the managers shall specify.

  Section 3.8 Restrictions specifically enforceable. Recognizing the relationship between all of the members, and the values and virtues of such commonality of ownership, each member of the Company hereby acknowledges the reasonableness of the restrictions on any form of transfer of membership interests imposed by this Operating Agreement. Accordingly, such restrictions shall be specifically and legally enforceable by any member of the Company, either by way of injunctive relief, and/or by an award of damages. Furthermore, a legend shall appear on all issued Certificates of Ownership noting that their transfer or assignment is subject to the restrictions contained within this Operating Agreement.

  Section 3.9 Disposing member bound. Any member who disposes of his or her interest in the Company shall not be relieved of any contractual or statutory duties that he or she

may owe the Company at the time of transfer or assignment unless the other members shall unanimously consent to any release or assignment of such obligations.

## ARTICLE IV

### Management

Section 4.1    Management of Company business.    The business and affairs of the Company shall be managed exclusively by its manager or managers. Such manager (the term "manager" referring to one or more managers) shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all of the Company's business in such manner as the manager shall deem to be in the best interests of the members. At any time when there is more than one manager, any one manager may take any action permitted to be taken by the managers, unless the approval of more than one of the managers is expressly required by this Operating Agreement or by state law. If more than one manager is serving, such managers may also, and from time to time, appoint one of their number to serve as "Records Manager." The Records Manager shall have custody of Company records, and shall be responsible for the day to day maintenance of such records. The Records Manager shall have such other administrative duties and authority as the managers may delegate in writing to him or her from time to time.

Section 4.2    Majority to control.    When more than one manager is serving, all decisions shall be by majority vote (or joint vote if only two managers are serving); however, in the manner hereinafter described, the other managers may delegate to any one manager (or the Records Manager) any powers or authority that they deem appropriate, including, but not limited to, the power to disburse Company funds, make securities acquisitions and trades, or the power to make contracts with members or third parties. Any such delegation shall not relieve the remaining managers of any responsibilities or liabilities imposed by law or by this Operating Agreement.

Section 4.3    Initial managers.    The initial manager of the Company shall be DAVID A. KREMSER. The initial manager shall serve as manager until his death, incapacity, resignation or removal as hereinafter provided. Managers need not be a member of the Company. The existing manager or managers may also appoint an additional manager or managers from time to time, provided that no more than five managers shall serve at any one time.

Section 4.4    Management vacancies.    In the event of the death, incapacity or resignation of initial manager, the remaining co-managers (or manager) shall continue to serve until his/her/their deaths, disability, resignation or removal as hereinafter provided. If there are no other managers left to serve, the members shall, by majority vote, elect a manager or managers to continue the operation of the Company until its termination or liquidation as hereinafter provided. However, no more than five co-managers shall be elected to serve at any one time. Such elected manager(s) need not be a member of the Company.

Section 4.5    Removal of managers.    Removal of an initial manager may occur only in accordance with the following provisions of this section 4.5:

(a)    The initial member-manager shall continue to serve as manager of the Company for the period stated in section 4.3 unless he shall be removed by the other members upon a clear and specific showing that: (i) he has, without authority from or ratification by the other members, knowingly and deliberately acted in violation of the authority and powers granted to him under this Operating Agreement or the Articles of Organization; or (ii) he has, due to age, disease or other disability, become incapable of managing the affairs of the Company, and his attending physician, or a physician selected by the membership, has certified in writing to such facts; or (iii) he has committed a willful breach of his fiduciary duties to the remaining members, and notice of such violation was given to such manager by a co-manager or any member or members in writing and he has failed within a period of thirty days thereafter to correct, rectify or otherwise satisfactorily address the violation.    Removal of the initial member-manager may occur only upon the unanimous vote of the members then entitled to vote, excluding any manager/member who is the subject of removal.

(b)    Any manager who was not a capital-contributing initial member of the Company, or any co-manager appointed by the initial managers, may be removed at any time upon a majority vote of the members other then the manager who is the subject of the removal action.

(c)    In the event of the removal of the sole initial manager, he shall be succeeded by a manager or co-managers to be elected by vote of a majority in interest of the remaining members then entitled to vote in the manner, and subject to the limitation, prescribed in section 4.4 of this Article.

Section 4.6    Manager authority and powers.    The manager shall have all powers and authority necessary and incident to the full and comprehensive management of the Company property, including, but not limited to, the power to subscribe, buy, sell, and to trade in stocks, bonds, options or any other securities, limited partnership interests or investment and trust units, whether or not in negotiable form, issued or unissued, foreign exchange, commodities, and contracts relating to same, for the Company account or accounts with any stock brokerage company, however designated, and whether presently open or hereafter opened.    This authorization shall include the power to purchase, sell, exchange and redeem any obligations or securities of the United States or any of its agencies, any state or agencies thereof, and any other government or municipality.    The manager may also, at any time or times, in his discretion, sell any assets that are contributed to or held by the company, and thereafter reinvest the proceeds in any other type of asset or assets, including real estate.    The manager may also: establish and write checks on all types of bank accounts in the Company name, wherever located;    employ accountants, attorneys and other professionals as the manager deems necessary and advisable in carrying out the objectives of the Company;    make and/or enter into any contracts or other agreements with outside parties, and enforce such agreements by whatever means necessary; and do all other acts as may be necessary or appropriate to the conduct of the Company business.

Section 4.7 No member management - grant of power of attorney. The members, in their capacity as such, shall have no right or authority to participate in the management of the Company. Accordingly, no debt or obligation shall be contracted, or liability incurred, on behalf of the Company by any member except with the written direction and consent of the manager. Each member of the Company hereby appoints the manager (or any one of the managers) of the Company as his/her special attorney-in-fact: to do all of those acts and things described in section 4.6 of Article IV of this Agreement, and to do and carry out any and all other things and actions required or authorized to be done by the manager on the members' behalf as set forth in this Operating Agreement as hereinafter amended. This special power of attorney is coupled with an interest in property and is irrevocable, and shall survive the death or incapacity of any member. All of the members shall, upon request of the managers, execute a written instrument which evidences this grant of authority.

Section 4.8 Managers may delegate duty. Managers may delegate to each other, or to any member of the Company, such duties and responsibilities for the day to day management of the Company's affairs as are deemed appropriate. This authority shall include the designation of a Records Manager as hereinabove provided. A specific delegation of authority to a member of the Company shall not thereby make such member a manager of the Company, but rather such delegation shall be limited to the particular transactions or duties described therein. Any delegation may be oral and informal, or may be reduced to writing as the manager(s) elects. However, unless specific contract authority has been delegated in writing to a particular manager or other person, DAVID A. KREMSER must both review and concur with respect to any decision regarding any action to be taken by the managers when and if more than one manager is serving. Managers may also, at any time or times, retain and compensate professional investment counsel of the managers' choice (including a person who is then serving as a manager) with regard to assets owned by the Company. If investment counsel is retained, the managers may rely on and abide by the advice and recommendation of such counsel. While such investment counsel is employed, the managers shall not be required to conduct their own independent reviews of Company investments or strategies, and they need not take any action with respect to such investments unless given written directions by such counsel. The managers may discharge any investment counsel at any time without cause.

Section 4.9 Manager action shall bind Company. Notwithstanding the restrictions set forth in section 4.8 of this Article, or any other provisions of this Operating Agreement, the signature of one or more managers shall be binding on the Company with respect to any contract or debt incurred to any third party.

Section 4.10 Compensation of managers. At the request of a manager, the Company shall pay such reasonable compensation to him or her as the managers may designate from time to time. All managers shall also be entitled to reimbursement for expenses properly and reasonably incurred in carrying out their responsibilities on behalf of the Company. Periodic expense summaries or vouchers shall be submitted by any manager requesting reimbursement. A majority of managers may approve such reimbursement, or if there be no other managers, then the manager incurring expenses may reimburse him/herself. The members, by a vote of 75% of the interests entitled to vote (excluding the affected manager(s), may disapprove any manager compensation

agreement or expense reimbursement. In such event, the members and the manager(s) shall negotiate in good faith to resolve the dispute. If resolution is not achieved within 30 days of the date of the vote, then the issue shall be arbitrated in the manner provided in section 7.5 of Article VII.

Section 4.11 No manager liability. Managers shall at all times exercise their best business judgment and management skill in dealing with the Company's affairs and property. Except upon a showing that a manager acted in bad faith, with gross negligence, or with fraudulent intent, no manager shall have any liability whatsoever to the Company or to any individual member or such member's successors or assigns on account of any decisions made, or any transactions entered into, on behalf of the Company. Nor shall the managers have or incur any such liability or responsibility with respect to any decisions made or actions taken by third party investment counsel, provided such counsel was selected by the managers with reasonable care and in good faith.

## ARTICLE V

Distributions and Finance

Section 5.1 Initial capital contributions. The initial capital contributions of the initial members shall be as described in the first Exhibit A which is attached herewith, the same being incorporated by this reference. A "Certification of Ownership Interest" reflecting the initial capital contributions and resulting percentage of capital ownership of all members is incorporated as part of Exhibit A. The said Exhibit A shall be updated by the manager to reflect any further or additional changes in ownership and/or capital interests, whether such changes occur by virtue of additional capital contributions by members, or because of gifts of capital interests made by or among members. Whenever reference is made to "members" in this Article, such reference shall, as appropriate, also include any non-member "economic interest holders" who have any transferee interest in the Company.

Section 5.2 Capital accounts. A capital account shall be maintained for each member. The capital account of each member shall consist of such member's original contribution increased by: (1) all additional contributions to capital by such member, and (2) such member's share of Company profits (including items of Company income and gain); and decreased by: (1) the amount of any distributions to such member, and (2) such member's distributive share of Company losses (including items of Company deduction and loss).

Section 5.3 Additional capital contributions. The manager shall have no authority to make capital calls without the consent and unanimous vote of all members. Accordingly, no member shall be required to make any additional capital contributions to the Company. Any member may, however, make voluntary contributions of capital to the Company at any time with the prior consent of the managers. To the extent that any member makes additional capital contributions after the formation date of the Company, such contributions shall be allocated to contributing member's capital account unless such member directs the manager in writing to

allocate his/her contribution in some other manner.  Any member who makes contributions pursuant to this section which are allocated to any other member's capital account shall be solely responsible for insuring that any federal and/or state gift tax consequences as to them are addressed by their own tax counsel.  No member shall be entitled to interest on such member's capital contribution(s).

     Section 5.4    Sharing of profits and losses.  All items of income, gain, loss, deduction, and credit of the Company for any taxable year shall be allocated to the members in accordance with their respective percentage of capital ownership. For purposes of determining the profits, losses, or any other item allocable to any period, profits, losses, and other items will be determined on a daily, monthly, or other basis, as determined by the Manager.  The Members shall be bound by the provisions of this article in reporting their shares of Company income and loss for federal, state, and local income tax purposes.

     Section 5.5    Sharing and making of distributions.  Distributions of net cash flow shall be made solely in the discretion of the manager from time to time, based upon the needs of the Company and based upon Company investment objectives.  Distributions of cash flow may be made pro rata according to member capital interests, or they may be made on a non-pro rata basis to one or more members.   Appropriate adjustments to member capital accounts shall be made as and when distributions of net cash flow are made. No member shall have any right at any time to demand any cash or property distributions.  However, provided there are, in the manager's sole judgment and discretion, adequate cash reserves to do so, the manager shall endeavor to make a minimum cash distribution by March 31 of each year sufficient to approximately cover the individual income tax liability incurred by each member on account of his/her/its Schedule K-1 income, if any.    In all events, with respect to the handling and disbursement of Company revenues, the manager(s) of the Company shall be deemed to have the same fiduciary duty and obligation to the members that a general partner would have to limited partners under state or common law.

     Section 5.6    Reinvestment of profits.  Notwithstanding the general authority granted to the manager pursuant to section 5.5, the parties to this Agreement recognize and agree that the best interests and mutual objectives of the members will be served by reinvesting Company profits to the maximum extent possible.  Each member therefore revocably grants to the manager the ongoing right, in the manger's discretion, to reinvest his/her share of profits in excess of any distributions that are made for tax purposes.  Such reinvestments may be made within pooled Company accounts, or by disbursing funds to individual investment accounts standing in the members' names.  If any member notifies a manager in writing of his/her revocation of this grant of authority, then the manager shall distribute such member's net profits to him or her, subject to the limitations of section 5.5.

     Section 5.7    No Distribution upon resignation.   Any member who withdraws from membership in the Company shall not then be entitled to receive the value of his/her membership interest in the Company.  The fair market value of the withdrawing member's interest shall be distributed to such member, or his heirs or assigns, at the time and in the manner as described in Article VI of this Operating Agreement.  However, notwithstanding the foregoing limitation, a

member who has withdrawn may at any time petition to the manager for a partial or full distribution. The manager shall then call a special meeting, at which the issue shall be presented to the members. Upon the unanimous vote of all members entitled to vote, the manager shall distribute the then fair market value of a withdrawing member's interest, or any portion thereof as the members shall have authorized, in cash or in kind as the manager in his sole discretion may elect. In all events, the manager shall have up to 90 days to accomplish the authorized distribution.

Section 5.8 Banking and borrowing. The Company shall conduct all banking operations through such banks or other financial institutions as the manager may select. If a single manager is acting, check writing authority shall be unlimited. If more than one manager is acting, they may designate one or more of their number to hold check writing authority, which authority may be limited or unlimited as they agree. Except as the managers may otherwise agree and delegate, the Company shall not borrow money or increase the amount any debt obligations existing on the date of execution of this Operating Agreement except upon the approval and signature of all acting co-managers.

Section 5.9 Tax elections. The manager shall make and implement on behalf of the Company and its members all decisions and elections under the federal and state tax laws and regulations which pertain to partnerships and limited liability companies, including any option or election to be taxed as a partnership. If any valuations of Company property are required for any tax or other purpose, the manager shall arrange for such valuation or appraisal report as he deems appropriate.

## ARTICLE VI

### Dissolution and Termination

Section 6.1 Dissolution. The Company's existence shall terminate, and it shall be dissolved, upon the occurrence of any of the following events:

(a) When only one member remains, and such member elects to dissolve the Company.

(b) When all of the existing members entitled to vote shall unanimously agree to dissolve the Company.

Upon the occurrence of any of the above events, the manager shall thereupon file all appropriate statements of intent to dissolve with the Secretary of State, and thereafter proceed with dissolution in the manner hereinafter specified. The death or withdrawal of any member shall not cause a termination of the Company's existence.

Section 6.2 Winding up, liquidation and distribution of assets. Upon dissolution, an accounting shall be made by the Company's independent accountant of the accounts of the Company and of the Company's assets, liabilities and operations from the last accounting period

to the date of dissolution. The manager shall thereafter see that all final bills and accounts are settled, whereupon the manager shall distribute the assets of the Company in proportion to the members' capital interest at date of dissolution. In making such distribution, the date of dissolution value of the assets shall be their market value in the case of marketable securities, and, in the case of non-marketable securities or other assets, their value as agreed to by the members. If any valuation disputes arise, values shall be as determined by an independent appraiser to be selected by the manager. Alternatively, the manager may, by majority vote of the members, proceed to sell the assets of the Company in the open marketplace at the highest and best return, then distribute the net sale proceeds to the members in final liquidation of their interests. Upon final distribution of all assets, Articles of Dissolution shall be filed by the manager with the Secretary of State.

## ARTICLE VII

Additional Powers, Limitations
and Administrative matters

Section 7.1 Member or manager may contract with Company. Any member or manager of the Company may lend money to, borrow money from, act as surety for, and transact any other business with the Company and, subject to other applicable law, shall have the same rights and obligations with respect thereto as a person who is not a member or manager; except that this section shall not be construed to relieve a manager from any of his or her duties as specified in this Operating Agreement.

Section 7.2 Right to specific performance. The parties to this Agreement recognize that irreparable injury will result from a breach of any provision of this Agreement, and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured shall (in addition to any other remedies which may be available to such party) be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

Section 7.3 Withdrawal of members; waiver of partition. No member shall, either directly or indirectly, take any action to require partition of apportionment of the Company or any of it assets or property or cause the sale of any Company property (except as otherwise authorized herein) and each member, his heirs successors and assigns hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale with respect to his Company interest, or with respect to any assets of the Company, except as expressly provided in this Agreement.

Section 7.4 Binding effect of minutes and resolutions. Any decisions and/or resolutions as may subsequently be adopted by the managers and/or members, and which may be

set forth in the Company minute records, shall be fully enforceable and binding as if made a part of this Operating Agreement, and until sooner repealed or modified.

Section 7.5    Arbitration of disputes.    The parties to this Agreement recognize that litigation is a costly and prolonged process for dispute resolution. Accordingly, in order to limit or avoid such costs and other burdens, the parties agree that any disputes arising under or in regard to any provisions of this Operating Agreement shall be submitted to a single arbitrator who shall be either an attorney at law, or a certified public accountant. The decision of such person shall be binding on all members and managers. If the members and managers cannot agree within thirty days as to the selection of an arbitrator, then the dispute shall be arbitrated by a panel of three arbitrators in accordance with the rules of the American Arbitration Association. Any arbitrator or panel of arbitrators shall have the authority and discretion upon the request of any party to award costs and fees of the proceeding against the non-prevailing party or parties.

Section 7.6    Complete Agreement.    This Agreement shall constitute the complete and entire agreement between the members, and between the members and the managers with respect to all items and issues herein addressed. There are no other or additional oral or written agreements between the parties, and no member or manager shall so contend. This provision shall not, however, prevent a manager (or any member) from entering into appropriate written compensation agreements with respect to actual services rendered to the Company.

Section 7.7    Amendments.    The members shall have the power to make amendments to this Operating Agreement, or repeal this Agreement and adopt a new Agreement, by unanimous vote of the members at any meeting of members or at any special meeting called for that purpose. All amendments shall be in a writing to be appended to this Operating Agreement, the same to be subscribed to by all members.

## ARTICLE VIII

Miscellaneous Provisions

Section 8.1 Gender and plural/singular references. Unless the context requires otherwise, wherever used in this Agreement, words denoting the singular may be construed as denoting the plural, and words of the plural may be construed as denoting the singular, and words of one gender or neuter may be construed as denoting such other gender as is appropriate. References herein to "he or she" shall, as appropriate, be deemed to include reference to a member that is an entity rather than an individual.

Section 8.2 Heirs, successors and assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

Section 8.3 Member assurances. Each member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the managers may deem necessary and appropriate to comply with the requirements of law for the formation and operation of the Company, and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement, consisting of 17 pages, including this and the following page, but excluding any attachment or Exhibits, constitutes the Operating Agreement of Elk Meadows Investments, LLC, the same being adopted and approved by the members of the Company as of the date above first written.

ELK MEADOWS INVESTMENTS, LLC:

MANAGER:

By:____________________
David A. Kremser

INITIAL MEMBERS:

____________________
David A. Kremser

____________________
Holly M. Kremser

Michael P. Kremser

Stan Kremser
Stanley A. Kremser

Bernice E. Kremser
Bernice E. Kremser

**NEW MEMBER SUBSCRIPTION**

By their signature hereupon, the following subsequently admitted members of Elk Meadows Investments, LLC herewith acknowledge that they have read the foregoing Operating Agreement, and that they accept and agree to be bound by the terms and provisions thereof for all purposes.

ADDITIONAL MEMBERS:

KREMSER GST MARITAL TRUST
BY DAVID KREMSER, TRUSTEE

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x

In re OPTIONABLE SECURITIES LITIGATION — 07 Civ. 3753 (LAK)

This Document Applies to: All Cases
------------------------------------------x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

On October 16, 2007, the Court directed KLD to "submit evidence establishing that (a) it had unconstrained investment discretion over the accounts to which the Optonable shares were allocated at the time the shares were purchased and allocated, and (b) it is the attorney-in-fact of each account owner for the purpose of bringing and maintaining this action."

KLD responded with a declaration of its owner, Kerwin Doughton. The declaration states first that KLD acted as a single investor in buying the Optionable shares, that it has discretionary authority with respect to client accounts, and that it thereafter allocated the Optionable shares to client accounts consistent with each client's objectives. It then goes on to say that KLD "individually notified each of its clients of the pending securities class action . . . and received its clients' consent for KLD . . . to file a motion for lead plaintiff in the action."

This falls rather short of what the Court had in mind, at least in some respects, although this might have been avoided by more explicit directions. Unless KLD withdraws its motion for appointment as Lead Plaintiff, it shall submit, on or before November 8, 2007, the following:

1. An affidavit or declaration setting forth the Optionable shares purchased by KLD, the accounts to which those shares were allocated, and the number of shares allocated to each.

2. Documentary proof that KLD had the discretionary authority to make those purchases on behalf of the relevant client accounts and to allocate the shares among them.

3. With respect to each relevant account, a power of attorney or other documentary proof demonstrating KLD's authority to maintain this action on behalf of the beneficial owner(s) and to seek lead plaintiff status.

SO ORDERED.

Dated: October 31, 2007

Lewis A. Kaplan
United States District Judge

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 10/31/07

# EXHIBIT D

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 10/16/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re OPTIONABLE SECURITIES LITIGATION

This Paper Applies to: All Cases

07 Civ. 3753 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

These are consolidated class actions alleging, generally, securities violations in connection with trading in the securities of Optionable, Inc. Now before the Court are competing motions for appointment of a lead plaintiff or plaintiffs and for approval of lead plaintiff's choice of counsel.

Under the Private Securities Litigation Reform Act ("PSLRA"), the Court is obliged to appoint as Lead Plaintiff the movant it determines to be the most capable of representing the interests of the class members. 15 U.S.C. §§ 78u-4(a)(3)(B)(I), 77z-1(a)(3)(B)(I). In making that determination, the moving plaintiff with the largest financial interest in the relief sought by the class is entitled to a presumption in its favor.

In this case, KLD Investment Management, Inc. ("KLD") claims a loss of over $3.7 million, which is more than three times greater than the loss claimed by any other movant. It therefore is entitled to the presumption unless those opposing its appointment in some material way have undermined that claim.

The principal argument against KLD is that KLD is a money manager that never owned any shares. While it appears to be the case that KLD is a money manager, its papers represent

that it had sole discretion to invest on behalf of its clients, that it purchased all of the shares that gave rise to the claimed loss for individual clients, and that the shares then were allocated to the individual client accounts. Moreover, it maintains that it "has the sole discretion and attorney-in-fact authority to make investments and related investment decisions for its clients and to bring litigation on their behalf to recover for investment losses." KLD Certification ¶ 7.

KLD's allegations, if accurate, would be sufficient to establish that it acted as a single person and thus that the aggregation of the purchases ultimately allocated among its advisees would be appropriate. *See Smith v. Suprema Specialties, Inc.*, 206 F. Supp.2d 627, 634 (D. N.J. 2002) (citing cases). Reliance on its certification, however, may well be inadequate. *Weisz v. Calpine Corp.*, 2002 WL 32818827, at *6 (N.D. Cal. Aug. 19, 2002). Accordingly, KLD, on or before October 30, 2007, shall submit evidence establishing that (a) it had unconstrained investment discretion over the accounts to which the Optionable shares were allocated at the time the shares were purchased and allocated, and (b) it is the attorney-in-fact of each account owner for the purpose of bringing and maintaining this action.

SO ORDERED.

Dated: October 16, 2007

Lewis A. Kaplan
United States District Judge

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | |
|---|---|
| KENNETH Z. SLATER, AS MANAGER OF KT INVESTMENTS, LLC, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GARRETT THORNBURG, LARRY A. GOLDSTONE, CLARENCE G. SIMMONS, ANN-DRUE M. ANDERSON, DAVID A. ATER, JOSEPH H. BADAL, ELIOT R. CUTLER, MICHAEL B. JEFFERS, IKE KALANGIS, OWEN M. LOPEZ, FRANCIS I. MULLIN, III, STUART C. SHERMAN and THORNBURG MORTGAGE, INC.,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff, Kenneth Z. Slater, as Manager of KT Investments, LLC ("Slater"), on behalf of himself and a Class (defined below) comprised of all other persons similarly situated, alleges upon the investigation made by and through his counsel, which includes, *inter alia*, a review of relevant public filings made by Thornburg Mortgage, Inc. ("TMI" or the "Company") with the Securities and Exchange Commission ("SEC"), as well as teleconferences, press releases, news articles, analysts' reports, and media reports concerning the Company. This Complaint is based upon plaintiff's personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

## I. SUMMARY OF ACTION

1. This is a class action on behalf of all persons, other than defendants, who purchased TMI common stock between October 6, 2005, and August 17, 2007, inclusive (the

"Class Period"), to recover damages caused by defendants' violations of the federal securities laws.

2.    TMI operates as a single-family residential mortgage lending company. It originates, acquires, and retains investments in adjustable and variable rate mortgage (ARM) assets. Its ARM assets comprise of purchased ARM assets and ARM loans, including traditional ARM assets and hybrid ARM assets. The Company acquires and originates assets, through correspondent lending, wholesale lending, direct retail lending, and bulk acquisition programs from investment banking firms, broker-dealers, mortgage bankers, mortgage brokerage firms, banks, savings and loan institutions, credit unions, home builders, and other entities involved in originating, securitizing, packaging, and selling mortgage-backed securities and mortgage loans. The Company operates as an externally advised real estate investment trust (REIT). It has elected to be treated as a real estate investment trust for federal income tax purposes. As a REIT, the Company would not be subject to federal corporate income tax, provided it distributes at least 85% of taxable income by the end of each calendar year. TMI was founded in 1992 and is based in Santa Fe, New Mexico.

3.    Throughout the Class Period, defendants issued numerous, positive financial statements, annual and quarterly financial reports filed with the SEC, press releases, and other public statements that described the Company's financial performance.  These public statements were materially false and misleading because they misrepresented and failed to disclose the following adverse facts, among others:  (a) that the Company was facing increasing margin calls; (b) that its available leverage had significantly diminished; (c) that its financial situation had deteriorated to the point where it must sell certain assets; and, (d) that as a result of the foregoing the Company reported overstated financial results.

4.      As a result of defendants' false statements, TMI's stock traded at artificially inflated price during the Class Period, reaching a high of $30.64 per share on June 17, 2005.

5.      On Tuesday, August 14, 2007, TMI shocked the markets by issuing a series of disclosures.  In particular, TMI reported in a press release that the book value of the Company's mortgage-securities portfolio had fallen to $14.28 per share as of August 13 from $19.38 at the end of June.  TMI also delayed payment of its second-quarter dividend until mid-September after scheduled monthly mortgage payments for August have been received, citing a "difficult environment."

6.      As a result of these disclosures, the Company's stock plummeted to a 52 week low of $7.61 per share as the Company disclosed its true financial condition, postponed its quarterly dividend and lowered its book value.

## II.      JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  TMI maintains its corporate headquarters in this judicial district at 150 Washington Ave, Santa Fe, New Mexico.  In addition, many of the acts and practices complained of herein occurred in substantial part in this judicial district.

9.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

10. Plaintiff purchased the common stock of TMI as set forth more fully in the annexed certificate, and suffered economic damages.

11. TMI is a Maryland corporation with its principal place of business at 150 Washington Ave, Santa Fe, New Mexico. At all relevant times, the Company's securities traded in an orderly and efficient market on the New York Stock Exchange (NYSE).

12. Defendant Garrett Thornburg, ("Thornburg") founded the Company in 1993 and at all relevant times has served as the Chairman of the Board of Directors and Chief Executive Officer.

13. Defendant Larry A. Goldstone, ("Goldstone") has served as President, Chief Operating Officer and a director of TMI since June 1993.

14. Defendant Clarence G. Simmons, ("Simmons") has served as has served as the Senior Executive Vice President of TMI since March 2005 and the Chief Financial Officer of TMI since April 2005.

15. Defendant Ann-Drue M. Anderson, ("Anderson") has served as a director of TMI since December 2003.

16. Defendant David A. Ater, ("Ater") has served as a director of TMI since March 1995.

17. Defendant Joseph H. Badal, ("Badal") has served as a director of TMI since June 1993 and has been an Executive Vice President since December 2001.

18. Defendant Eliot R. Cutler, ("Cutler") has served as a director of TMI since December 2003.

19. Defendant Michael B. Jeffers, ("Jeffers") has served as a director of TMI since

January 2006.

20.     Defendant Ike Kalangis, ("Kalangis") has served as a director of TMI since January 2001.

21.     Defendant Owen M. Lopez, ("Lopez") has served as a director of TMI since December 1996.

22.     Defendant Francis I. Mullin, III, ("Mullin") has served as a director of TMI since January 2001.

23.     Defendant Stuart C. Sherman ("Sherman") has served as a director of TMI since June 1993.

24.     Defendants Thornburg, Goldstone, Simmons, Anderson, Ater, Badal, Cutler, Jeffers, Kalangis, Lopez, Mullin and Sherman are sometimes referred to herein as the "Individual Defendants."  Because of the Individual Defendants' positions as directors or senior officers of the Company, each had access to the material adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

25.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of them,

by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Each was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

26.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, was traded on the NYSE, and is governed by the provisions of the federal securities laws, each defendant had a duty to disseminate timely, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that became materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.    The Individual Defendants participated in the drafting, preparation, or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership or executive and managerial positions with TMI, each of the Individual

Defendants had access to the adverse undisclosed information about the Company's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about TMI and its business, issued or adopted by the Company, materially false and misleading.

28.     The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

29.     Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases alleged herein, and is therefore primarily liable for the representations contained therein.

30.     Each of the defendants is also liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TMI securities by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme (a) deceived the investing public regarding the Company's business, operations, and the intrinsic value of TMI's publicly traded securities, and (b) caused plaintiffs and other members of the Class to purchase TMI's publicly traded securities and to do so at artificially inflated prices.

## IV.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those persons who purchased TMI securities during

the Class Period and who suffered damages thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

32. The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's most recent quarterly financial statement filed with the SEC on Form 10-Q, on August 8, 2007 TMI had 122,858,409 shares of common stock outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by defendants' acts as alleged herein;

b. whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and financial condition of the Company;

c. whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

d. whether the market prices of the Company's common stock were artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

e. to what extent the members of the Class have sustained damages and the proper measure of damages.

36. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V. BACKGROUND

37. TMI operates as a single-family residential mortgage lending company. It originates, acquires, and retains investments in adjustable and variable rate mortgage (ARM) assets. Its ARM assets comprise of purchased ARM assets and ARM loans, including traditional ARM assets and hybrid ARM assets. TMI acquires and originates assets, through correspondent lending, wholesale lending, direct retail lending, and bulk acquisition programs from investment banking firms, broker-dealers, mortgage bankers, mortgage brokerage firms, banks, savings and

loan institutions, credit unions, home builders, and other entities involved in originating, securitizing, packaging, and selling mortgage-backed securities and mortgage loans.

38. The Company operates as an externally advised real estate investment trust (REIT). It has elected to be treated as a real estate investment trust for federal income tax purposes. As a REIT, the company will not be subject to federal corporate income tax so long as it distributes at least 85% of taxable income by the end of each calendar year.

**Substantive Allegations**

39. On October 6, 2005, after market close, TMI issued a press release announcing a higher than expected earnings forecast for the third quarter of 2005. Specifically, the Company reported:

> It expects to report earnings per share for the third quarter of 2005 that will modestly exceed First Call's mean earnings per share estimate of $0.68, which is also the amount of the company's current quarterly dividend. Further, the company said the quarterly financial results were generated from ongoing operations and without the benefit of asset sales.

On this news, the following day the stock climbed over 6% on unusually heavy trading volume to close at $24.13 per share.

40. On October 17, 2005, after market close, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2005. The Company reported net income of $74 million, total assets of $39.6 billion, and a book value of $21.09 per share. The Company also declared a third quarter dividend of $0.68 per share. In the press release, defendant Thornburg was quoted as stating:

> Our performance during the quarter remained strong despite the current challenges confronting the mortgage industry. While the Fed Funds rate has increased 275 basis points since mid 2004, our earnings have remained fairly constant. Our business model protects our profitability during periods of rising interest rates or flattening yield curves by requiring that we fund our hybrid

> adjustable-rate mortgage (ARM) portfolio with fixed-rate borrowings of comparable maturity. This strategy clearly reduced our net interest income and earnings in prior years, but has been instrumental in allowing us to maintain our earnings through this rising interest rate cycle.

41. On November 8, 2005, the Company filed with the SEC its Form 10-Q for the third quarter of 2005, which included the same financial results previously reported. The Form 10-Q also included a certification by defendant Thornburg, as TMI's CEO, that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

42. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

43. On January 24, 2006, TMI issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2005. The Company reported net income of $282 million for the year and $72.8 million for the fourth quarter, a book value of $20.00 per share and total assets of $42.5 billion. The Company also reported a dividend of $0.68 per share. In the press release, defendant Thornburg was quoted as stating:

> The company's performance was solid in 2005 despite an environment that has continued to erode our portfolio margin. Our earnings results confirm the strength of our diversified business model and the benefit of focusing on high credit quality assets and interest rate risk management, both key contributors to our stable net interest income. We also attribute our results to the successful execution of financing and alternative capital raising transactions

> that augment our core spread lending business. The issuance of common and preferred stock, junior subordinated debt, the completion of collateralized debt obligation (CDO) financings, as well as deploying some of our excess liquidity, all contributed to balance sheet growth and earnings stability during the year. We believe these strategies are critical to ensuring current and future dividend coverage regardless of a potential worsening interest rate or mortgage market environment.

44. On March 7, 2006, TMI filed with the SEC its Form 10-K for the fiscal year ended December 31, 2005, which included the same financial results previously reported. The Form 10-K also included a certification by defendant Thornburg, as TMI's CEO, that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-K of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

45. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-K.

46. On April 18, 2006, after market close, TMI issued a press release announcing its earnings for the first quarter ended March 31, 2006. The Company reported net income of $72.4 million, total assets of $46.1 billion, and a book value of $21.00 per share. TMI also reported a first quarter dividend of $0.68 per share. Defendant Thornburg publicly remained optimistic about TMI's outlook despite the poor market conditions, he was quoted in the press release as stating:

> As we had anticipated, 2006 has proven to be a challenging year thus far. The interest rate environment and competitive landscape have remained difficult which has impacted our short-term earnings results. Regardless, we are pleased with the strength of our earnings results and anticipate that our prospects should

> improve once the market environment changes. In the interim, we believe we can maintain the current dividend level fulfilling our top priority of building long-term wealth for our shareholders by minimizing risk and paying consistent dividends. After the payment of the first quarter dividend, we will have in reserve an estimated $0.38 per share of undistributed taxable income to support the dividend should our future earnings temporarily fall below the current dividend level.

On this news, the Company's stock rose 4% on heavy trading to close at $27.75 per share on April 19, 2006.

47. On May 9, 2006, TMI filed with the SEC its Form 10-Q for the quarter ended March 31, 2006, which included the same financial results previously reported. The Form 10-Q also included a certification by defendant Thornburg, as TMI's CEO, that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

49. On July 20, 2006, TMI issued a press release announcing its second quarter earnings for the quarter ended June 30, 2006. The Company reported net income of $69.6 million, a book value of $21.27 per share, total assets of $49.9 billion and maintained its $0.68 dividend for the quarter. Defendant Thornburg, while acknowledging the poor market conditions, indicated that these conditions would not affect the Company and commented as follows:

> The difficult competitive and operating environment facing mortgage portfolio lenders has not abated, which continues to put downward pressure on our portfolio margin and in turn our

> earnings results. We remain confident that our earnings over the balance of the year when combined with our undistributed taxable income will be sufficient to cover the dividend at the current level. After the payment of the second quarter dividend, we have in reserve an estimated $0.24 per share of undistributed taxable income.

50. On August 8, 2006, the Company filed with the SEC its Form 10-Q for the second quarter of 2006, which included the same financial results previously reported. The Form 10-Q also included a certification by Defendant Thornburg that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

51. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

52. On October 16, 2006, the Company issued a press release announcing its earnings for the third quarter ended September 30, 2006. TMI reported net income of $75.3 million, total assets of $52.9 billion, and a book value of $20.03 per share. The Company also reported a dividend of $0.68 per share. The press release also included a statement from defendant Thornburg as follows:

> While the environment continues to be challenging, continued execution of our core strategies has allowed us to achieve relative earnings stability and maintain the dividend. After the payment of the third quarter dividend, based on common shares outstanding, we will have remaining an estimated $0.12 per share of undistributed taxable income. We remain confident that this amount, when combined with our fourth quarter earnings, will allow us to maintain the current dividend level through the remainder of this year.

53. On November 8, 2006, the Company filed with the SEC its Form 10-Q for the Third quarter of 2006, which included the same financial results previously reported. The Form

10-Q also included a certification by Defendant Thornburg, as CEO of the Company, that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

54. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

55. On January 23, 2007, after market close, TMI issued a press release announcing its earnings for the fiscal year and fourth quarter ended December 31, 2006. The Company reported net income of $297.7 million for the fiscal year and $80.3 million for the fourth quarter. It also reported total assets of $52.7 billion, a book value of $18.92 per share and a dividend of $0.68 per share. Defendant Thornburg, as the Company's CEO, again denied the effect the down market had on TMI's business and commented on its earnings as follows:

> While 2006 was a challenging year for the mortgage industry as a whole, Thornburg Mortgage once again proved the strength of our exceptional business model. Our strategy has always been to maintain a focus on only originating and/or acquiring excellent credit quality adjustable-rate mortgage (ARM) assets, hedging our borrowings to offset interest rate fluctuations, and utilizing an array of asset acquisition, financing and capital strategies. As a result, our 2006 performance was solid and we sustained the dividend. Looking ahead, the likelihood that we can maintain the current dividend has improved as our fourth quarter results increased our undistributed taxable income. Presently, based on common shares outstanding, we have an estimated $0.22 per share of undistributed taxable income, some of which could be used to support the current quarterly dividend of $0.68 per share.

On this news, the stock immediately climbed 8% to close at 25.99 on January 24, 2007. Over the next couple of days, the stock continued to climb to $26.75 per share by January 26, 2007 on unusually heavy trading over the three day period.

56. On March 1, 2007, the Company filed with the SEC its Form 10-K for the fiscal

year ended December 31, 2006, which included the same financial results previously reported. The Form 10-K also included a certification by defendant Thornburg, as TMI's CEO, that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-K of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the

audit committee of the registrant's board of directors (or persons performing the equivalent function):

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

57. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-K.

58. On April 19, 2007, after market close, TMI issued a press release announcing its earnings for the first quarter ended March 31, 2007. The Company reported net income of $75 million, total assets of $55.2 billion and a book value of $18.76 per share. TMI also reported a dividend of $0.68 per share. Defendant Thornburg again emphasized the Company's allegedly rosy outlook, and even indicated that the Company could benefit from the troubles in the mortgage industry by stating:

> The year 2007 is off to a better start than we had anticipated. Our disciplined approach to interest rate and credit risk management continues to allow us to report earnings above consensus earnings estimates. We anticipate that we will further benefit from the troubles in the mortgage lending industry as credit standards tighten and investment returns on new mortgage assets improve. As a result, our first quarter earnings were solid and we sustained the dividend. And, as we look ahead we are increasingly confident that we may not need to make a downward adjustment in the current dividend rate in 2007. After payment of the first quarter dividend, we will have an estimated $0.11 per share of undistributed taxable income to support future quarterly dividends.

On this news, stock rose 4% to close at $27.91 on April 20, 2007 and continued to climb to $28.05 by April 23, 2007 on unusually heavy trading volume.

59. On May 9, 2007, TMI filed with the SEC its Form 10-Q for the quarter ended

March 31, 2007, which included the same financial results previously reported. The Form 10-Q also included a certification by defendant Thornburg, as TMI's CEO, that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the

audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

60. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

61. On July 19, 2007, after market close, the Company issued a press release to announce its earnings for the second quarter ended June 30, 2007. TMI reported net income of $83.4 million, total assets of $57.5 billion, a book value of $19.38 per share and a dividend of $0.68 per share. Defendant Thornburg, as the Company's CEO, also continued to deny that the negative market conditions would effect TMI's business:

> The second quarter continued the strong earnings trend that we set in the first quarter. For the second quarter in a row, our earnings were above consensus estimates on the strength of improved margins. And, despite all the headline news regarding credit problems in the mortgage lending industry, the credit performance of our prime quality mortgage loan portfolio remained exceptional because of our unwavering focus on high quality lending practices. As a result, our second quarter earnings remained solid and we maintained our dividend at $0.68 per common share.

On this news, the stock price climbed $1.66 (about 6%) to close at $27.19 on July 20, 2007 on very heavy trading volume.

62. On August 8, 2007, just two days before analysts began to disclose TMI's negative outlook (as further described below), the Company filed with the SEC its Form 10-Q for the quarter ended June 30, 2007, which included the same financial results previously reported. The Form 10-Q also included a certification by defendant Thornburg, as TMI's CEO,

that stated:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

63. Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

64. All of the foregoing statements, however, were materially false and misleading when made because the Company did not reveal: (a) that the Company was facing increasing margin calls; (b) that its available leverage had significantly diminished; (c) that its financial situation had deteriorated to the point where it must sell certain assets; and, (d) that as a result of the foregoing the Company reported overstated financial results.

**The Truth Slowly Emerges**

65. On August 10, 2007, without any prior warning from the Company, Moody's Investor Service, disclosed that there was significant funding and valuation volatility within TMI and consequently downgraded its senior unsecured debt to a "Ba3" rating and its preferred stock to a "B2" rating. Moody's also indicated that the ratings remain under review for possible downgrade.

66. Standard & Poor's Rating Services also lowered its ratings of TMI securities on August 10, 2007. It lowered the Company's long-term credit rating to "B" from "BB" and placed the rating on CreditWatch Negative. Standard & Poor's analyst Adom Rosengarten stated in his report, "While the company's balance sheet is comprised of high-quality assets, dislocation in pricing of all mortgage assets has restricted Thornburg's access to repo funding and the company is facing increasing margin calls."

67. As a result of this news, the TMI share price dropped from its close on August 9, 2007 of $21.23 to $18.06 on August 10, 2007.

68. Despite these downgrades, the Company still did not disclose that it was facing significant problems with its business. Instead, it simply disclosed that it would cease accepting requests for lock-ins for a period of four-days starting August 14, 2007. The Company described its current situation to be based upon “unprecedented and irrational sentiment in the secondary mortgage market, which has generated conditions of liquidity throughout the industry."

69. On August 14, 2007, several other ratings agencies lowered their outlooks on TMI securities, including Credit Suisse, RBC Capital Markets, Friedman Billings Ramsey, Jefferies & Co. and Piper Jaffray. Bose George, an analyst from Keefe, Bruyette & Woods, even indicated that the Company would likely have to sell a fifth of its assets to meet its financing obligations.

70. Also on August 14, 2007, analysts at Jeffries wrote in a research report, “We believe that margin calls exacerbated by decreased available leverage is forcing asset sales.” These analysts added, “[i]n addition, with Thornburg's stock trading at a substantial discount to book value, we believe the company has no opportunity to raise permanent capital to stem the tide.”

71. Piper Jaffray cut TMI stock to underperform from market perform and premised the downgrade on “increased liquidity pressures.”

72. Credit Suisse analysts remarked, “As a result of rising funding costs, margin calls on its short-term funding instruments and the deleveraging of its balance sheet, we expect Thornburg will have to cut its dividend significantly.”

73. Based on all of the negative news surrounding the Company, the stock continued to plummet until trading was halted on the afternoon of August 14, 2007. By the time trading

was stopped, the Company's stock had dropped nearly 47% to close at the 52 week low of $7.61 per share.

74.    With its stock halted and the market awash with rumors about the Company, the Company issued a press release late in the day on August 14, 2007.  First, it stated that it would delay its dividend until September 17, 2007 as a result of the "difficult environment."  Second, the Company reported that it would decrease its book value from $19.38 to $14.28.  The press release stated follows:

> The Board of Directors said it took this action in response to significant disruptions in the mortgage market which resulted in the sudden and unprecedented decline in the market prices of its AAA-rated mortgage securities that began on August 9, 2007 and subsequent increase in margin calls related to its repurchase agreement financings on those securities. There have also been disruptions in the company's ability to fund its mortgage assets in the commercial paper and the asset-backed securities markets. To date, the company has successfully met all of its commercial paper obligations. Finally, the company has also experienced delays in its ability to fund mortgage loans to its lending partners.

75.    This news caused the Company's stock to rebound slightly when it opened for trading on August 15, 2007.

76.    On August 20, 2007, however, the Company could no longer hide the scope and severity of its myriad problems.

77.    Specifically, before the market opened, the Company published a press release over the Business Wire detailing that it was forced to sell $20.5 billion of its top-rated mortgage backed securities to boost its liquidity.  This announcement was made in the wake of last week's announcement that the Company had to stop funding loans due to the credit crunch.  The Company had been unable to repay nearly $8.4 billion of commercial paper outstanding as of June 30, 2007 because buyers of the paper demanded terms and covenants that the Company was either unwilling or unable to satisfy.

78. In short, the sale came amid slumping mortgage-securities prices and "simultaneous declines in the value of its hedging instruments," according to the Company. The end result was that the Company was unable to support its borrowings by using its mortgage portfolio as collateral.

79. In addition to cutting the size of its mortgage asset portfolio to $36.4 billion as of Friday and reducing its future exposure to margin calls on short-term borrowings, the Company was forced to terminate some $41.1 billion in interest-rate hedges.

80. The fire sale will result in an approximate third-quarter capital loss of $930 million. The securities only fetched approximately 96 cents on the dollar. Ending the hedging program will result in a gain of about $40 million.

81. The Company also stated that "[i][n light of the dramatic reduction in the company's mortgage portfolio over the past week, the company is not yet prepared to offer earnings or dividend guidance regarding the amount of any future dividends" beyond the upcoming September 17, 2007 payment.

82. The Company further stated that its book value continues to fall due to the mortgage-market deterioration and the mortgage securities sales. The estimated book value is now $12.40 a share, compared with an estimated $14.28 on August 13, 2007 and an estimated $19.38 on June 30, 2007.

83. These revelations concerning the Company’s precarious position stood in stark contrast to the otherwise positive spin the Company tried to place on the deepening credit crisis.

84. Indeed, the market was shocked that the Company was in such dire straits and its price per share fell an additional $1.73 by midday trading, a 9% decline over Friday’s close on extremely heavy volume.

## VI.    UNDISCLOSED MATERIAL, ADVERSE FACTS

85.    The market for TMI's common stock was open, well-developed, and efficient at all relevant times.

86.    As a result of these materially false and misleading statements and failures to disclose, TMI's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired TMI common stock relying upon the integrity of the market price of TMI's common stock and market information relating to TMI, and have been damaged thereby.

87.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of TMI's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

88.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the stock purchases by Plaintiff and other members of the Class.

89.    Each defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about TMI.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TMI common stock was a success, as it (i) deceived the investing public regarding TMI's prospects and business; (ii) artificially inflated the prices of TMI common stock; and (iii) caused plaintiff and other members of the Class to purchase TMI common stock at inflated prices.

## VII. SCIENTER ALLEGATIONS

90. As alleged herein, defendants acted with scienter, in that they knew the Company's public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

91. As alleged herein in detail, by virtue of their receipt of information reflecting the true facts regarding TMI and its business practices, their control over or receipt of TMI's materially false and misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning TMI, defendants were active and culpable participants in the fraudulent scheme alleged herein.

92. Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

93. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

94. In particular, defendants Thornburg, Goldstone and Simmons engaged in such a scheme to inflate the price of TMI securities in order to protect and enhance their executive positions, their own personal wealth in accumulated holdings of TMI stock, and the substantial compensation and prestige they obtained thereby, as demonstrated by the salary and bonuses they earned during the Class Period.

95.     Warning signs of a down-turn or slow-down in the real estate market began appearing as early as the end of 2004 or the beginning of 2005.

96.     According to financial and real estate trade publications, a slow-down began to affect the real estate market as early as the first quarter of 2005.

97.     By the first quarter of 2005, the Morgan Stanley REIT index 30-week moving average showed that the real estate run-up was ending and warned of an impending correction in the real estate market.  However, irrespective of this bad news, TMI continued to trumpet its successes and failed to adequately inform investors of its exposure to this sector of the market.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE FRAUD-ON-THE-MARKET DOCTRINE

98.     At all relevant times, the market for TMI securities was efficient for the following reasons, among others:

a.     TMI's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.     As a regulated issuer, TMI filed periodic public reports with the SEC; and

c.     TMI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

99.     As a result of the foregoing, the market for TMI's securities promptly digested current information regarding TMI from all publicly available sources and reflected such information in TMI's stock price.  Under these circumstances, all purchasers of TMI securities during the Class Period suffered similar injury through their purchase of TMI securities at

artificially inflated prices and a presumption of reliance applies.

## IX. NO SAFE HARBOR

100. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of TMI who knew that those statements were false when made.

## COUNT ONE

### Violation of Section 10(b) of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

101. Plaintiff incorporates by reference paragraphs 1 though 91 above as if set forth herein.

102. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase TMI securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them,

took the actions set forth herein.

103.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for TMI securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.    All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

104.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of TMI as specified herein.

105.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TMI value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about TMI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of TMI securities during the Class Period.

106.    Each of the Individual Defendants' primary liability, and controlling person

liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

107.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

108.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of TMI securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of TMI publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired TMI securities during the Class Period at artificially high prices and were damaged thereby.

109. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the true financial position and operating conditions that TMI was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their TMI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

110. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

111. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT TWO

### Violation of Section 20(a) of The Exchange Act Against Defendants Thornburg, Goldstone and Simmons

112. Plaintiff incorporates by reference paragraphs 1 though 111 above as if set forth

herein.

113.    Defendants Thornburg, Goldstone and Simmons acted as controlling persons of TMI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in or awareness of the Company's operations or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants Thornburg, Goldstone and Simmons had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

114.    Defendants Thornburg, Goldstone and Simmons were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

115.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

116.    As set forth above, defendants TMI, Thornburg, Goldberg and Simmons each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants Thornburg, Goldberg and Simmons are liable pursuant to Section 20(a) of the Exchange Act.

117.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and

other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 21, 2007

**BRANCH LAW FIRM**

By: */s/ Richard A. Sandoval*
Richard A. Sandoval
2025 Rio Grande Blvd NW
Albuquerque, NM 87104
(505) 243-3500
(505) 243-3534 (Facsimile)

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: *<u>/s/ Richard A. Sandoval</u>*
Gregory M. Nespole
Fred Taylor Isquith
Martin E. Restituyo
Rachel S. Poplock
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

/486255

**PLAINTIFF'S CERTIFICATION**

Kenneth Z. Slater, as Manager of KT Investments, LLC ("Plaintiff"), declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in Thornburg Mortgage Inc. securities during the Class Period specified in the Complaint are as follows:

| Date | # Shares/transaction | Price |
|---|---|---|
| 11/4/05 | 3,000/purchase | $24.55 |
| 12/1/05 | 1,000/purchase | $26.69 |
| 8/10/07 | 1,500/sale | $20.02 |

5. During the three years prior to the date of this Certificate, Plaintiff has served as a representative party for a class in *In re Bausch & Lomb, Inc. Securities Litigation*, Master File No. 01 CV 6190 (W.D.N.Y.), under the federal securities laws

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of August 2007.

Kenneth Z. Slater

486445

# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KT INVESTMENTS, LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL STRAUSS, NICHOLAS R. MARFINO, MICHAEL A. McMANUS, JR., CATHLEEN C. RAFFAELI, JOHN A. JOHNSTON, IRVING J. THAU, KRISTIAN R. SALOVAARA, and STEVEN A. HOZIE,<br><br>Defendants. | Civil Action No. 2:07-CV-03388-TCP-ETB<br><br>JURY TRIAL DEMANDED |

**DECLARATION OF KENNETH Z. SLATER AS MANAGER OF KT INVESTMENTS, LLC IN SUPPORT OF THE MOTION TO APPOINT THE TURCOT FAMILY/KT INVESTMENTS GROUP LEAD PLAINTIFF AND THE CONCOMITANT SELECTION OF LEAD COUNSEL**

I, Kenneth Z. Slater, as manager of KT Investments, LLC duly declares as follows:

1. I am the manager of KT Investments, LLC ("KT Investments") a substantial institutional investor that manages a family trust. KT Investments, under my direction, manages real estate assets and various types of securities. I am a licensed attorney though I do not actively practice. KT Investments is one of the members of the Turcot Family/KT Investments Group, the proposed Lead Plaintiff. I have personal knowledge of the facts set forth herein and, if called as a witness, would testify competently thereto.

2. KT Investments and the Turcot Family together have suffered a substantial loss arising out the malfeasance of the defendants (an amount that exceeds $390,000) and I believe the Turcot Family/KT Investments Group possesses the largest financial interest in the outcome

of this litigation of any relevant movant for lead plaintiff. I also believe that, standing alone, the Turcot Family has the largest loss notwithstanding the inclusion of my loss calculations.

3. Accordingly, this declaration is made in support of the Turcot Family/KT Investments Group's Motion for an Order Appointing the Turcot Family/KT Investments Group Lead Plaintiff (the "Motion").

4. Moreover, by way of the Motion, I support the position that the Turcot Family should be appointed sole Lead Plaintiff if the Court decides it is appropriate to appoint a sole Lead Plaintiff. I, however, would be willing to remain active in the litigation and assist my chosen counsel in all possible ways and possibly serve as a proposed class representative if circumstances warrant my doing so. I do believe, however, that the interests of the Class would be best served by a Lead Plaintiff that consists of both an individual and institutional investor.

5. The Turcot Family/KT Investments Group also seeks an order appointing Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") as Lead Counsel.

6. KT Investments acquired American Home Mortgage Investment Corp. ("AHM" or the "Company") securities during the Class Period, as set forth in the Certification filed with this Motion and to the Complaint filed in this action annexed to the declaration of my attorney Gregory M. Nespole, a partner with Wolf Haldenstein.

7. As evidenced by the Certification annexed to the Complaint filed by KT Investments on August 15, 2007, KT Investments suffered a loss in excess of $125,000 as a result of that acquisition of AHM stock.

8. KT Investments has played an active role in this litigation from the outset. KT Investments directed its longstanding counsel Wolf Haldenstein to investigate the circumstances surrounding AHM's precipitous decline and necessity to seek protection in bankruptcy.

9. Indeed, I played a substantial role in shaping the complaint's allegations and as evidenced in KT Investments' Certification, I have reviewed the complaint drafted by Mr. Nespole's firm and discussed the case with Mr. Nespole and his partner Mark C. Rifkin. I am thus very familiar with the allegations therein, and authorized my counsel to take the necessary steps to commence this litigation.

10. I have discussed this case and my responsibilities as Lead Plaintiff extensively with Messrs. Rifkin and Nespole of Wolf Haldenstein and I understand that Lead Counsel owes a fiduciary duty to all members of the proposed Class to provide fair and adequate representation.

11. I also understand that I have a fiduciary duty to the class and a responsibility to act in the Class's best interests.

12. I have prior experience in this type of litigation. I was appointed lead plaintiff on behalf of the proposed class in an action styled *In re Bausch & Lomb, Inc. Securities Litigation*, Master File No. 01 CV (W.D.N.Y) and was later appointed a class representative pursuant to rule 23 of the Federal Rule of Civil Procedure. That action was settled by Mr. Rifkin and his firm on very satisfactory terms.

13. Subsequent to filing this action and executing the Certification, I contacted the Wolf Haldenstein firm concerning perceived malfeasance in Thornburg Mortgage Inc. Mr. Nespole and his colleagues investigated the situation and we elected to proceed with a claim. As of this time, I do not intend to move for lead plaintiff in that action and, instead, focus my energy on this case.

14. I understand that it is my responsibility as a member of the Turcot Family/KT Investments Group to keep fully informed at all times concerning the status and progress of this

action, the strengths and weaknesses of the case, and the prospects for any resolution of this matter.

15. I have conferred with Mr. Raoul M. Turcot of the Turcot Family via conference call, along with our counsel. I believe that the combination of my experience along with that of Mr. Turcot - a sophisticated individual investor who suffered a large loss - will afford the class excellent and diverse representation.

16. As a member of the Turcot Family/KT Investments Group, I will consult with Mr. Turcot, and our counsel when necessary on important motions, settlement discussions, trial preparation and trial, and shall have the authority and responsibility to direct counsel with respect to each of these events after receiving the benefits of Lead Counsel's advice. In addition, we will meet or otherwise communicate via telephone or via written correspondence at least quarterly amongst ourselves and Lead Counsel for status updates. We will communicate as often as is necessary to ensure the vigorous and efficient prosecution of this case.

17. I understand that I have the right to select counsel as part of the lead plaintiff process. In connection therewith, I have made a considered judgment in retaining Wolf Haldenstein as lead counsel. I believe that the firm possesses extensive experience in prosecuting complex securities class actions and has the resources necessary to prosecute this action. Indeed, I have retained them in the past and together we achieved an excellent result in the *Bausch & Lomb Litigation* referenced above.

18. I contacted Wolf Haldenstein on my own initiative to initiate my role in the case, rather than having been directly contacted by the attorneys and asked to serve in a lead plaintiff capacity.

19. I have discussed attorneys' fees with counsel and understand that they will be compensated on a contingency basis, and further understand that they will receive only what the Court awards them on successful result of the litigation, as Counsel's portion of the recovery.

20. In addition, I am aware that it may be necessary, and I am willing if the need arises, to travel in connection with this litigation.

21. I believe I and Mr. Turcot implemented sufficient procedures to provide for efficient prosecution of the action, including a regular schedule to discuss and evaluate the action as it progresses.

22. I also understand that the Turcot Family is prepared to serve as the sole Lead Plaintiff should the Court decide it is appropriate to select only one shareholder to serve as a Lead Plaintiff. I am amenable to that strategy but, as stated above, will remain active and available to assist counsel when needed.

23. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:

September 27, 2007

Kenneth Z. Slater
Manager of KT Investments, LLC

**PLAINTIFF'S CERTIFICATION**

Kenneth Z. Slater, as Manager of KT Investments, LLC ("Plaintiff"), declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in American Home Mortgage Investment Corp. securities during the Class Period specified in the Complaint are as follows:

| **Date** | **# Shares/transaction** | **Price** |
|---|---|---|
| 6/2/05 | 1,000/purchase | $31.96 |
| 11/14/05 | 1,200/purchase | $29.01 |
| 11/28/05 | 1,300/purchase | $31.29 |
| 4/10/07 | 1,000/purchase | $20.46 |

5. During the three years prior to the date of this Certificate, Plaintiff has served as a representative party for a class in *In re Bausch & Lomb, Inc. Securities Litigation*, Master File No. 01 CV 6190 (W.D.N.Y.), under the federal securities laws

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of August 2007.

Kenneth Z. Slater

485869

# EXHIBIT G

CLOSED, CLOSED_2004, LEAD

**U.S. DISTRICT COURT**
**U.S. District Court, Western District of New York (Rochester)**
**CIVIL DOCKET FOR CASE #: 6:01-cv-06190-CJS-JWF**

Mahler v. Bausch & Lomb, Inc., et al
Assigned to: Hon. Charles J. Siragusa
Referred to: Hon. Jonathan W. Feldman
Demand: $1,000,000
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 04/13/2001
Date Terminated: 12/15/2004
Jury Demand: None
Nature of Suit: 850 Securities/Commodities
Jurisdiction: Federal Question

**Plaintiff**

**Arnold Mahler**
*on behalf of himself and all others similarly situated*

represented by **Gregory M. Nespole**
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Ave.
New York, NY 10016
(212) 545-4600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**H. Todd Bullard**
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534
585-419-8696
Fax: 585-419-8816
Email: tbullard@harrisbeach.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joel P. Laitman**
Schoengold & Sporn, P.C.
19 Fulton Street
Suite 406
New York, NY 10038
(212) 964-0046
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Savarese**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019-6150
(212) 403-1235
Fax: (212) 403-2000
Email: jfsavarese@wlrk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**K. Wade Eaton**
Chamberlain, D'Amanda, Oppenheimer & Greenfield
1600 Crossroads Building
Two State Street
Rochester, NY 14614
585-232-3730
Fax: 585-232-3882
Email: kwe@cdlawyers.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Mark C. Rifkin**
Wolf, Haldenstein, Adler, Freeman & Hertz, LLP
270 Madison Avenue
11th Floor
New York, NY 10016
212-545-4600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel P. Sporn**
Schoengold & Sporn, P.C.
19 Fulton Street
Suite 406
New York, NY 10038
(212) 964-0046
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Consol Plaintiff</u>**

**Kenneth Slater**
*as Trustee of the Kendall Trust DTD 10/7/98, on behalf of himself and all others similarly situated (consolidated Lead Plaintiff)*

represented by **Brian F. Mumford**
Harvey and Mumford
20 Corporate Woods Boulevard
Albany, NY 12211
(518) 463-4491
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A.P. Brower**
Milberg, Weiss, Bershad, Hynes & Lerach, LLP
One Pennsylvania Plaza
New York, NY 10119-0165
212-594-5300
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory M. Nespole**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Savarese**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**K. Wade Eaton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas H. Burt**
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
11th Floor
New York, NY 10016
(212) 545-4600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Richard Mones**
*on behalf of himself and all other similarly situated*

represented by **Brian F. Mumford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A.P. Brower**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory M. Nespole**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Savarese**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**K. Wade Eaton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas H. Burt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Charles . Miller**
*on behalf of himself and all others similarly situated*

represented by **Brian F. Mumford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory M. Nespole**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Savarese**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Iris Hsu**
*on behlaf of himself and all others similarly situated*

represented by **Brian F. Mumford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory M. Nespole**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Savarese**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bausch & Lomb, Inc.**       represented by   **Carolyn G. Nussbaum**
Nixon Peabody LLP
Clinton Square
P.O. Box 31051
Rochester, NY 14603
(585) 263-1558
Fax: 866-947-0625
Email: cnussbaum@nixonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Savarese**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**William . Carpenter**       represented by   **Carolyn G. Nussbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Savarese**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Khaled Ajez**       represented by   **David A.P. Brower**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**K. Wade Eaton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel H. Rudman**
Coughlin Stoia Geller Rudman & Robbins, LLP
58 South Service Road
Suite 200
Melville, NY 11747
631-367-7100
Fax: 631-367-1173
Email: srudman@lerachlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven G. Schulman**
Milberg, Weiss, Bershad, Hynes & Lerach LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119-0165
(212) 594-5300
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas H. Burt**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Joe Hannon** represented by **David A.P. Brower**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**K. Wade Eaton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven G. Schulman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas H. Burt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Harold Rossen** represented by **Steven G. Schulman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Ai-Yun Tang** represented by **David A.P. Brower**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**K. Wade Eaton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel H. Rudman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven G. Schulman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas H. Burt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/13/2001 | 1 | COMPLAINT filed; FILING FEE $ 150.00 RECEIPT # 61196 (TO) (Entered: 04/16/2001) |
| 04/13/2001 | | SUMMONS(ES) issued for Bausch & Lomb, Inc., William . Carpenter (TO) (Entered: 04/16/2001) |

| | | |
|---|---|---|
| 05/10/2001 | 2 | MOTION by Arnold Mahler to proceed without local counsel court to set return date (TO) (Entered: 05/10/2001) |
| 05/21/2001 | 3 | WAIVER OF SERVICE Returned Executed as to Bausch & Lomb, Inc., William . Carpenter . Request mailed on 4/18/01 . Answer due on 6/17/01 for William . Carpenter, for Bausch & Lomb, Inc. (TO) (Entered: 05/22/2001) |
| 06/11/2001 | 4 | NOTICE of attorney appearance for Bausch & Lomb, Inc., William Carpenter by John F. Savarese and Carolyn Nussbaum (TO) Modified on 06/15/2001 (Entered: 06/11/2001) |
| 06/12/2001 | 5 | MOTION by movants Ajez, Hannon, Rossen and Tang to Consolidate Cases (01cv6241 and 01cv6245) , and appointment as lead plaintiff and for approval of selection of lead counsel court to set return date (TO) Modified on 06/12/2001 (Entered: 06/12/2001) |
| 06/12/2001 | 6 | DECLARATION by J. Douglas Richards attorney for movants, Khaled Ajez, Joe Hannon, Harold Rossen, Ai-Yun Tang Re: in support of [5-1] motion to Consolidate Cases and 01cv6245) by Arnold Mahler, [5-2] motion appointment as lead plaintiff and for approval of selection of lead counsel by Arnold Mahler (TO) (Entered: 06/12/2001) |
| 06/12/2001 | 7 | MEMORANDUM by Khaled Ajez, Joe Hannon, Harold Rossen, Ai-Yun Tang in support of [5-1] motion to Consolidate Cases (01cv6241 and 01cv6245) by Arnold Mahler, [5-2] motion appointment as lead plaintiff and for approval of selection of lead counsel by Arnold Mahler (TO) (Entered: 06/12/2001) |
| 06/12/2001 | 8 | MOTION by Arnold Mahler to Consolidate Cases (with 01cv6241 and 01cv6245 , and appointment of lead plaintiff and approval of lead counsel court to set return date (TO) (Entered: 06/13/2001) |
| 06/12/2001 | 9 | DECLARATION by Ashley Kim attorney for Arnold Mahler Re: [8-1] motion to Consolidate Cases (with 01cv6241 and 01cv6245 by Arnold Mahler, [8-2] motion appointment of lead plaintiff and approval of lead counsel by Arnold Mahler (TO) (Entered: 06/13/2001) |
| 06/12/2001 | 10 | MEMORANDUM by Arnold Mahler in support of [8-1] motion to Consolidate Cases (with 01cv6241 and 01cv6245 by Arnold Mahler, [8-2] motion appointment of lead plaintiff and approval of lead counsel by Arnold Mahler (TO) (Entered: 06/13/2001) |
| 06/25/2001 | 11 | STIPULATION and ORDER, to Extend Time for defendant's to answer until after the court appoints the lead plaintiff and lead counsel signed by USDJ Charles J. Siragusa . Notice and copy of order sent to Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, John F. Savarese, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman . (TO) (Entered: 06/25/2001) |
| 06/25/2001 | 12 | CERTIFICATE OF SERVICE by Arnold Mahler [10-1] support memorandum by Arnold Mahler, [9-1] affirmation by Arnold Mahler, [8-1] motion to Consolidate Cases (with 01cv6241 and 01cv6245 by Arnold Mahler, [8-2] motion appointment of lead plaintiff and approval of lead counsel by Arnold Mahler upon party attorney's (TO) (Entered: 06/25/2001) |
| 06/28/2001 | 13 | MOTION by Khaled Ajez, Joe Hannon, Harold Rossen, Ai-Yun Tang to Withdraw [5-1] motion to Consolidate Cases (01cv6241 and 01cv6245) by Arnold Mahler (TO) (Entered: 07/02/2001) |
| 10/16/2001 | 14 | ORDER (Pretrial order no.1) granting [8-1] motion to Consolidate Cases (with 01cv6241, 6369, 6368 and 6245, granting [8-2] motion appointment of lead plaintiff and approval of lead counsel; plaintiffs' lead counsel may proceed without local counsel, court hereby orders the admission of David Brower, Gregory Nespole and Thomas Burt ( signed by Charles J. Siragusa ) Notice and copy of order sent to Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, John F. Savarese, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (TO) (Entered: 10/17/2001) |
| 10/16/2001 | | Consolidated Lead Case (TO) (Entered: 10/17/2001) |
| 12/17/2001 | 15 | first consolidated class action COMPLAINT (TO) (Entered: 12/18/2001) |
| 02/05/2002 | 16 | ORDER, to Extend Time , Response to consolidated complaint due 3/22/02 granting request for enlargement of briefs from 25 pages to 40 pages and a reply brief from 10 to 15 pages ( signed by USDJ Charles J. Siragusa ) Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (JL) (Entered: 02/06/2002) |
| 03/22/2002 | 17 | MOTION by Bausch & Lomb, Inc., William . Carpenter to Dismiss the first consolidated class action complaint court to set return date (TO) (Entered: 03/25/2002) |
| 03/22/2002 | 18 | MEMORANDUM by Bausch & Lomb, Inc., William . Carpenter in support of [17-1] motion to Dismiss the first consolidated class action complaint by William . Carpenter, Bausch & Lomb, Inc. (TO) Modified on 03/25/2002 (Entered: 03/25/2002) |

| | | |
|---|---|---|
| 03/22/2002 | 19 | AFFIDAVIT by Israel Friedman attorney for Bausch & Lomb, Inc., William . Carpenter in support of [17-1] motion to Dismiss the first consolidated class action complaint by William . Carpenter, Bausch & Lomb, Inc. (TO) (Entered: 03/25/2002) |
| 03/22/2002 | 22 | Unreported Authorities cited in defendants' memorandum of law in support of motion to dismiss (TO) (Entered: 03/28/2002) |
| 03/26/2002 | 20 | ORDER, Response to Motion set to 4/22/02 for [17-1] motion to Dismiss the first consolidated class action complaint , and Reply to Response to Motion set to 6/22/02 for [17-1] motion to Dismiss the first consolidated class action complaint , and Motion Hearing set for 3:00 8/15/02 for [17-1] motion to Dismiss the first consolidated class action complaint ( signed by USDJ Charles J. Siragusa ) Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (TO) (Entered: 03/26/2002) |
| 03/28/2002 | 21 | ORDER, Response to Motion set to 4/30/02 for [17-1] motion to Dismiss the first consolidated class action complaint , and Reply to Response to Motion set to 5/14/02 for [17-1] motion to Dismiss the first consolidated class action complaint , and Motion Hearing set for 3:30 6/13/02 for [17-1] motion to Dismiss the first consolidated class action complaint ( signed by USDJ Charles J. Siragusa ) Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (TO) (Entered: 03/28/2002) |
| 04/11/2002 | 23 | AMENDED SCHEDULING ORDER setting defendant's reply to response due by 6/5/02 ; plaintiff's Response to defendant's motion to dismiss by 5/6/02 ; Oral Argument 3:00 7/25/02 ; ( signed by USDJ Charles J. Siragusa ). Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Thomas H. Burt, David A.P. Brower, E. Wade Eaton, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (TO) (Entered: 04/11/2002) |
| 05/06/2002 | 24 | DECLARATION by K. Wade Eaton in opposition Re: [17-1] motion to Dismiss the first consolidated class action complaint by William . Carpenter, Bausch & Lomb, Inc. (TO) (Entered: 05/07/2002) |
| 05/06/2002 | 25 | MEMORANDUM/RESPONSE by plaintiffs to [17-1] motion to Dismiss the first consolidated class action complaint by William . Carpenter, Bausch & Lomb, Inc. (TO) (Entered: 05/07/2002) |
| 05/07/2002 | 26 | CERTIFICATE OF SERVICE by plaintiffs [25-1] memorandum /response, [24-1] affirmation by K. Wade Eaton upon counsel for defendants (TO) (Entered: 05/08/2002) |
| 06/05/2002 | 27 | Reply MEMORANDUM by Bausch & Lomb, Inc., William . Carpenter in support of [17-1] motion to Dismiss the first consolidated class action complaint by William . Carpenter, Bausch & Lomb, Inc. (TO) (Entered: 06/06/2002) |
| 06/05/2002 | 28 | SUPPLEMENTAL AFFIDAVIT by Israel Friedman attorney for` Bausch & Lomb, Inc., William . Carpenter in support of [17-1] motion to Dismiss the first consolidated class action complaint by William . Carpenter, Bausch & Lomb, Inc. (TO) (Entered: 06/06/2002) |
| 06/24/2002 | 29 | MOTION by plaintiffs to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) Motion Hearing set for 7/25/02 (TO) (Entered: 06/25/2002) |
| 06/24/2002 | 31 | CERTIFICATE OF SERVICE [30-1] support memorandum, [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) upon Carolyn Nussbaum and Jeffrey Boffa (TO) (Entered: 06/25/2002) |
| 06/25/2002 | 30 | PLAINTIFFS' MEMORANDUM in support of [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) (TO) (Entered: 06/25/2002) |
| 06/25/2002 | 32 | DECLARATION by Thomas Burt attorney for lead plaintiffs in support of [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) (TO) (Entered: 06/26/2002) |
| 07/08/2002 | 33 | ORDER, Response to Motion set to 7/12/02 for [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) , and Motion Hearing set for 3:00 7/25/02 for [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) ( signed by USDJ Charles J. Siragusa ) Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Thomas H. Burt, David A.P. |

| | | |
|---|---|---|
| | | Brower, E. Wade Eaton, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (TO) (Entered: 07/09/2002) |
| 07/12/2002 | 34 | MEMORANDUM by Bausch & Lomb, Inc., William . Carpenter in opposition to [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) (TO) (Entered: 07/12/2002) |
| 07/12/2002 | 35 | AFFIDAVIT byIsrael Friedman attorney for Bausch & Lomb, Inc., William . Carpenter, Steven McCluski and Carl Sassano in support of [34-1] opposition memorandum by William . Carpenter, Bausch & Lomb, Inc. (TO) (Entered: 07/12/2002) |
| 07/22/2002 | 36 | REPLY MEMORANDUM by Plaintiffs' in support of [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ( [28-1] support affidavit by William . Carpenter, Bausch & Lomb, Inc., [27-1] support memorandum by William . Carpenter, Bausch & Lomb, Inc.) (TO) Modified on 07/23/2002 (Entered: 07/23/2002) |
| 07/25/2002 | 37 | Minute entry: granting in part, denying in part [29-1] motion to Strike matter outside the pleadings submitted by defendants in support of their motion to dismiss ; [17-1] motion to Dismiss the first consolidated class action complaint under advisement (CJS) (TO) (Entered: 08/01/2002) |
| 03/31/2003 | 38 | ORDER granting in part, denying in part [17-1] motion to Dismiss the first consolidated class action complaint, plaintiff's motion to strike #29 is granted in its entirety ( signed by USDJ Charles J. Siragusa ) Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Thomas H. Burt, David A.P. Brower, E. Wade Eaton, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (TO) (Entered: 03/31/2003) |
| 04/07/2003 | 39 | Letter RESPONSE by Arnold Mahler, Kenneth Slater, Richard Mones, Charles . Miller, Iris Hsu to the letter of defendants' counsel submitted to the court 8/2/02 (TO) (Entered: 04/09/2003) |
| 04/14/2003 | 40 | ORDER REFERRING CASE to USMJ Jonathan W. Feldman for all pretrial matters ( signed by USDJ Charles J. Siragusa ) Notice and copy sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Thomas H. Burt, David A.P. Brower, E. Wade Eaton, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman . (TO) (Entered: 04/15/2003) |
| 04/18/2003 | 41 | STIPULATION and ORDER, reset Answer deadline to 5/30/03 for William . Carpenter, for Bausch & Lomb, Inc. signed by USDJ Charles J. Siragusa . Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Thomas H. Burt, David A.P. Brower, E. Wade Eaton, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman . (TO) (Entered: 04/21/2003) |
| 04/23/2003 | 42 | ORDER, set Scheduling Conference for 9:30 5/28/03 for the purpose of entry of a case management order ( signed by USMJ Jonathan W. Feldman ) Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Thomas H. Burt, David A.P. Brower, E. Wade Eaton, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman (TO) (Entered: 04/23/2003) |
| 05/30/2003 | 43 | ANSWER to the first consolidated class action Complaint by Bausch & Lomb, Inc., William . Carpenter, Steven McCluski and Carl Sassano (Attorney Carolyn Nussbaum ), (TO) Modified on 05/30/2003 (Entered: 05/30/2003) |
| 06/19/2003 | 44 | STIPULATION and ORDER, plaintiffs shall have until 6/23/03 to serve and file a motion for class certification set Motion Filing deadline to 6/23/03 signed by USMJ Jonathan W. Feldman . Notice and copy of order sent to John F. Savarese, Gregory M. Nespole, Brian F. Mumford, Thomas Burt, David A.P. Brower, E. Wade Eaton, Samuel H. Rudman, Steven G. Schulman, Carolyn G. Nussbaum, H. Todd Bullard, Samuel P. Sporn, Joel P. Laitman . (TO) (Entered: 06/20/2003) |
| 06/19/2003 | 46 | Rule 16 Scheduling conference held (JWF) (TO) (Entered: 06/24/2003) |
| 06/23/2003 | 45 | MOTION by Arnold Mahler, Kenneth Slater, Richard Mones, Charles Miller, Iris Hsu for class certification (TO) (Entered: 06/24/2003) |
| 07/03/2003 | 47 | SCHEDULING ORDER setting Deadline for filing of all motions 12/15/04 ; Discovery cutoff 7/15/04 ; Defendant's expert witness ID deadline on 8/30/04 Plaintiff's expert witness ID deadline for 7/30/04; expert discovery by 10/15/04 ( signed by USMJ Jonathan W. Feldman ). Notice and copy of order sent to John F. Savarese in 6:01-cv-06190, Gregory M. Nespole in 6:01-cv-06190, Brian Mumford in 6:01-cv-06190, Thomas H. Burt in 6:01-cv-06190, David A.P. Brower in 6:01-cv-06190, E. Wade Eaton in 6:01-cv-06190, Samuel H. Rudman in 6:01-cv-06190, Steven G. Schulman in 6:01-cv-06190, Carolyn G. Nussbaum in 6:01-cv-06190, H. Todd Bullard in 6:01-cv-06190, Samuel P. Sporn in 6:01-cv-06190, Joel P. Laitman in 6:01-cv-06190 (TO) (Entered: 07/08/2003) |

| | | |
|---|---|---|
| 07/07/2003 | 49 | MOTION by Arnold Mahler in 6:01-cv-06190 for Mark C. Rifkin to Appear Pro Hac Vice (JL) (Entered: 08/18/2003) |
| 07/09/2003 | 50 | ORDER granting [49-1] motion for Mark C. Rifkin to Appear Pro Hac Vice in 6:01-cv-06190 ( signed by USDJ David G. Larimer ) Notice and copy of order sent to all parties (JL) (Entered: 08/18/2003) |
| 08/08/2003 | 48 | STIPULATION and ORDER re: confidential discovery material signed by USMJ Jonathan W. Feldman Notice and copy of order sent to John F. Savarese in 6:01-cv-06190, Gregory M. Nespole in 6:01-cv-06190, Brian F. Mumford in 6:01-cv-06190, Thomas H. Burt in 6:01-cv-06190, David A.P. Brower in 6:01-cv-06190, K. Wade Eaton in 6:01-cv-06190, Samuel H. Rudman in 6:01-cv-06190, Steven G. Schulman in 6:01-cv-06190, Carolyn G. Nussbaum in 6:01-cv-06190, H. Todd Bullard in 6:01-cv-06190, Samuel P. Sporn in 6:01-cv-06190, Joel P. Laitman in 6:01-cv-06190. (JL) (Entered: 08/14/2003) |
| 09/05/2003 | 51 | MOTION by Arnold Mahler in 6:01-cv-06190, Kenneth Slater in 6:01-cv-06241, Iris Hsu in 6:01-cv-06245, Charles . Miller in 6:01-cv-06368, Richard Mones in 6:01-cv-06369 to Compel the defendants to produce all responsive and non-privileged electronic data court to set return date (JL) (Entered: 09/09/2003) |
| 09/05/2003 | 52 | MEMORANDUM by Arnold Mahler in 6:01-cv-06190, Kenneth Slater in 6:01-cv-06241, Iris Hsu in 6:01-cv-06245, Charles . Miller in 6:01-cv-06368, Richard Mones in 6:01-cv-06369 in support of [51-1] motion to Compel the defendants to produce all responsive and non-privileged electronic data by Richard Mones, Charles . Miller, Iris Hsu, Kenneth Slater, Arnold Mahler in 6:01-cv-06190 (JL) (Entered: 09/09/2003) |
| 09/05/2003 | 53 | MOTION by Bausch & Lomb, Inc. in 6:01-cv-06190, William . Carpenter in 6:01-cv-06190 to Compel (TO) (Entered: 09/15/2003) |
| 09/05/2003 | 54 | MEMORANDUM by Bausch & Lomb, Inc. in 6:01-cv-06190, William . Carpenter in 6:01-cv-06190 in support of [53-1] motion to Compel by William . Carpenter, Bausch & Lomb, Inc. (TO) (Entered: 09/15/2003) |
| 09/05/2003 | 55 | SEALED DOCUMENT placed in vault Aff. by Friedman) (TO) (Entered: 09/15/2003) |
| 09/09/2003 | 57 | MEMORANDUM by Arnold Mahler in 6:01-cv-06190 in support of [51-1] motion to Compel the defendants to produce all responsive and non-privileged electronic data by Richard Mones, Charles . Miller, Iris Hsu, Kenneth Slater, Arnold Mahler (TO) (Entered: 09/15/2003) |
| 09/11/2003 | 56 | AMENDED MOTION by Bausch & Lomb, Inc. in 6:01-cv-06190, William . Carpenter in 6:01-cv-06190 to Compel referring to [53-1] motion to Compel by William . Carpenter, Bausch & Lomb, (TO) (Entered: 09/15/2003) |
| 09/12/2003 | | Deadline updated; Response to Motion set to 10/6/03 for [53-1] motion to Compel , Motion Hearing set for 10:00 11/14/03 for [53-1] motion to Compel pursuant to notice (JWF) (JL) (Entered: 09/29/2003) |
| 09/25/2003 | | Deadline updated; Response to Motion set to 10/6/03 for [56-1] amended motion to Compel, set to 10/6/03 for [56-2] amended motion, set to 10/6/03 for [53-1] motion to Compel, set to 10/6/03 for [51-1] motion to Compel the defendants to produce all responsive and non-privileged electronic data , Reply to Response to Motion set to 10/20/03 for [56-1] amended motion to Compel, set to 10/20/03 for [56-2] amended motion, set to 10/20/03 for [53-1] motion to Compel, set to 10/20/03 for [51-1] motion to Compel the defendants to produce all responsive and non-privileged electronic data , Motion Hearing set for 10:00 11/14/03 for [56-1] amended motion to Compel, set for 10:00 11/14/03 for [56-2] amended motion, set for 10:00 11/14/03 for [53-1] motion to Compel, set for 10:00 11/14/03 for [51-1] motion to Compel the defendants to produce all responsive and non-privileged electronic data pursuant to notice (JWF) (JL) (Entered: 09/29/2003) |
| 10/06/2003 | 58 | MEMORANDUM OF LAW in Opposition re 51 plaintiff's Motion to Compel filed by Bausch & Lomb, Inc.. (sealroch, ) (Entered: 10/07/2003) |
| 10/06/2003 | 59 | AFFIDAVIT by Carolyn G. Nussbaum in Opposition re 51 Motion to Compel filed by Bausch & Lomb, Inc.. (sealroch, ) (Entered: 10/07/2003) |
| 10/06/2003 | 60 | AFFIDAVIT by Steven P. Opladen in Opposition re 51 plaintiff's Motion to Compel - filed by Bausch & Lomb, Inc.. (sealroch, ) (Entered: 10/07/2003) |
| 10/06/2003 | 61 | AFFIDAVIT by Marie Smith for Bausch & Lomb in Opposition re 51 plaintiff's Motion to Compel- (sealroch, ) (Entered: 10/07/2003) |
| 10/07/2003 | 62 | RESPONSE (Memorandum) in Opposition re 53 Motion to Compel filed by Arnold Mahler. (JL, ) (Entered: 10/09/2003) |
| 10/10/2003 | 63 | ORDER Status Conference set for 12/8/2003 09:00 AM before Hon. Jonathan W. Feldman. Discovery due by 7/15/2004. Motions due by 12/15/2004.. Signed by Judge Jonathan W. Feldman on 10/10/03. (JL, ) (Entered: 10/17/2003) |

| | | |
|---|---|---|
| 10/20/2003 | 64 | MEMORANDUM IN SUPPORT re 51 Motion to Compel by Iris Hsu, Arnold Mahler, Charles. Miller, Richard Mones, Kenneth Slater. (sealroch, ) (Entered: 10/22/2003) |
| 10/20/2003 | 65 | AFFIDAVIT by Thomas Ferrone for Arnold Mahler in support of motion to compel (sealroch, ) (Entered: 10/22/2003) |
| 10/20/2003 | 66 | DECLARATION by K. Wade Eaton for Arnold Mahler, et al re: motion to compel (sealroch, ) (Entered: 10/22/2003) |
| 10/20/2003 | 67 | REPLY MEMORANDUM IN SUPPORT re 53 Motion to Compel by Bausch & Lomb, Inc., William. Carpenter. (JL, ) (Entered: 10/22/2003) |
| 10/20/2003 | 68 | AFFIDAVIT by Israel Friedman for Bausch & Lomb, Inc., William. Carpenter. (JL, ) (Entered: 10/22/2003) |
| 10/23/2003 | 70 | MOTION to Compel compliance with defendants' document request no. 40 by Bausch & Lomb, Inc.. (JL, ) (Entered: 10/29/2003) |
| 10/23/2003 | 71 | ***SEALED*** MEMORANDUM IN SUPPORT re 70 MOTION to Compel by Bausch & Lomb, Inc.. (JL, ) (Entered: 10/29/2003) |
| 10/23/2003 | 72 | **SEALED** AFFIDAVIT by Israel Friedman for Bausch & Lomb, Inc.. (JL, ) (Entered: 10/29/2003) |
| 10/23/2003 | | Order re: status conference sent to Mark Rifkin of Greenfield & Rifkin returned marked "unable to forward" (JL, ) (Entered: 10/30/2003) |
| 10/24/2003 | 69 | ORDER granting plaintiff's request to extend page limit to 15 pages for reply papers. Signed by Judge Jonathan W. Feldman on 10/24/03. (JL, ) (Entered: 10/29/2003) |
| 10/28/2003 | 73 | AFFIDAVIT by Brian Ansley for Bausch & Lomb, Inc..in support of motion to compel (JL, ) (Entered: 10/29/2003) |
| 10/29/2003 | | Set Deadlines/Hearings: Re: motions to compel Replies due by 11/12/2003. Responses due by 11/5/2003 Oral Argument set for 11/14/2003 10:00 AM before Hon. Jonathan W. Feldman pursuant to notice (JWF). (JL, ) (Entered: 11/07/2003) |
| 11/05/2003 | 74 | **SEALED** MEMORANDUM IN OPPOSITION re defendant's 70 MOTION to Compel by Arnold Mahler. (JL, ) Modified on 11/12/2003 (JL, ). (Entered: 11/12/2003) |
| 11/05/2003 | 75 | **SEALED** DECLARATION by Thomas H. Burt in opposition to defenants' motion to compel by Arnold Mahler. (JL, ) (Entered: 11/12/2003) |
| 11/05/2003 | 76 | CERTIFICATE OF SERVICE by Arnold Mahler (JL, ) (Entered: 11/12/2003) |
| 11/12/2003 | 77 | AFFIDAVIT IN SUPPORT re 70 MOTION to Compel by Noah Doolittle for Bausch & Lomb, Inc.. (JL, ) (Entered: 11/17/2003) |
| 11/12/2003 | 78 | REPLY MEMORANDUM IN SUPPORT re 70 MOTION to Compel by Bausch & Lomb, Inc.. (JL, ) (Entered: 11/17/2003) |
| 11/14/2003 | 90 | Minute Entry for proceedings held before Judge Jonathan W. Feldman : Motion Hearing held on 11/14/2003 re 56 Motion to CompelMotion for Miscellaneous Relief filed by Bausch & Lomb, Inc., William. Carpenter, 51 Motion to Compel filed by Arnold Mahler, 53 Motion to Compel filed by Bausch & Lomb, Inc., William. Carpenter.motions not argued; court direct counsel to try to resolve the motions and the court will rule on whatever is left (Court Reporter digital recording.) (JL, ) (Entered: 08/20/2004) |
| 11/20/2003 | 80 | TRANSCRIPT of Proceedings held on 11/14/03 before Judge Jonathan W. Feldman. Court Reporter: Executype Office Services. (15 pages) (JL, ) (Entered: 11/28/2003) |
| 11/25/2003 | 79 | Sealed Document. Letter by defendants in further opposition motion to compel (TO, ) (Entered: 11/26/2003) |
| 12/01/2003 | 81 | LETTER BRIEF by Iris Hsu, Arnold Mahler in further suport of plaintiff's moton to compel (JL, ) (Entered: 12/05/2003) |
| 12/05/2003 | 82 | ORDER that a meet and confer on class certification and merits discovery shall be postpone until 30 days after the Court formally rules on the disocovery disputes.. Signed by Judge Jonathan W. Feldman on 12/5/03. (JL, ) (Entered: 12/15/2003) |
| 12/15/2003 | 83 | ***SEALED *** LETTER by defendants re: discovery disputes. (JL, ) (Entered: 12/19/2003) |
| 02/11/2004 | | MOTIONS 45 Motion for Miscellaneous Relief is being handled by Judge Charles J. Siragusa. (LMD, ) (Entered: 02/11/2004) |

| | | |
|---|---|---|
| 05/18/2004 | 84 | STIPULATION AND ORDER staying discovery for 90 days. Signed by Hon. Jonathan W. Feldman on 5/18/04. (JL, ) (Entered: 05/18/2004) |
| 07/16/2004 | | NOTICE of Hearing on Motion for Class Certification and Proposed Settlement Motion Hearing set for 8/3/2004 04:30 PM before Hon. Charles J. Siragusa. (KAR, ) (Entered: 07/16/2004) |
| 08/03/2004 | 85 | MOTION for Settlement by Arnold Mahler. (Eaton, K. Wade) (Entered: 08/03/2004) |
| 08/03/2004 | 86 | MEMORANDUM IN SUPPORT re 85 MOTION for Settlement by Arnold Mahler. (Eaton, K. Wade) (Entered: 08/03/2004) |
| 08/05/2004 | | NOTICE of Hearing on Motion for Provisional Class Certification and Proposed Settlement is rescheduled for AUGUST 17, 2004 AT 11 A.M. (KAR, ) (Entered: 08/05/2004) |
| 08/17/2004 | 87 | Minute Entry for proceedings held before Judge Charles J. Siragusa : Conference on stipulated settlement held. Fairness Hearing scheduled for 11/5/04 at 2:00 p.m.(Court Reporter Frank Leogrande.) (MSH, ) (Entered: 08/17/2004) |
| 08/17/2004 | 88 | STIPULATION OF SETTLEMENT by Bausch & Lomb, Inc., William. Carpenter, Iris Hsu, Arnold Mahler, Charles. Miller, Richard Mones, Kenneth Slater. (Attachments: # 1 exhibits A-D# 2 exhibits E,F)(JL, ) (Entered: 08/19/2004) |
| 08/19/2004 | 89 | PRELIMINARY APPROVAL ORDER . Signed by Hon. Charles J. Siragusa on 8/18/04. (JL, ) (Entered: 08/19/2004) |
| 09/15/2004 | 91 | AMENDED Preliminary Approval ORDER . Signed by Hon. Charles J. Siragusa on 9/13/04. (JL, ) (Entered: 09/17/2004) |
| 10/15/2004 | 92 | MEMORANDUM in Support re 85 MOTION for Settlement filed by Arnold Mahler. (Attachments: # 1 Certificate of Service)(Eaton, K. Wade) (Entered: 10/15/2004) |
| 10/15/2004 | 93 | AFFIDAVIT in Support re 85 MOTION for Settlement *by Thomas Burt, Esq.* filed by Arnold Mahler. (Attachments: # 1 Exhibit 1-4# 2 Exhibit 5-6# 3 Exhibit 7-13)(Eaton, K. Wade) (Entered: 10/15/2004) |
| 10/21/2004 | 94 | CERTIFICATE OF SERVICE by Arnold Mahler re 93 Affidavit in Support of Motion *by Thomas Burt to A pprove Settlement* (Eaton, K. Wade) (Entered: 10/21/2004) |
| 10/29/2004 | 95 | MEMORANDUM in Support re 85 MOTION for Settlement *(Supplemental)* filed by Arnold Mahler. (Attachments: # 1 Exhibit A# 2)(Eaton, K. Wade) (Entered: 10/29/2004) |
| 11/05/2004 | 96 | MEMORANDUM IN SUPPORT re 85 MOTION for Settlement *and Petition for award of counsel fees* byArnold Mahler. (Eaton, K. Wade) (Entered: 11/05/2004) |
| 11/05/2004 | 97 | Minute Entry for proceedings held before Judge Charles J. Siragusa : Appearances: For the plaintiffs: Mark Rifkin, Thomas Burt, K. Wade Eaton. For the defendants: John Savarese, Israel Friedman, Carolyn Nussbaum, Richard McGuirkMatter on for fairness hearing. Court approves the settlement amount but wants to consider the fee applications. Court will issue a decision in 30-45 days. (Court Reporter Frank Leogrande.) (MSH, ) (Entered: 11/05/2004) |
| 12/07/2004 | 98 | DECISION AND ORDER granting in part and denying in part 85 Motion for Settlement. The Court gives final certification to this action as a class action, and approves the settlement of the case for the sum of $12,500,000.00. The Court further directs that payments be made to lead counsel as follows: 1) an award of $3,125,000.00 for attorneys? fees; 2) an award of $197,331.65 for expenses; 3) an award of $250.00 to Kenneth Slater; 4) an award of $550.00 to Agnes Tang; and 5) an award of $832.63 to Joseph Hannon. Signed by Judge Charles J. Siragusa on 12/6/04. (KAR, ) (Entered: 12/07/2004) |
| 12/15/2004 | 99 | ORDER AND FINAL JUDGMENT . Signed by Hon. Charles J. Siragusa on 12/14/04. (JL, ) (Entered: 12/20/2004) |
| 01/25/2006 | 100 | MOTION for Disbursement of Funds *to Class Members, etc.* by Arnold Mahler. (Attachments: # 1 Text of Proposed Order)(Eaton, K. Wade) (Entered: 01/25/2006) |
| 01/25/2006 | 101 | AFFIDAVIT *of Thomas Burt* by Arnold Mahler. (Attachments: # 1 Exhibit A to Burt Affidavit# 2 Exhibit B to Burt Affidavit)(Eaton, K. Wade) (Entered: 01/25/2006) |
| 01/25/2006 | 102 | AFFIDAVIT in Support re 100 MOTION for Disbursement of Funds *to Class Members, etc. of Stephen J. Cirami* filed by Arnold Mahler. (Attachments: # 1 Exhibit A to Cirami Affidavit# 2 Exhibit B to Cirami Affidavit# 3 Exhibit C to Cirami Affidavit)(Eaton, K. Wade) (Entered: 01/25/2006) |

| | | |
|---|---|---|
| 01/25/2006 | 103 | CERTIFICATE OF SERVICE by Arnold Mahler re 102 Affidavit in Support of Motion,, 100 MOTION for Disbursement of Funds *to Class Members, etc.*, 101 Affidavit *in Support of Motion* (Eaton, K. Wade) (Entered: 01/25/2006) |
| 02/01/2006 | 104 | CERTIFICATE OF SERVICE by Arnold Mahler re 100 MOTION for Disbursement of Funds *to Class Members, etc.* (Eaton, K. Wade) (Entered: 02/01/2006) |
| 02/01/2006 | 105 | SETTLEMENT DISTRIBUTION ORDER granting 100 Motion for Disbursement of Funds . Signed by Judge Charles J. Siragusa on 1/31/06. (KAR, ) (Entered: 02/01/2006) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/17/2008 18:22:57 | | | |
| **PACER Login:** | kg0557 | **Client Code:** | Municipal Mortgage |
| **Description:** | Docket Report | **Search Criteria:** | 6:01-cv-06190-CJS-JWF |
| **Billable Pages:** | 11 | **Cost:** | 0.88 |

# EXHIBIT H

The Honorable Marsha J. Pechman

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation

**No. 2:08-mdl-01919-MJP**

TOM SNEVA, Derivatively on Behalf of WASHINGTON MUTUAL, INC.,

Plaintiff,

v.

KERRY K. KILLINGER, STEPHEN ROTELLA, THOMAS W. CASEY, JAMES B. CORCORAN, JOHN F. WOODS, ANNE V. FARRELL, STEPHEN E. FRANK, THOMAS C. LEPPERT, CHARLES M. LILLIS, PHILLIP D. MATTHEWS, REGINA T. MONTOYA, MICHAEL K. MURPHY, MARY E. PUGH, WILLIAM G. REED, JR., ORIN C. SMITH and JAMES H. STEVER,

Defendants,

-and-

WASHINGTON MUTUAL, INC.,

Nominal Defendants.

**No. C07-1826 MJP**

PLAINTIFFS TOM SNEVA, LYNNE HARRISON, KENNETH Z. SLATER AND WALTER RYAN'S MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS

**NOTE FOR MOTION:**
April 25, 2008

*[ADDITIONAL CAPTIONS FOLLOW]*

LAW OFFICES
**BRESKIN JOHNSON & TOWNSEND PLLC**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

LYNNE HARRISON, Derivatively on Behalf of WASHINGTON MUTUAL, INC.,

Plaintiff,

v.

KERRY K. KILLINGER, STEPHEN ROTELLA, THOMAS W. CASEY, JAMES B. CORCORAN, JOHN F. WOODS, ANNE V. FARRELL, STEPHEN E. FRANK, THOMAS C. LEPPERT, CHARLES M. LILLIS, PHILLIP D. MATTHEWS, REGINA T. MONTOYA, MICHAEL K. MURPHY, MARY E. PUGH, WILLIAM G. REED, JR., ORIN C. SMITH and JAMES H. STEVER,

Defendants,

-and-

WASHINGTON MUTUAL, INC.,

Nominal Defendant.

**No. C07-1827 MJP**

*[ADDITIONAL CAPTIONS FOLLOW]*

**PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS**

- ii -

LAW OFFICES
**BRESKIN JOHNSON & TOWNSEND PLLC**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

KENNETH Z. SLATER, as Manager of KT INVESTMENTS, LLC, and EVELYN WEINGARTEN, Derivatively on Behalf of WASHINGTON MUTUAL, INC.,

Plaintiffs,

v.

KERRY K. KILLINGER, ANNE V. FARRELL, STEPHEN E. FRANK, THOMAS C. LEPPERT, CHARLES M. LILLIS, PHILLIP D. MATTHEWS, REGINA T. MONTOYA, MICHAEL K. MURPHY, MARGARET OSMER-MCQUADE, MARY E. PUGH, WILLIAM G. REED, JR., ORIN C. SMITH, JAMES H. STEVER, STEVEN J. ROTELLA, THOMAS W. CASEY, JAMES B. CORCORAN, DAVID C. SCHNEIDER and JOHN F. WOODS,

Defendants,

-and-

WASHINGTON MUTUAL, INC.,

Nominal Defendant.

**No. C08-0005 MJP**

*[ADDITIONAL CAPTIONS FOLLOW]*

**PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS**

- iii -

LAW OFFICES
**BRESKIN JOHNSON & TOWNSEND PLLC**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

WALTER E. RYAN, JR., Individually and on Behalf of Others Similarly Situated,

Plaintiff,

v.

KERRY K. KILLINGER, STEPHEN E. FRANK, CHARLES M. LILLIS, REGINA T. MONTOYA, MARGARET OSMER-MCQUADE, WILLIAM G. REED JR., JAMES H. STEVER, ANNE V. FARRELL, THOMAS C. LEPPERT, PHILLIP D. MATTHEWS, MICHAEL K. MURPHY, MARY E. PUGH, AND ORIN C. SMITH, FIRST AMERICAN CORPORATION, AND EAPPRAISALIT, INC.,

Defendants,

-and-

WASHINGTON MUTUAL, INC.,

Nominal Defendant.

**No. C08-0095 MJP**

*[ADDITIONAL CAPTIONS FOLLOW]*

PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS

- iv -

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

| | |
|---|---|
| JOSEPH PROCIDA, Derivatively on Behalf of the Nominal Defendant,<br><br>Plaintiff,<br><br>v.<br><br>KERRY K. KILLINGER, STEPHEN ROTELLA, THOMAS W. CASEY, JAMES B. CORCORAN, JOHN F. WOODS, ANNE V. FARRELL, STEPHEN E. FRANK, THOMAS C. LEPPERT, CHARLES M. LILLIS, PHILLIP D. MATTHEWS, REGINA T. MONTOYA, MICHAEL K. MURPHY, MARY E. PUGH, WILLIAM G. REED, JR., ORIN C. SMITH, JAMES H. STEVER and JOHN DOES 1-10,<br><br>Defendants,<br><br>-and-<br><br>WASHINGTON MUTUAL, INC.,<br><br>Nominal Defendant. | **No. C08-0389 MJP** |

## I. INTRODUCTION

Plaintiffs Tom Sneva ("Sneva"), Lynne Harrison ("Harrison"), Kenneth Z. Slater ("Slater") and Walter Ryan ("Ryan") (collectively, "Plaintiffs") respectfully move for an order consolidating all of the above-captioned related actions for all purposes pursuant to Fed. R. Civ. P. 42(a) and appointing the law firms of Faruqi & Faruqi, LLP and Krislov & Associates, Ltd. as co-lead counsel ("Proposed Co-Lead Counsel") and Breskin Johnson & Townsend PLLC as liaison counsel for Plaintiffs ("Proposed Liaison Counsel").

The appointment of a lead counsel structure will contribute to the efficient prosecution of all derivative actions brought on behalf of Washington Mutual, Inc. ("WaMu" or the "Company") and improve the administration of justice. Further, Plaintiffs' selection of counsel – co-lead counsel Faruqi & Faruqi, LLP and Krislov & Associates, Ltd. and liaison counsel Breskin Johnson & Townsend PLLC – are experienced in the area of shareholder derivative litigation and are committed to prosecuting the consolidated actions in the best interests of the Company and its shareholders. Accordingly, Plaintiffs respectfully request that this Court grant their motion to consolidate the

LAW OFFICES
**BRESKIN JOHNSON & TOWNSEND PLLC**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

above-captioned actions for all purposes and approve Plaintiffs' selection of co-lead and liaison counsel.

## II. PROCEDURAL HISTORY

The above-captioned actions are shareholder derivative actions brought by shareholders of nominal defendant WaMu against certain of the Company's officers and directors (the "Individual Defendants"), and all allege that the Individual Defendants[1] breached their fiduciary duties to WaMu in connection with the Company's recent improper subprime lending practices.[2]

Plaintiffs Sneva and Harrison filed their respective shareholder derivative complaints on November 13, 2007, Slater filed his complaint on January 3, 2008, and Ryan filed his complaint on January 18, 2008. All of Plaintiffs' complaints were filed in this Court. All Plaintiffs allege that WaMu has incurred significant damages as a result of various practices permitted by the Individual Defendants since April 2006, including allowing WaMu personnel to wrongly manipulate the appraisal value of properties in order to qualify the properties for subprime loans from the Company, repeatedly misrepresent the sufficiency of its loss reserves for subprime loans and misrepresent that the reserves were calculated and reported to investors in compliance with Generally Accepted Accounting Principles or "GAAP." All of Plaintiffs' complaints allege substantially similar causes of action seeking the same relief against mostly identical defendants for the same alleged misconduct, during the same time period.

In addition to the complaints filed by Plaintiffs, plaintiff Joseph Procida ("Procida") filed two actions: a shareholder derivative complaint in the United States District Court for the Southern

---

[1] There are slight variations among the complaints as to which current or former WaMu officers and/or directors are named as defendants, but collectively, the complaints name Kerry K. Killinger, Stephen Rotella, Thomas W. Casey, James B. Corcoran, John F. Woods, Anne V. Farrell, Stephen E. Frank, Thomas C. Leppert, Charles M. Lillis, Phillip D. Matthews, Regina T. Montoya, Michael K. Murphy, Mary E. Pugh, William G. Reed, Jr., Orin C. Smith, James H. Stever, and David C. Schneider. *Procida I* (as defined herein) also names ten unknown WaMu loan officers and executives as John Does 1-10. All these defendants are collectively referred to herein as the "Individual Defendants." WaMu and the Individual Defendants are collectively referred to herein as the "Defendants."

[2] The *Ryan* complaint also alleges a claim against First American Corporation and eAppraiseIT for aiding and abetting the Individual Defendants' breaches of their fiduciary duties.

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

District of New York on January 23, 2008, currently styled as *Procida v. Killinger, et al.*, No. C08-0389 MJP ("*Procida I*"), and another shareholder derivative complaint in this Court on March 6, 2008, currently styled as *Procida v. Killinger, et al.*, No. C08-0466-MJP ("*Procida II*") (collectively, "*Procida*"). The complaint in *Procida I* is almost a verbatim copy of the *Sneva* and *Harrison* complaints. *Procida II* incorporates all the allegations from *Procida I* and adds unrelated allegations regarding alleged wrongdoing during the time period from April 15, 2003 to June 28, 2004. The new allegations in *Procida II* regarding the earlier allegations of wrongdoing are an almost verbatim copy of allegations raised in a long pending and stayed shareholder derivative action, *Lee Family Investments v. Killinger, et al.,* No C05-2121-ORD (W.D. Wash.). Accordingly, Plaintiffs do not seek consolidation of the *Procida II* action and its stayed claims.

Other plaintiffs have filed class action complaints against WaMu for violations of federal securities laws and the Employment Retirement Income Security Act ("ERISA"), also related to alleged wrongdoing in connection with WaMu's subprime lending practices in this Court and in the United States District Court for the Southern District of New York.[3]

On November 28, 2007, WaMu moved before the Judicial Panel on Multidistrict Litigation ("JPMDL") pursuant to 28 U.S.C. §1407 to "coordinate or consolidate" the seven then-pending class, derivative, and ERISA actions raising allegations regarding WaMu's subprime lending practices before Judge Pechman in the Western District of Washington. (Motion of Washington Mutual for Transfer of Actions to the Western District of Washington Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings ("MDL Motion") attached to Declaration of Clinton A. Krislov in Support of Plaintiffs Tom Sneva, Lynne Harrison, Kenneth Z. Slater and Walter Ryan's Motion to Consolidate All Related Shareholder Subprime Derivative Actions qnd Appoint Lead Counsel for Derivative Plaintiffs ("Krislov Decl.") as Exhibit A). WaMu also

---

[3] *Koesterer v. Killinger, et al.*, No. 07 Civ. 9801(S.D.N.Y.), *Abrams v. Killinger, et al.,* No. 07 Civ. 9806 (S.D.N.Y.), *Nelson v. Killinger, et al.*, No. C07-1809 (W.D. Wash.), *Sneva v. Killinger, et al.,* No. C07-1826 (W.D. Wash.), *Harrison v. Killinger, et al.,* No. C07-1827 (W.D. Wash.), *Bushansky v. Killinger, et al.,* No. C07-1874 (W.D. Wash.), *Bussey v. Killinger, et al.,* No. C07-1879 (W.D. Wash.).

LAW OFFICES
**BRESKIN JOHNSON & TOWNSEND PLLC**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

Case 1:08-cv-00980-RMB Document 41-4 Filed 04/10/2008 Page 8 of 19

requested that all subsequently filed related actions be coordinated or consolidated before Judge Pechman. *Id.* Plaintiffs Sneva and Harrison filed a response to WaMu's MDL Motion on December 20, 2007, in which they did not oppose the coordination of the related litigation before Judge Pechman, but did object to the extent that WaMu sought ***consolidation*** of subprime derivative actions with non-derivative related (class) actions. (Joint Response of Federal Derivative Plaintiffs Tom Sneva and Lynne Harrison to Motion to Transfer and Coordinate or Consolidate Actions for Pretrial Proceedings Under 28 U.S.C. § 1407 (" MDL Response") attached to Krislov Decl. as Exhibit B).[4] Plaintiff Ryan's counsel appeared at the JPMDL hearing on the MDL Motion, held on January 30, 2008, and supported the arguments of Sneva and Harrison that derivative actions should be coordinated, but not consolidated with the securities class actions and ERISA actions. On February 21, 2008, the JPMDL issued an order transferring the seven actions and related actions before Judge Pechman. As of the date of this filing, the *Procida* actions and all of Plaintiffs' cases, have been transferred to Judge Pechman.[5]

## III. ARGUMENT

### A. THE COURT SHOULD CONSOLIDATE THE RELATED ACTIONS

Plaintiffs seek consolidation of the following shareholder subprime derivative actions (the "Subprime Derivative Actions"):

---

[4] On December 14, 2007, plaintiffs Sneva and Harrison moved in both of their respective actions to consolidate both actions and to appoint Faruqi & Faruqi, LLP and Gardy & Notis, LLP as co-lead counsel. (Plaintiffs' Motion to Transfer and Consolidate Related Shareholder Derivative Actions and Appoint a Leadership Structure for Derivative Plaintiffs ("Plaintiffs' Transfer Motion") attached to Krislov Decl. as Exhibit C). At that time, *Sneva* and *Harrison* were the only pending WaMu derivative actions raising subprime lending practice claims. The Transfer Motion was brought to expedite proceedings in conjunction with the MDL Motion. After other derivative actions were filed, Sneva and Harrison's Transfer Motion was mooted and on March 4, 2008, plaintiffs Sneva and Harrison filed a notice striking the motion. (Notice of Striking Derivative Plaintiffs' Motion to Transfer and Consolidate Related Shareholder Derivative Actions and Appoint a Leadership Structure for Derivative Plaintiffs attached to Krislov Decl. as Exhibit D).

[5] *Koesterer* and *Abrams* are class actions initially filed in United States District Court for the Southern District of New York alleging claims against WaMu for violations of federal securities laws and have also been transferred to Judge Pechman.

PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS

- 4 -

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

| Case Name | Case No. | Filing Date |
|---|---|---|
| *Sneva v. Killinger, et al.* | 07-cv-1826-MJP | November 13, 2007 |
| *Harrison v. Killinger, et al.* | 07-cv-1827-MJP | November 13, 2007 |
| *Slater v. Killinger, et al.* | 08-cv-0005-MJP | January 3, 2008 |
| *Ryan v. Killinger, et al.* | 08-cv-0095-MJP | January 18, 2008 |
| *Procida v. Killinger, et al.* | 08-cv-0389-MJP | January 23, 2008 |

The consolidation of actions in federal court is governed by Rule 42 of the Federal Rules of Civil Procedure which provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed. R. Civ. P. 42(a); *see also In re Adams Apple, Inc.*, 829 F.2d 1484, 1487 (9th Cir. 1987) ("consolidation is within the broad discretion of the district court…and trial courts may consolidate cases *sua sponte*").

Here, the Subprime Derivative Actions name nearly identical defendants and claims on behalf of WaMu, and arise from the same factual circumstances. Defendants have acknowledged that the actions are "related actions" and have requested consolidation before Judge Pechman before the JPMDL. *See* MDL Motion at ¶18. Consolidation of the Subprime Derivative Actions is necessary and appropriate and will serve to promote efficient litigation by expediting pretrial proceedings, avoiding duplication of effort, avoiding harassment of parties and witnesses and minimizing the expenditure of time and money by all persons concerned. Consolidation of the Subprime Derivative Actions is also warranted because all of these cases are dependant on proof of the same questions of law and fact – specifically, whether the Individual Defendants breached their fiduciary duties to WaMu by, *inter alia*, engaging in improper business practices which led to accounting improprieties. Hence, plaintiffs in each case will seek to review the same documents and depose the same witnesses. Under these circumstances, consolidation is proper pursuant to Fed. R. Civ. P. 42(a).

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

**B. THE COURT SHOULD NOT CONSOLIDATE *PROCIDA II* WITH THE SUBPRIME DERIVATIVE ACTIONS**

Plaintiffs do not seek to have *Procida II* consolidated with the Subprime Derivative Actions because that case contains unrelated claims and allegations already raised in pending, but stayed litigation. As noted above, plaintiff Procida first filed *Procida I* in the Southern District of New York, raising identical claims – with identical language – as plaintiffs Sneva and Harrison. Plaintiff Procida then filed *Procida II*, repeating the allegations in *Procida I*, and adding allegations regarding alleged wrongdoing involving WaMu occurring during the period from April 15, 2003 to June 28, 2004. The new allegations in *Procida II* were recycled almost entirely from the complaint in *Lee Family Investments*.[6] *Lee Family Investments* is currently stayed[7] pending the final resolution of class action securities litigation captioned *South Ferry LP et al. v. Killinger, et al.*, No C04-1599C, which is currently on appeal.

Consolidation of *Procida II* is not warranted because the action raises numerous allegations that are completely unrelated to the allegations raised in the Subprime Derivative Actions. Indeed, the new allegations in *Procida II* all involve alleged wrongdoing which transpired two years before the conduct alleged in the Subprime Derivative Actions. Consolidation of extraneous and unrelated allegations would needlessly complicate the proceedings, unnecessarily taxing the resources of the Court and the parties. Further, Plaintiffs' claims should not be consolidated with an action that raises claims that have already been stayed in *Lee Family Investments*. Consolidation with an action raising stayed claims arguably puts Plaintiffs in violation of the *Lee Family Investments* Stay Order and puts Plaintiffs' unrelated allegations at risk of being stayed. *See Mul-T-Lock Corp. v. Mul-T-Lock Ltd.*, No. 83-1620, 1984 U.S. Dist. LEXIS 20490, at *3-4 (E.D.N.Y. Jan. 12, 1984) (consolidating and staying new claims with prior stayed claims). Plaintiff Procida would not be

---

[6] Counsel for Procida Mikkelborg, Broz, Wells & Fryer, PLLC, also represents the plaintiff in *Lee Family Investments.*

[7] *See* Order to Stay All Proceeding Pending Resolution of Related Case, attached to Krislov Decl. as Exhibit E.

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

prejudiced if this Court does not consolidate *Procida II* with the Subprime Derivative Actions because the relevant allegations, which are the ones raised in *Procida I*, would be consolidated with the Subprime Derivative Actions.[8]

## C. THE COURT SHOULD APPOINT LEAD AND LIAISON COUNSEL FOR THE CONSOLIDATED SUBPRIME DERIVATIVE ACTIONS

In shareholder derivative cases, it is well established that the court may appoint a lead counsel structure to coordinate the prosecution of the litigation. *See, e.g.*, *In re Comverse Tech., Inc. Deriv. Litig.*, No. 06-1849, 2006 U.S. Dist. LEXIS 94235, at *4 (E.D.N.Y. Sept. 22, 2006) (appointing lead counsel); *Wright v. Krispy Kreme Doughnuts, Inc.*, 232 F.R.D. 528, 530 (M.D.N.C. 2005) (appointing lead and liaison counsel); *Horn v. Raines*, 227 F.R.D. 1, 4 (D.D.C. 2005) (appointing lead counsel).

Further, the *Manual for Complex Litigation* recognizes the benefits of appointing lead counsel in complex, multiparty litigation:

> Complex litigation often involves numerous parties with common or similar interests but separate counsel. Traditional procedures in which all papers and documents are served on all attorneys, and each attorney files motions, presents arguments, and examines witnesses, may waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily. Instituting special procedures for coordination of counsel early in the litigation will help to avoid these problems.

*Manual for Complex Litigation, Fourth* §10.22 (2004).

In this case it makes sense to appoint lead counsel for plaintiffs to ensure the efficient prosecution of the Subprime Derivative Actions. Indeed, if no lead counsel is appointed there could be substantial duplication of discovery and briefing which would waste the resources of the parties as well as the Court.

---

[8] If Proposed Co-Lead Counsel is appointed, they intend to file on behalf of all plaintiffs a consolidated complaint which would not include the additional allegations raised in *Procida II.* The other claims are already being pursued by Procida's counsel in *Lee Family Investments.*.

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

### D. THE COURT SHOULD APPOINT FARUQI & FARUQI, LLP AND KRISLOV & ASSOCIATES, LTD. AS CO-LEAD COUNSEL AND BRESKIN JOHNSON & TOWNSEND PLLC AS LIAISON COUNSEL FOR THE CONSOLIDATED SUBPRIME DERIVATIVE ACTIONS

Federal courts have articulated various factors to be considered in the selection of lead counsel in derivative action diversity cases, including "(1) the quality of the pleadings; (2) the vigorousness of the prosecution of the lawsuits; and (3) the capabilities of counsel" and also Fed. R. Civ. P. Rule 23(g) factors: "(1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable laws; (4) the resources counsel will commit to representing the class; and (5) any other matter pertinent to counsel's ability to fairly represent the interests of the class." *Comverse,* 2006 U.S. Dist. LEXIS 94235, at *9-10; *see also Hacker v. Peterschmidt*, No. 06-3468, 2006 U.S. Dist. LEXIS 77325, at *10 (N.D. Cal. Oct. 12, 2006); *Millman v. Brinkley*, No. 03-3831, 2004 U.S. Dist. LEXIS 20113, at *5 (N.D. Ga. Oct. 1, 2004); *Dollens v. Zionts*, No. 01-5931, 2001 U.S. DIST. LEXIS 19966 (N.D. Ill. Dec. 4, 2001). Some courts have also looked to whether or not the client of proposed lead counsel has a significant financial interest in the outcome of the litigation. *See, e.g., Hacker*, 2006 U.S. Dist. LEXIS 77325, at *10 (noting lead plaintiffs collectively owned over 5,500 shares of nominal defendant). However, courts have specifically refused to apply the presumption from the inapplicable Private Securities Litigation Reform Act of 1995 ("PSLRA") which provides that the lead plaintiff in a fraud action filed under federal securities law is presumptively the plaintiff with the largest financial interest. *See Comverse*, 2006 U.S. Dist. LEXIS 94235, at *11 ("the PSLRA is simply not an adequate template from which to determine whom should be appointed lead counsel in a shareholder derivative case."). These factors strongly favor the selection of Faruqi & Faruqi, LLP and Krislov & Associates, Ltd. as co-lead counsel.

#### 1. Proposed Co-Lead Counsel Filed Quality Pleadings and are Vigorously Prosecuting their Lawsuits

Plaintiffs Sneva and Ryan both filed detailed and well researched complaints. The *Sneva* complaint was the first filed. While courts have routinely rejected a "first filed" rule, *see, e.g.*,

PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS

- 8 -

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

*Biondi v. Schrushy*, 820 A.2d 1148, 1158 (Del. Ch. 2003), the fact that the *Sneva* complaint was filed first highlights the diligence and original research and drafting by Sneva's counsel, Faruqi & Faruqi, LLP. *See In re The Topps Co. S'holder Litig.*, No. 600715/07, 2007 N.Y. Misc. LEXIS 8973, at *8 (N.Y. Supr. Ct. June 8, 2007) (Prompt commencement of litigation upon disclosure of wrongdoing "shows the tenacity and ability of this plaintiff and his counsel to act quickly and forcefully to challenge what they believe to be improper actions by the [] board of directors."). Although not first filed, Ryan's complaint is not a duplicate of other filed complaints, but a quality product of independent research and drafting by Ryan's counsel, Krislov & Associates, Ltd. The demonstrated quality and diligence of Proposed Co-Lead Counsel's work in this case to date strongly favors their selection as co-lead counsel.

In marked contrast to Proposed Co-Lead Counsel, counsel for plaintiff Procida clearly did not do much original research or drafting, as the complaint in *Procida I* is almost an exact copy of the complaint in *Sneva*.[9] Counsel for Procida similarly appear to have failed to have spent much time and effort researching and drafting the *Procida II* complaint, which again copies from the *Sneva* complaint and then recycles allegations from the *Lee Family Investments* complaint.

Further, the fact that *Procida II* adds the separate, stayed *Lee Family Investments* allegations is troubling. First, *Procida II* inexplicably lumps disparate allegations involving two completely separate time periods together with the only common thread being that both sets of allegations involve the Company and some of the same individual defendants. Second, *Procida II* combines new, viable claims with claims that have been stayed for over two years, potentially subjecting the viable claims in *Procida II* and the claims brought by Plaintiffs at risk of unnecessarily being stayed as well. Finally, the non-subprime claims in *Procida II* involve conduct that ended almost four years ago, and *Lee Family Investments* has been pending for over two years. Thus Procida has not

---

[9] The fact that Procida copied from Sneva's complaint is further testament to the quality of the pleadings in *Sneva*. *See Millman*, 2004 U.S. Dist. LEXIS 20113, at *10-11 ("Plaintiff Tam's use of Plaintiff Millman's and Walter's Complaint as a template for the Complaint filed by Plaintiff Tam underscores the quality of their work.")

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

exercised any diligence in pursuing the *Lee Family Investments* claims. Notably, Procida is the only plaintiff of five that does not support the counsel organization proposed herein. Krislov Decl. at ¶¶19-22.

**2. Proposed Co-Lead Counsel Are Knowledgeable, Capable and Experienced in Handling Complex Litigation Including Shareholder Derivative Actions**

Faruqi & Faruqi, LLP, Krislov & Associates, Ltd. and Breskin Johnson & Townsend PLLC are qualified to prosecute this litigation given their extensive experience in complex shareholder derivative litigation. As set forth in the firm resumes attached hereto,[10] these firms have been appointed by numerous courts to lead complex derivative cases.

Proposed Co-Lead Counsel, Krislov & Associates, Ltd., has shown it ability and success in prosecuting shareholder actions in the most complicated of cases. Krislov Decl. at ¶9. The Krislov firm is comprised of experienced and successful litigators with a wealth of knowledge in corporate law. *Id.* Most recently in the derivative action against the officers and directors of Maxim Integrated Products, *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007), the Krislov firm has achieved a number of ground-breaking decisions regarding the obligations of corporate directors under Delaware law. *See Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007) (first case declaring stock-options backdating a breach of fiduciary duty), *Ryan v. Gifford*, 935 A.2d 258 (Del.Ch. 2007) (establishing officer jurisdiction under §3114 of the Delaware Corporation code), *Ryan v. Gifford*, No. 2213, 2007 Del. Ch. LEXIS 168 (Del. Ch. Nov. 30, 2007) (holding that special committee of board of directors disclosure to Board and their counsel waived attorney-client privilege), *Ryan v. Gifford*, No. 2213, 2008 WL 43699 (Del. Ch. Jan. 2, 2008) (denying application for interlocutory appeal clarifying privilege decision).

Proposed Co-Lead Counsel Faruqi & Faruqi, LLP has extensive experience in complex litigation, including shareholder derivative and class actions. Krislov Decl. at ¶13.The attorneys at

[10] The firm resumes of Krislov & Associates, Ltd., Faruqi & Faruqi, LLP, and Breskin Johnson & Townsend PLLC are attached as Exhibits F, G and H, respectively to the Krislov Decl.

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

Faruqi & Faruqi, LLP have more than 100 years of combined experience representing shareholders in derivative and class action litigation. *Id.* Faruqi & Faruqi, LLP is currently sole lead or co-lead counsel in dozens of shareholder derivative and class actions pending throughout the United States in both state and federal courts. *Id.* Furthermore, Faruqi & Faruqi, LLP has been recognized by numerous courts for achieving excellent results for shareholders of corporations. *Id.* Among other cases, Faruqi & Faruqi, LLP was appointed as lead counsel in derivative litigation on behalf of UnitedHealth Group, Inc.,[11] in which they recently obtained a settlement valued at approximately $922 million, representing the largest shareholder derivative action settlement ever achieved. *Id.* In *Brickell Partners v. Emerging Commc'ns, Inc.*, No. 16415 (Del. Ch. 1998), Faruqi & Faruqi, LLP, as sole lead counsel, was instrumental in establishing new law and new standards for determining the fiduciary duties of corporate directors, especially directors who have specialized backgrounds (such as accountants, lawyers and financial experts). *Id.* The *Brickell Partners* action was litigated vigorously for over four years, including a six week trial, until the Court returned a verdict in favor of plaintiff. *Id.* In *In re Avatex Corp. S'holders Litig.*, C.A. No. 16334-NC (Del. Ch. 1999), Faruqi & Faruqi, LLP, as sole lead counsel, successfully established new standards for the rights of preferred shareholders under Delaware law. *Id.* Furthermore, in *In re Tenet Healthcare Corp. Deriv. Litig.*, No. 01098905 (Cal. Super. Ct., Santa Barbara Cty.) Faruqi & Faruqi, LLP, as one of plaintiffs' co-lead counsel, secured $51.5 million in cash for the company and substantial corporate governance changes to be implemented and maintained by the company. *Id.*

Proposed Liaison Counsel, Breskin Johnson & Townsend PLLC, has extensive experience in complex litigation, including shareholder derivative and class actions in the federal courts. . Krislov Decl. at ¶15. Breskin Johnson & Townsend was recently appointed lead counsel *In re: WSB Financial Group Securities Litigation*, W. Dist. Wa. (C07-1747RAJ) and its three partners have practiced in this district for over 40 years. *Id.*

---

[11] *In re UnitedHealth Group Inc. Deriv. Litig.* No. 27-CV-06-8085 (Minn. Dist Ct., Hennepin Cty.).

PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS

- 11 -

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

### 3. Proposed Co-Lead Counsel's Clients Have A Significant Financial Stake in the Outcome of the Litigation

Although the PSLRA's presumption in favor of a shareholder with the largest financial interest in the litigation does not apply to this case, the magnitude of Ryan's WaMu holdings is another indication of his commitment to pursuing this action diligently. Plaintiff Ryan currently holds over 50,000 shares of WaMu. Krislov Decl. at ¶10. He has been an investor in WaMu since December 17, 2004, long before the wrongdoing alleged in the Subprime Derivative Actions began. *Id.* Upon information and belief, no other plaintiff in these actions holds a comparable amount of shares. Therefore, Ryan is committed to prosecuting the wrongdoers on behalf of WaMu to assist in rehabilitating the Company and making it whole so Ryan can recover his losses through WaMu's success.

### 4. Four of the Five Plaintiffs Favor the Appointment of Proposed Lead Counsel

All but one of the plaintiffs in the Subprime Derivative Actions favor the appointment of Proposed Co-Lead Counsel. Krislov Decl. at ¶22. Counsel for all of the plaintiffs have met and conferred in an effort to avoid litigating the issue of plaintiff leadership. Krislov Decl. at ¶¶19-22. However, all plaintiffs except Procida have agreed to adopt the leadership structure proposed herein. Krislov Decl. at ¶22. This fact also militates in favor of appointing Proposed Co-Lead Counsel and Proposed Liaison Counsel. *See Hacker*, 2006 U.S. Dist. LEXIS 77325, at *16 (approving leadership structure supported by three of four plaintiffs).

## IV. CONCLUSION

In the interests of judicial economy and for the reasons set forth above, Plaintiffs respectfully request that the Court: (i) consolidate the Subprime Derivative Actions and any subsequently filed shareholder derivative actions brought on behalf of WaMu in this Court which raise allegations regarding WaMu's subprime lending practices; and (ii) appoint the law firms of Faruqi & Faruqi, LLP and Krislov & Associates, Ltd. as co-lead counsel and Breskin Johnson & Townsend PLLC as liaison counsel.

LAW OFFICES
**BRESKIN JOHNSON & TOWNSEND PLLC**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

Dated: April 10, 2008

BRESKIN JOHNSON & TOWNSEND PLLC

By: s/ Roger M. Towsend
Roger M. Townsend, WSBA #25525

999 Third Avenue, Suite 4400
Seattle, WA 98104-4088
Telephone: (206) 652-8660
Facsimile: (206) 652-4088

*Proposed Liaison Counsel for Plaintiffs*

FARUQI & FARUQI, LLP
Nadeem Faruqi
David H. Leventhal
369 Lexington Avenue, 10th Floor
New York, NY 10017-6531
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

FARUQI & FARUQI, LLP
Vahn Alexander
1901 Avenue of the Stars, Second Floor
Los Angeles, CA 90067
Telephone: (310) 461-1426
Facsimile: (310) 461-1427

KRISLOV & ASSOCIATES, LTD.
Clinton A. Krislov
Jeffrey M. Salas
20 North Wacker Drive, Suite 1350
Chicago, IL 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207

*Proposed Co-Lead Counsel for Plaintiffs*

PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS

- 13 -

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

GARDY & NOTIS, LLP
Mark C. Gardy
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ 07632
Telephone: (201) 567-7377
Facsimile: (201) 567-7337

*Counsel for Plaintiff Lynne Harrison*

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
Gregory M. Nespole
Malcom T. Brown
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4643

*Counsel for Kenneth Z. Slater*

PLAINTIFFS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER SUBPRIME DERIVATIVE ACTIONS AND APPOINT LEAD COUNSEL FOR DERIVATIVE PLAINTIFFS

- 14 -

LAW OFFICES
BRESKIN JOHNSON & TOWNSEND PLLC
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104-4088
(206) 652-8660, (206) 652-8290 FAX

Case 2:08-cv-00805-MJP Document 14 Filed 04/10/2008 Page 15 of 16

# CERTIFICATE OF SERVICE

I certify that I caused to be filed/served via the CM/ECF system a copy of the foregoing pleading on all counsel of record on the service list.

David H. Leventhal
FARUQI & FARUQI
369 LEXINGTON AVE
10 FL
NEW YORK, NY 10017
212-983-9330
Email: dleventhal@faruqilaw.com

Vahn Alexander
FARUQI & FARUQI
1901 AVENUE OF THE STARS
SECOND FL
LOS ANGELES, CA 90067
310-461-1426
Email: valexander@faruqilaw.com

Ronald L Berenstain
PERKINS COIE
1201 3RD AVE
STE 4800
SEATTLE, WA 98101-3099
206-359-8477
Email: rberenstain@perkinscoie.com

Stephen M. Rummage
DAVIS WRIGHT TREMAINE
1201 THIRD AVENUE
SUITE 2200
SEATTLE, WA 98101-3045
206-757-8136
Fax: FAX 206-757-7136
Email: steverummage@dwt.com

Steven P Caplow
DAVIS WRIGHT TREMAINE
1201 THIRD AVENUE
SUITE 2200
SEATTLE, WA 98101-3045
206-757-8018
Email: stevencaplow@dwt.com

DATED:April 10, 2008, at Seattle, Washington.

By: s/ Kasey Johansen
Kasey Johansen

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| KEN SLATER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CENTRAL PARKING CORPORATION, MONROE J. CARELL, JR., WILLIAM J. VARESCHI and HIRAM A. COX,<br><br>Defendants. | **CIVIL ACTION NO.**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by his undersigned attorneys, alleges, upon information and belief (said information and belief being based, in part, upon the investigation conducted by and through its counsel), except with respect to paragraph 6, which is alleged upon personal knowledge, as follows:

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of investors in the securities of Central Parking between November 4, 2002 to February 13, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

**JURISDICTION AND VENUE**

2. (a) The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

(b) Jurisdiction over the subject matter of this action is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

3. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District and Central Parking maintains its executive offices in this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

5. Plaintiff Ken Slater, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Central Parking at artificially inflated prices during the Class Period and has been damaged thereby.

6. Defendant Central Parking is a Tennessee corporation with its principal place of business located at 2401 21st Avenue South, Suite 200, Nashville, TN 37212. Central Parking describes itself as a "leading provider of parking and transportation services. The Company operates approximately 3,900 parking facilities containing approximately 1.6 million spaces at locations in 39 states, the District of Columbia, Canada, Puerto Rico, the United Kingdom, the Republic of Ireland, Chile, Germany, Switzerland, Mexico, Poland, Spain, Venezuela and Greece."

7. (a) Defendant Monroe J. Carell, Jr. ("Carell") served as Central Parking's Chairman of the Board and a director of the Company during the Class Period.

(b) Defendant William J. Vareschi ("Vareschi") served as Central Parking's Vice Chairman of the Board, President and Chief Executive Officer during the Class Period.

(c) Defendant Hiram A. Cox ("Cox") served as Central Parking's Senior Vice President and Chief Financial Officer during the Class Period.

(d)    Defendants Carell, Vareschi and Cox are collectively referred to herein as the "Individual Defendants."

8.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

9.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Central Parking, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

10.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

11.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Central Parking, each of the Individual Defendants had access to the adverse undisclosed information about Central Parking's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Central Parking and its business issued or adopted by the Company materially false and misleading.

12.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

13. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Central Parking common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Central Parking's business, operations, management and the intrinsic value of Central Parking common stock; (ii) enabled defendant Carell to sell thousands of shares of his Central Parking common stock to the unsuspecting public; and (iii) caused plaintiff and other members of the Class to purchase Central Parking common stock at artificially inflated prices.

**FACTUAL ALLEGATIONS**

14. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Central Parking between November 4, 2002 and February 13, 2003, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Central Parking common shares were actively

traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Central Parking or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Central Parking; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     Central Parking operates or manages multi-level parking facilities and surface lots. It also provides ancillary products and services, including parking consulting, shuttle, valet, on-street and parking meter enforcement, as well as billing and collection services. Central Parking operates parking facilities under three general types of arrangements: management contracts, leases and fee ownership. As of September 30, 2002, the Company operated 1,762 parking facilities under management contracts and 1,886 parking facilities under leases. In addition, it owned 214 parking facilities either independently or through joint ventures. The Company operates its parking facilities in 39 states, the District of Columbia, Canada, Puerto Rico, Mexico, Chile, Colombia, Peru, Venezuela, the United Kingdom, the Republic of Ireland, Spain, Germany, Poland, Greece and Switzerland.

21.     The Class Period commences on November 4, 2002. On that date, Central Parking issued a press release announcing its financial results for the fourth quarter of 2002 and fiscal year 2002, the periods ended September 30, 2002. The Company reported earnings of $0.12 per share for the fourth quarter and earnings of $0.93 per share of the fiscal year 2002. Defendant Vareschi commented on the results stating in pertinent part as follows:

> Earnings for the fourth quarter of fiscal 2002 were in line with our July guidance. Pro forma earnings exceeded last year's level by 15%, a period that was negatively impacted by the events of September 11th. … Looking forward, for fiscal year 2003 we expect revenues (excluding reimbursed management costs) to be approximately $757 to $771 million, an increase of about 6-8%. … Based on this revenue growth, we estimate earnings for the year to

> total $1.18 to $1.23 per share before property-related activities (pro forma) compared to $1.06 per share in fiscal 2002. ... For the first quarter of fiscal 2003, we expect revenues (excluding reimbursed management costs) to be approximately $184-$187 million and pro forma earnings of $0.30-$0.33 per share.

22. The Company further reported that Central Parking had "Accounts payable" as of September 30, 2002 of $73.638 million.

23. In the weeks following the release of the financial results, defendant Carell sold tens of thousands of his personal shares of common stock to the unsuspecting public reaping millions of dollars in proceeds.

24. On December 20, 2002, Central Parking filed its Form 10-K for the year ended September 30, 2002, with the SEC which confirmed the previously announced financial results and was signed by defendants Carell, Vareschi and Cox. The Form 10-K contained financial statements for the year-ended December 20, 2002.

25. The statements referenced above in paragraphs 21 and 23 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a) that the Company's internal controls were inadequate to record and document the Company's financial results;

(b) that the Company was materially understating its bad debt reserve, thereby overstating its earnings;

(c) that the Company as materially understating its accounts payable, thereby overstating its financial condition; and

(d) as a result of the foregoing, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles and, therefore, were materially false and misleading.

26. On February 14, 2003, Central shocked the investing public when it announced "GAAP net earnings of $0.19 per diluted share for the quarter ended December 31, 2002." The press release stated, in pertinent part, as follows:

> The Company previously indicated that it expected pro forma earnings of $0.30 to $0.33 per diluted share.
>
> * * *
>
> Impacting the Company's net earnings for the first quarter of 2003 is a $1.5 million increase in accounts payable to correct an error in the process for recording vendor invoices, which impacted net earnings per diluted share by $.03.
>
> * * *
>
> This error was in a large part attributed to the Company's decentralized payables process. A rigorous process has been established to capture and record vendor invoices on a more timely basis and to estimate the liabilities for vendor invoices not yet received. The Company believes that this improved process has resulted in a more accurate accounts payable balance and does not anticipate further adjustments. Plans are underway to centralize the accounts payable process.
>
> * * *
>
> Also impacting net earnings in the first quarter of 2003 was a $1.1 million increase in bad debt expense including reserves. This increase in the bad debt expense was attributed to the Company aggressively pursuing collections, identifying deterioration in aging accounts, customers who have filed for bankruptcy and balances being disputed by customers whose resolution is in litigation. Additionally, the Company implemented a reconciliation software system to monitor credit card transactions throughout the corporation. During the quarter this system highlighted specific technical problems resulting in exposures related to aged transactions for which a reserve of $500,000 was established. The Company does not believe that these levels of bad debt expense will be experienced in the future. These actions to boost reserves impacted net earnings per diluted share by $0.03.

In addition, Central Parking Corporation also announced that Hiram A. Cox, senior vice president and chief financial officer, resigned from his position with the Company.

27.     Market reaction was swift and negative with CPC stock falling from a close of $15.82 on February 13, 2002 to a close of $12.31 on February 14, 2002, or a single-day decline of more than 22%, on more than seven times normal trading volume.

28.     An article dated February 15, 2003, titled "Central Parking Corp. shares drop after CFO resigns" appearing in the Memphis Tennessean provided the following additional details:

> The resignation of CFO Hiram Cox, meanwhile, comes after less than two years with the parking-lot operator. Central Parking said Chief Executive Officer William Vareschi will act as interim CFO.
>
> "It got to a point where he was working 80 to 100 hours a week and we had to send him home," Vareschi explained on a conference call with analysts, adding Cox made the move for family reasons.
>
> Cox had planned to leave earlier but stayed on until Central Parking hired Jeff Heavrin as controller to replace Gary Willis, who quit last fall to join LifePoint Hospitals Inc., Vareschi said.
>
> One analyst was skeptical about the explanation considering that the company also reported issues with financial controls.

29.     The market for Central Parking's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Central Parking's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Central Parking common stock relying upon the integrity of the market price of Central Parking's common stock and market information relating to Central Parking, and have been damaged thereby.

30.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Central Parking's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

31. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Central Parking's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Central Parking and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

32. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Central Parking, their control over, and/or receipt and/or modification of Central Parking's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to

confidential proprietary information concerning Central Parking, participated in the fraudulent scheme alleged herein.

33. In addition, during the Class Period, defendant Carell sold tens of thousands of his personally-held shares of Central Parking common stock to the unsuspecting public, thereby generating millions of dollars of proceeds.

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

34. At all relevant times, the market for Central Parking's common stock was an efficient market for the following reasons, among others:

(a) Central Parking's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Central Parking filed periodic public reports with the SEC and the NYSE;

(c) Central Parking regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Central Parking was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

35. As a result of the foregoing, the market for Central Parking's common stock promptly digested current information regarding Central Parking from all publicly available

sources and reflected such information in Central Parking's stock price. Under these circumstances, all purchasers of Central Parking's common stock during the Class Period suffered similar injury through their purchase of Central Parking's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

36. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forwardlooking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Central Parking who knew that those statements were false when made.

**FIRST CLAIM**

**Violation Of Section 10(b) Of**
**The Exchange Act Against And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

37. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

38. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase Central Parking's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

39. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Central Parking's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

40. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Central Parking as specified herein.

41. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Central Parking's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Central Parking and its business operations and future prospects in the light of the circumstances under which they were made,

not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Central Parking common stock during the Class Period.

42. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

43. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Central Parking's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did

not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

44.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Central Parking's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Central Parking's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Central Parking common stock during the Class Period at artificially high prices and were damaged thereby.

45.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding Central Parking's financial results, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Central Parking common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

46.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

47. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants

48. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49. The Individual Defendants acted as controlling persons of Central Parking within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

50. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

51. As set forth above, Central Parking and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 27, 2003

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Fred T. Isquith, Esq.
Gustavo N. Bruckner, Esq.
270 Madison Avenue
New York, NY 10016
(212) 545-4600

Attorneys for Plaintiff

# EXHIBIT J

P SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. CV 05-8133 PA (SHx) Date July 14, 2006

Title Roger Brooks, et al. v. Interlink Electronics, Inc., et al.

Present: The Honorable PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| C. Kevin Reddick | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

DOCKETED ON CM
JUL 17 2006
BY [illegible] 007

**Proceedings:** IN CHAMBERS - COURT ORDER

Before the Court is the Motion to Vacate, or in the Alternative, to Reconsider the Order Appointing Westpark Capital as Lead Plaintiff filed by Bill Green and Brij Bhargava (Docket No. 48). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for July 10, 2006 is vacated, and the matter taken off calendar.

The PSLRA directs the court to "appoint as lead plaintiff the member or members of the purported class that the court determines to be the most capable of adequately representing the interest of the class members. . . ." 15 U.S.C. § 78u-4(a)(3)(B)(i). Specifically, the PSLRA presumes that the "most adequate plaintiff" is the person or group of persons that "in the determination of the court, has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Accordingly, the PSLRA provides a rebuttable presumption that the person or group of persons with the largest financial interest in the relief sought by the class is the plaintiff "most adequately" situated to represent the class as lead plaintiff, provided this person or group of persons otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb)-(cc). This presumption may be rebutted by evidence that the plaintiff would not fairly and adequately represent the interest of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(3)(B)(iii)(II)(aa)-(bb).

Here, Westpark was an "in-and-out" seller which sold all of its shares before Interlink made either of its corrective disclosures. As the Complaint alleges, the price of Interlink's stock dropped approximately forty percent on the day Interlink announced its second restatement of its financial results. The Court therefore determines that much of the relief sought by the class relates to the harm associated with the November 2, 2005 disclosure. Because Westpark was not a shareholder at the time of either the March 9, 2005 or the November 2, 2005 disclosures, it does not, in the Court's view, have the largest financial interest in the relief sought by the class. Cf. In re Cornerstone Propane Partners, L.P. Securities Litig., No. C 03-2522 MHP, 2006 WL 1180267, at *8 (N.D. Cal. May 3, 2006) ("Here, since corrective disclosure is alleged to have occurred only from July 2001 onwards, under Dura there can be no loss causation for plaintiffs who purchased and sold stock at the inflated share price prior to that disclosure.

59

P SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 05-8133 PA (SHx) | Date | July 14, 2006 |
| Title | Roger Brooks, et al. v. Interlink Electronics, Inc., et al. | | |

and thus these plaintiffs may not recover at all.") (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)).[1/]

The Court further finds that although Westpark may have been the presumptive lead plaintiff, as an in-and-out seller which sold its shares prior to the corrective disclosures, Westpark does not satisfy the adequacy and typicality requirements of Federal Rule of Civil Procedure 23 and is subject to unique defenses that render it incapable of adequately representing the class. Id.; see also 15 U.S.C. § 78u-4(3)(B)(II)(aa)-(bb). The Court therefore will not name Westpark as lead plaintiff. Instead, the Court declares Bill Green and Brij Bhargava as the presumptive lead plaintiffs. See In re Cavanaugh, 306 F.3d 726, 731 (9th Cir. 2002). Any plaintiff who wishes to attempt to rebut the new presumptive lead plaintiffs showing that they satisfy Rule 23's typicality and adequacy requirements may do so by filing an opposition to the appointment of Bill Green and Brij Bhargava as lead plaintiffs no later than July 31, 2006. If an opposition is filed, Bill Green and Brij Bhargava may file a reply in support of their appointment as lead plaintiffs by August 7, 2006.

IT IS SO ORDERED.

_______ : _______

Initials of Preparer _______________

cc:

[1/] The Court is not finding, at this point, that no in-and-out seller can establish loss causation. Instead, the Court has merely determined that as an in-and-out seller which sold all of its shares before the corrective disclosures, Westpark does not have largest financial interest in the relief sought by the class.

# EXHIBIT K

**Municipal Mortgage & Equity, LLC (MMA)**
Federal Securities Class Action
MMA Investors Group - Daryl Bonyor

Daryl Bonyor

| | | | | Price Range and Error | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Using Date on Cert "Settlement Date" | | | | | Using Three Trading Days Earlier | | | | |
| Date | Shares | Price | Cost | High | Low | Volume | Price Too High | Price Too Low | High | Low | Volume | Price Too High | Price Too Low |
| Purchases | | | | | | | | | | | | | |
| 4/15/2004 | 1,200 | $24.80 | $29,760.00 | 23.74 | 23.31 | 100600 | $1.06 | | 25.49 | 24.6 | 98900 | | |
| 4/15/2004 | 740 | $24.80 | $18,352.00 | 23.74 | 23.31 | 100600 | $1.06 | | 25.49 | 24.6 | 98900 | | |
| 4/15/2004 | 815 | $24.80 | $20,212.00 | 23.74 | 23.31 | 100600 | $1.06 | | 25.49 | 24.6 | 98900 | | |
| 6/2/2004 | 465 | $23.47 | $10,913.55 | 23.5 | 23.2 | 42100 | | | 23.57 | 23 | 70700 | $0.07 | |
| 7/9/2004 | 385 | $23.67 | $9,112.95 | 24 | 23.76 | 58800 | | $0.09 | 23.87 | 23.46 | 41300 | $0.17 | |
| 7/13/2004 | 415 | $23.70 | $9,835.50 | 24.23 | 23.85 | 71900 | | $0.15 | 23.99 | 23.6 | 62700 | | |
| 9/14/2004 | 330 | $25.31 | $8,352.30 | 25.32 | 24.93 | 46600 | | | 25.35 | 25.04 | 68100 | $0.00 | |
| 12/17/2004 | 2,480 | $26.25 | $65,100.00 | 26.44 | 26.1 | 33800 | | | 26.36 | 26.1 | 34000 | $0.12 | |
| 2/15/2005 | 310 | $26.35 | $8,168.50 | 26.52 | 26.16 | 119400 | | | 26.45 | 26.25 | 164000 | $0.09 | |
| 5/25/2005 | 340 | $24.54 | $8,343.60 | 24.89 | 24.67 | 57800 | | $0.13 | 24.79 | 24.5 | 62000 | | |
| 9/1/2005 | 330 | $26.10 | $8,613.00 | 26.41 | 25.78 | 42500 | | | 26.16 | 25.81 | 48400 | $0.01 | |
| 10/7/2005 | 790 | $24.30 | $19,197.00 | 24.5 | 24.2 | 55500 | | | 25.04 | 24.42 | 50900 | | $0.12 |
| 10/7/2005 | 200 | $24.35 | $4,870.00 | 24.5 | 24.2 | 55500 | | | 25.04 | 24.42 | 50900 | | $0.07 |
| 10/18/2005 | 200 | $24.30 | $4,860.00 | 24.83 | 24.5 | 32500 | | $0.20 | 24.45 | 24.05 | 49600 | | |
| 1/22/2008 | 700 | $14.50 | $10,150.00 | 15.65 | 14.01 | 242800 | | | 16.37 | 15.71 | 160400 | | $1.21 |
| 1/22/2008 | 3,600 | $15.30 | $55,080.00 | 15.65 | 14.01 | 242800 | | | 16.37 | 15.71 | 160400 | | $0.41 |
| 1/24/2008 | 200 | $16.95 | $3,390.00 | 17.25 | 16.62 | 194800 | | | 15.9 | 15 | 183600 | $1.26 | |
| 1/24/2008 | 400 | $17.15 | $6,860.00 | 17.25 | 16.62 | 194800 | | | 15.9 | 15 | 183600 | $1.46 | |
| 1/25/2008 | 5,000 | $14.75 | $73,750.00 | 17.5 | 16.76 | 183000 | | $2.01 | 15.65 | 14.01 | 242800 | $0.74 | |
| 1/28/2008 | 100 | $16.00 | $1,600.00 | 17.2 | 16 | 227600 | | $0.00 | 16.8 | 15.4 | 237300 | $0.11 | |
| Sales | | | | | | | | | | | | | |
| 12/19/2007 | 3,290 | $14.66 | $48,216.40 | 17.2 | 15.81 | 462500 | | $1.15 | 14.99 | 14.34 | 433100 | $0.28 | |
| 12/19/2007 | 1,210 | $14.60 | $17,671.00 | 17.2 | 15.81 | 462500 | | $1.21 | 14.99 | 14.34 | 433100 | $0.22 | |
| 12/19/2007 | 4,200 | $14.52 | $60,984.00 | 17.2 | 15.81 | 462500 | | $1.29 | 14.99 | 14.34 | 433100 | $0.14 | |
| 12/19/2007 | 200 | $14.54 | $2,908.00 | 17.2 | 15.81 | 462500 | | $1.27 | 14.99 | 14.34 | 433100 | $0.16 | |
| 12/19/2007 | 100 | $14.55 | $1,455.00 | 17.2 | 15.81 | 462500 | | $1.26 | 14.99 | 14.34 | 433100 | $0.17 | |

# EXHIBIT L

Yahoo! My Yahoo! Mail Search: Web Search

YAHOO! MESSAGE BOARDS Sign In New User? Sign Up Message Boards Home - Help

Welcome to the new Yahoo! Message Boards - Send us feedback | Product updates

**MUNI MTG** - Quote Info

Message Boards Settings

Search : in MUNI MTG board Search Advanced Search

Yahoo! Message Boards > Business & Finance > Investments > Stocks (A to Z) > Stocks M > MUNI MTG

View all Topics | View all Messages < Newer Topic | Older Topic > Get Message Board for: GO

**INVESTOR NOTICE- Attorney Advertisement** 29-Jan-08 10:04 am

philkimrose...

View Messages
Ignore User
Report Abuse

Investor Notice – Attorney Advertisement

We are attorneys with the Rosen Law Firm, P.A. Our firm's practice is focused on securities class action and shareholder litigation. We have been conducting an internal investigation of Municipal Mortgage & Equity, Corp. and its accounting practices for a significant period of time. We are preparing a complaint against the company and other responsible persons for violations of federal securities laws.

As you are aware, last night MMA announced that it was reducing its dividend and further extending its restatement period yet again. This morning, the Company has disclosed that it has been improperly accounting for its tax-exempt assets. The Company now acknowledges that it will be changing the way the company accounts for many of its loans. We believe the Company may have been improperly over-valuing its non-performing assets for at least two years in violation of GAAP and the Company's own accounting policies.

The Company' stock price has declined substantially in the wake of these disclosures. The Company recently announced plans to delist its shares from the New York Stock Exchange.

If you have any information that may assist our investigation or wish to obtain further information about the proposed class action, please do not hesitate to contact us.

Larry Rosen, Esq.
Phil Kim, Esq.
The Rosen Law Firm, P.A.
350 5th Avenue, Suite 5508
New York, NY 10118
Tel: (212) 686-1060
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

**Rating :** (2 Ratings) **Rate it:**

Reply < Previous Message | Next Message >

**View**: Simple | Summary | Expanded
**As**: Threaded | Msg List Page 1 of about 1 First | < Prev | Next > | Last

## Messages in Topic

Minimum rating: 2 stars + unrated What's this?

| Subject | Author | Rating | Time of Post (ET) |
|---|---|---|---|
| INVESTOR NOTICE- Attorney Advertisement | philkimrose... | (2 Ratings) | 29-Jan-08 10:04 am |
| Re: INVESTOR NOTICE- Attorney Advertisement<br>Anyone on here think this firm is for real? I hav ... | tallman9992... | Rate it | 29-Jan-08 10:18 am |

**View**: Simple | Summary | Expanded Page 1 of about 1 First | < Prev | Next > | Last

ADVERTISEMENT

Yahoo! Inc (YHOO)
YHOO 17-Apr 3:59pm (C)Yahoo!
28.4
28.3
28.2
28.1
28.0
27.9
10am
12pm
2pm
4pm

On Sep 28: 32.35 0.00 (0.00%)

Enter Symbol(s): e.g. YHOO, ^DJI Get Quote
Symbol Lookup

Get streaming real-time quotes - Free Trial

Quote data delayed 15 minutes for Nasdaq, 20 minutes for NYSE and Amex. For delay times on other exchanges see exchange table.

SPONSORED LINKS

Bank of America ® - Free Checking Plus Online Bill Pay, Security Protection, ATMs & More.
www.BankofAmerica.com

The Bakken Oil Formation - The Biggest Oil Find in US History Learn How To Profit in Our New Rpt.
EnergyAndCapital.com/bakkenoilrpt

Forex Market Made Easy - This system does it for you. Low risk high return No products to sell.
forex-killer.com

Currency Options Made Easy - See How To Turn Every $1 Into $30. Free 25 Page Report.
CurrencyRiches.com

Copyright 2008 © Yahoo! Inc.  All right reserved. Terms of Service - Copyright/IP Policy - Send Feedback - Help
We collect personal information on this site. For more information please see our Privacy Policy.