**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH S. GELMIS, Individually And<br>On Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>      vs.<br><br>EARL W. COLE, III, et al.,<br><br>                Defendants. | Case No. 08-CV-00980 (RMB)<br><br>CLASS ACTION |

(Captions continued on following pages)

**THE KREMSER GROUP'S REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND SELECTION OF LEAD COUNSEL AND IN OPPOSITION TO ALL COMPETING MOTIONS**

JULES ROTHAS, Individually And
On Behalf of All Others Similarly Situated,

                Plaintiff,

     vs.

MUNICIPAL MORTGAGE & EQUITY,
LLC, et al.,

                Defendants.

Case No. 08-CV-01120 (RMB)

---

ARNOLD J. ROSS, Individually And
On Behalf of All Others Similarly Situated,

                Plaintiff,

     vs.

EARL W. COLE, III, et al.,

                Defendants.

Case No. 08-CV-01299 (RMB)

---

ALEX D'ANGELO, Individually And
On Behalf of All Others Similarly Situated,

                Plaintiff,

     vs.

MUNICIPAL MORTGAGE & EQUITY,
LLC, et al.,

                Defendants.

Case No. 08-CV-01331 (RMB)

JUDITH GREENBERG, Individually And
On Behalf of All Others Similarly Situated,

                Plaintiff,

      vs.

MICHAEL L. FALCONE, et al.,

                Defendants.

Case No. 08-CV-02005 (RMB)

NAOMI RAPHAEL, Individually And
On Behalf of All Others Similarly Situated,

                Plaintiff,

      vs.

MUNICIPAL MORTGAGE & EQUITY,
LLC, et al.,

                Defendants.

Case No. 08-CV-02190 (RMB)

The PSLRA provides that only a "member of the purported class may ***move*** the court to serve as lead plaintiff of the purported class." 15 U.S.C. § 78u-4(a)(3)(A) (emphasis added). In deciding from among such members of the class who timely and properly moved, the Court shall then appoint as lead plaintiff the "person or ***group of persons*** that … has the largest financial ***interest in the relief sought by the class***" and otherwise meets the requirement of Rule 23. *See id.* at § 78u-4(a)(3)(B) (emphasis added). Thus, whether an individual or a group, only ***members of the class*** are eligible to ***move*** for appointment as lead plaintiff. Here, all lead plaintiff movants are "groups." Therefore, before considering any other factors, the Court must first determine that each member of each purported "group" is a "member of the class"; and that the "group" was properly formed at its inception.

From among the three remaining competing lead plaintiff "groups" with the largest claimed losses, only the Kremser Group is a properly constituted "group" under the PSLRA. By contrast, the so-called FAFN/Slater Group and the MMA Investors are not proper groups. Accordingly, neither is a proper movant, and the Court need not reach the question of whether, absent their defects, either could satisfy the other requirements for appointment under the PSLRA. *See Christman v. Brauvin Realty Advisors, Inc.*, 191 F.R.D. 142, 151-52 (N.D. Ill. 1999). Since those movants are disqualified, the Kremser Group, which has the largest loss among the remaining lead plaintiff movants, is the presumptive "most adequate plaintiff."

A.     **FAFN/Slater Group And MMA Investors Are Not Proper Lead Plaintiff Movants**

Neither FAFN nor the Slater entities are Class members. As the FAFN/Slater Group's counsel admitted at the hearing before this Court on April 10, 2008, FAFN merely manages individual brokerage accounts for individual clients.[1] FAFN is neither an institutional investor,

---

[1] While the FAFN/Slater Group has refused to provide any information about FAFN's *modus operandi*, its counsel provided some insight into the decentralized services for its customers when he conceded that, to attempt to obtain authority to pursue this action for its customers,

like a mutual or pension fund, that commingles beneficiaries funds to make indivisible, single investments for all its customers, nor is it an investment advisor that invests identically for all of its customers.[2] Thus, unlike the entities in the cases that the FAFN/Slater Group cites, it does not operate as a requisite "single entity" for its customers. *See* Dkt. No. 46 ("Kremser Opp.") at 11-12 (citing cases).[3] Moreover, unlike the proposed lead plaintiff funds and investment advisors in those cases, FAFN failed to provide any evidence of its authority to bring lawsuits for its customers, such as the customer agreements or powers of attorney.[4] Instead, the FAFN/Slater

---

various different account "reps" (*i.e.*, brokers) needed to contact their own customers. *See* Dkt. No. 35 ("4/10/08 Trans."), at 30. Therefore, it is clear FAFN's customers consist of different customers with different accounts supervised by different brokers.

[2] Neither FAFN nor the Slater LLC's are the types of institution – like large mutual funds and state pension plans – that Congress conceived of in creating the lead plaintiff provisions of the PSLRA, *see* H.R. Conf. Rep. No. 104-369 (1995), and Congress did not create any presumption in favor of institutions. *See, e.g., Mohanty v. Bigband Networks, Inc.*, No. C 07-5101 SBA, 2008 U.S. Dist. LEXIS 32764, *17 (N.D. Cal. Feb. 13, 2008) ("a plaintiff's mere status as an institutional investor does not provide any presumption that the institutional plaintiff is a more adequate lead plaintiff than an individual investor with a larger financial interest.").

[3] The cases cited by FAFN/Slater Group demonstrate this distinction. *See, e.g., Sofran v. Labranche & Co.*, 220 F.R.D. 398, 403-04 (S.D.N.Y. 2004) (citing cases appointing union and municipal pension funds that invest for all their beneficiaries identically as a whole); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 298-99 (D. Del. 2003) (Florida state pension fund statutory authority to pursue litigation). Indeed, the courts in this circuit have generally not permitted investment advisors to be appointed lead plaintiffs in the stead of their clients. *See, e.g., In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 98 (S.D.N.Y. 2005) ("In order for an investment advisor to attain standing on behalf of investors[,] the transactions in question must have been executed as if by a single person. Moreover, the advisor must be the attorney in fact for his clients, and  must be granted both unrestricted decision-making authority and the specific right to recover on behalf of his clients."); *Olsen v. New York Cmty. Bancorp, Inc.*, 233 F.R.D. 101, 107 (E.D.N.Y. 2005) (same); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 358 (S.D.N.Y. 2002) (same); *accord Smith v. Suprema Specialties Inc.*, 206 F. Supp. 2d 627 (D.N.J. 2002) (rejecting investment firm that did not function as a "single investor" and did not submit evidence that it received permission to move on its clients' behalf).

[4] Actual evidence of authority to pursue litigation on behalf of customers was provided in the cases that FAFN/Slater cites. *See, e.g.,* the *Ezra Charitable Trust v. Rent-way*, 136 F. Supp. 2d 435 (W.D. Pa. 2001) and *Ezra Charitable Trust v. Rent-way*, 218 F.R.D. 101 (W.D. Pa. 2003) (investment advisory agreement submitted to the Court that allowed "unrestricted decision-making authority" with respect to the client's investments it made *and* client provided letter

2

Group admits "FAFN is . . . hired by investors to invest money at its discretion." *See* Dkt. No.

45 ("FAFN Opp.") at 6.  Pursuing litigation is not investing money.[5]

Indeed, when the FAFN/Slater Group's counsel informed this Court that FAFN was only

then seeking to obtain powers of attorney from those customers to pursue this suit, FAFN

impliedly conceded that whatever agreements it may have with its customers, they are

inadequate to provide it with authority to bring lawsuits for them.  *See* 4/10/08 Trans. at 29.

Thus, FAFN conclusion that it was necessary to obtain direct authority from its customers to

"make sure [the customers] wanted [FAFN] to pursue the loss in this forum," but it only did so

*after* filing a lead plaintiff motion purporting to already have that authority.  *See id.*  Since FAFN

is not a class member, and plainly lacked authority *when it filed* its lead plaintiff motion,

obtaining any such authority *post facto* be untimely under the PSLRA deadline.  Moreover,

***FAFN has failed to submit the promised powers of attorney that "have been executed or will***

***be executed [by] the beneficial owner[s]"*** *See id.* at 28  The only logical conclusion is that

FAFN could not obtain them from some or all of its customers.  Therefore, irrespective of

FAFN's incorrect legal arguments about its alleged constructive authority to act for its customers

in this suit, some or all of those customers – by refusing to provide powers of attorney -- have

---

giving express authority to pursue suit); *Kaplan v. Gelfond*, 240 F.R.D. 88, 95 (S.D.N.Y. 2007) (undisputed affidavit attesting to investment firm was "authorized to undertake all acts on behalf of [the five funds], including the right to commence legal action on their behalf[,] which includes the right to seek to serve as lead plaintiff in an action brought pursuant to the federal securities laws on their behalf."). *But, cf., Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 255 (S.D.N.Y. 2004) (finding a declaration inadequate to demonstrate investment manager "has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring suit to recover for investment losses.")

[5] FAFN will also need to demonstrate that MuniMae investments were consistent with the goals of each of its customers on whose behalf it purchased those shares.  It has also not provided any of the actual documentation upon which it claims its authority to pursue this case on their behalf, and the declaration proffered by FAFN does not attest that the customers it is choosing to represent here were its only customers who purchased MuniMae shares or whether those customers purchased and/or sold MuniMae shares elsewhere.  This paucity of information raises numerous serious issues that must be resolved before FAFN could be appointed a lead plaintiff.

affirmatively denied FAFN that authority.

In turn, whatever losses FAFN used from these customers' accounts to calculate *"its"* claimed losses here, those losses, whatever they might have been, can not be considered. Since FAFN has failed to identify those customers, the number of customers involved, or the amount of losses in each customer's account, *see id.* at 30-31,[6] FAFN's true claimed losses, if any, are now impossible to determine. Nevertheless, at least some of FAFN's customers' losses must be eliminated, rendering FAFN's declaration regarding the size of *"its"* losses inaccurate and overstated. *See, e.g., In re Vonage IPO Sec. Litig.*, Civil No. 07-177-FLW, 2007 U.S. Dist. LEXIS 66258, *27-28, *30 & n.8 (D. N.J. Sept. 6, 2008) (holding proposed lead plaintiff inadequate due, in part, to "misinformation" stated in PSLRA certification).

Similarly, Mr. Slater's failure to provide any evidence of his authority to act for the entities he purports to represent bars his appointment here. For instance, contrary to the arguments of the Yates and FAFN/Slater Groups, the Kremser Group submitted the actual operating agreement for Mr. Kremser's family investment company, Elk Meadows Investments, LLC. *See* Dkt No. 47 ("Declaration of Kim E. Miller"), Ex. B. That agreement demonstrates his express authority to pursue this litigation. *See id.* at 4.6-4.7. To date, Mr. Slater has failed to provide any similar evidence of the ownership and operational structure of the LLC's he purports to represent, the business they are permitted to conduct, or his authority to pursue this litigation. Instead, the only information yet provided is his counsel's open-court admission that the money held by these LLC's does not belong to him. *See* 4/10/08 Trans. at 27. Again, as demonstrated by the cases the FAFN/Slater Group itself cites, proof of express authority is required to appoint a lead

---

[6]    The reason, notwithstanding the Court's inquiries of its counsel, that FAFN has still not disclosed any of this information is evident. *See Smith*, 206 F. Supp. 2d at 636. (refusing to appoint a "group if customers of a firm because the firm failed to submit certifications from any of the customers it purported to represent and a group consisting of 22 independent customers was too large to work effectively).

plaintiff that does not own the securities in question.[7]  Thus, Mr. Slater, like FAFN, cannot make

the most fundamental showing necessary to a lead plaintiff movant – that he be a Class member.[8]

As to the two remaining competing "groups," the MMA Investors and the Yates Group, the

MMA Investors is not a proper "group" under the PSLRA, and the Yates Group has losses that

are smaller than those of the Kremser Group.    The Yates Group devotes much of its

memorandum to describing what the members of a "group" must do before moving as a group to

be appointed lead plaintiff; how such a group will function as a "group" if appointed; and that

the evidence demonstrating compliance with this rule must be submitted at the time the lead

plaintiff motion is made.  *See* Dkt. No. 44 ("Yates Group Opp."), at 2, 4-13.  The Yates Group

has correctly stated the law.   However, contrary to the Yates Group's statements, the Kremser

Group submitted precisely the information that the Yates Group explains was required.  *See* Dkt.

No. 27 ("Declaration of David A.P. Brower"), Ex. B.  The Yates Group apparently overlooked

---

[7]  The failure of Mr. Slater (or FAFN) to submit PSLRA Certifications with their motion raises more concerns.  That Certification requires a number of sworn undertakings and disclosures that neither Mr. Slater nor FAFN have yet made.  The lack of those Certifications disqualifies them from being appointed lead plaintiff here.  *See* Kremser Opp. at 13-16.  Moreover, as the information provided by other movants has shown, if Mr. Slater had submitted a proper Certification for himself and the LLCs, it would have revealed that the LLCs are routinely used as litigation vehicles by Mr. Slater.  Closed corporate entities used regularly to pursue class litigation have been criticized due to their potential for abuse.  *See, e.g.*, *In re SS&C Tech. S'holders Litig.*, C.A. No. 1525-VCL, Memorandum Opinion and Order (Del. Ch. Mar. 6, 2008) (Ex. A hereto).

[8]  Further, since FAFN clearly cannot be considered for appointment as a lead plaintiff, and since Slater and FAFN moved as a group, that "group" is disqualified.  Likewise, because Mr. Slater did not timely move *in the alternative* to be appointed individually as the lead plaintiff, he can no longer be considered for appointment here.  On the other hand, courts have indicated that, if a lead plaintiff movant group moves in the alternative at the time the lead plaintiff motions are made, the court can consider choosing the largest member(s) of a group.  *See, e.g.*, *Marvin J. Netsy, Marks Bros., Inc. v. Capstead Mortgage Corp.*, No. 3:98-CV-1716-L, 2000 U.S. Dist. LEXIS 9941, at *27-28 (N.D. Tex. July 12, 2000).  The Kremser Group properly moved when it filed its lead plaintiff motion, in the alternative, to have Mr. Kremser, its member with the largest individual loss, appointed lead plaintiff.  Rather than showing a lack of cohesiveness, as the Yates Group contends, the Kremser Group has provided the Court flexibility within the strict deadline set forth in the PSLRA demonstrates instead the foresight and practicality on its part.

the declarations of the members of the Kremser Group filed with its initial lead plaintiff motion. Thus, based on the Yates Group's reasoning, the Kremser Group, which has larger losses than the Yates Group, should be appointed here.

By contrast, the MMA Investors initially failed to submit any evidence that it is a cohesive group that can efficiently function as the lead plaintiff and supervise counsel. In a futile and untimely attempt to cure that fatal flaw, MMA Investors has now submitted a legally defective "joint declaration" that not only fails to satisfy the requirements of a "group" under the PSLRA, but proves that its members are not qualified to lead this litigation. As an initial matter, by submitting its so-called "joint declaration," MMA Investors impliedly concedes that its initial lead plaintiff motion was inadequate and that evidence of the existence of a unified, cohesive group was required of it *ab initio*. As, by its own admission, it failed to make the appropriate showing of the existence of a PSLRA "group" at the time it made its lead plaintiff motion, that defect cannot be cured at this late date. *See* Kremser Opp. at 20-22 (citing cases).

Further, the MMA Investors' so-called "joint declaration" is not a proper declaration under federal law because, though purportedly based on the "personal knowledge" of each signatory, it is impossible for each of the unrelated MMA Investors' members to have personal knowledge of the prior conduct, knowledge, intent and state of mind of the other declarants. That, however, is exactly what they collectively purport to do.[9] Not only is such a proffer inadequate to meet the requirements of showing the proper formation and existence of a "group," but it subjects the MMA Investors' members to serious credibility attacks.

---

[9] "Under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006). An affidavit purportedly based upon personal knowledge should be rejected if the witness actually fails to demonstrate personal knowledge, including by not stating evidence "sufficient to support a finding that the witness has personal knowledge of the matter." *Corwin v. Walt Disney Co.*, Case No. 6:02-cv-1377-Orl-19KRS, 2004 U.S. Dist. LEXIS 30688, at *57 (M.D. Fla. Nov. 12, 2004).

In addition to its technical and timeliness defects, the content (or lack thereof) of the "joint declaration" demonstrates that MMA Investors is not a proper PSLRA "group." For instance, the MMA Investors assert they had a conference call together, but no date is provided. *See* Dkt. 43-2 ("MMA Joint Declaration") ¶ 9. Given the studied absence of a date, the fair inference is that the alleged call, and, hence, the formation of the "group," actually occurred ***after*** its counsel made a motion for it to act as a "group." Such a belated telephone conference militates against the existence of a "group." *See In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d 39, 44-45 (D. Mass. 2001). It would not be surprising if this "group" was formed after the motions were filed since the MMA Investors' counsel, the Rosen Firm, has previously been criticized for playing fast-and-loose with the formation of putative lead plaintiff groups. *See In re Atlas Mining Co. Sec. Litig.,* No. CV 07-428-N-EJL-MHW, Memorandum and Order, at 10 (D. Idaho Mar. 25, 2008) ("Atlas Investors [represented by the Rosen Firm] appear to be purely lawyer-driven. Two of its members were members of another group, with different counsel, four hours prior to filing the Atlas Investors' motion.") (Ex. B hereto).

Moreover, a primary responsibility of lead plaintiff is to exercise control over counsel. *See In re Cendant Corp. Sec. Litig.* 404 F.3d 173, 181 (3rd Cir. 2005). The MMA Investors' "joint declaration," however, offers an unworkable and improper mechanism for supervising counsel – a majority vote rule. *See* MMA Joint Declaration ¶ 15. By agreeing, in advance, to abide by majority rule, they have abandoned their fiduciary obligations to independently exercise their own best judgment on specific decisions that will need to be made in the case. A fiduciary who believes an action is wrong may not permit the action to occur – the obligation would be to bring the disagreement to the Court or retain separate counsel. By abandoning that obligation, the MMA Investors cannot serve as fiduciaries. *See Baffa v. Donaldson Lufkin & Jenrette*, 222 F.3d 52, 61 (2d Cir. 2000)(inadequacy will be found "'where the class representatives have so

little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'") (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)). Moreover, the absence of a group leader or other viable mechanisms to address emergencies also renders it an improper lead plaintiff.   *See* Kremser Opp. at 20-21 (citing cases).   Such mechanisms are the touchstone of permissible groups.   *See, e.g., In re Network Assocs. Sec. Litig.*, 76 F. Supp. 2d 1017, 1023-27 (N.D. Cal. 1999).

Additionally, the mysterious absence of Jamie Stark, who was a signatory of the PSLRA Certification for the joint account of Robert and Jamie Stark, attesting to **her** understanding of **her** responsibilities and obligations, as either a lead plaintiff movant or declarant, renders the Starks unfit to represent the Class.  As the court made clear in *Zucker v. Zoran Corp.*, No. C 06-04843, 2006 U.S. Dist. LEXIS 93469, at *13 (N.D. Cal. Dec. 11, 2006), a lead plaintiff in a PSLRA case is to perform important fiduciary duties, duties which must be exercised with due care and can not be delegated.  Yet, by Jamie Stark giving over her role to her husband, she has abandoned the fiduciary duties she undertook by signing the Certification that the MMA Investors has used as proof of her losses and suitability to serve as part of that "group."  *See In re Network Assocs.*, 76 F. Supp. 2d at 1023 ("Although the PSLRA authorizes an investor to seek the lead for itself, it does not authorize investors to seek the lead for someone else.").   The Starks' conduct violates the settled principle that a class representative may not abdicate or delegate his or her fiduciary responsibilities to the class to another and still be adequate.  *See In re Cendant,* 404 F.3d at 198.  Without either of the Starks, MMA Investors has losses that are significantly smaller than the Kremser Group.

**B.  <u>The Kremser Group Is the Only Proper Lead Plaintiff Movant</u>**

The other movants attempt to reduce the amount of the Kremser Group's losses by

challenging the losses sustained by Mr. Kremser on his purchases of MuniMae shares made on January 29, 2008. January 29th -- the date that MuniMae made its second curative disclosure that sent its shares down another $5.20 per share -- is the proper ending date of the Class Period.[10] *In re Oxford Health Plans Sec. Litig.*, 191 F.R.D. 369, 378 (S.D.N.Y. 2000) ("[t]he class period ends when the full truth has been disclosed to the markets and the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security."). There can also be no dispute that Mr. Kremser, who purchased both before January 28th and on January 29th may represent a class consisting of all purchasers of MuniMae securities during the entire Class Period. Disputes regarding the length and proper ending date of a class period involve the type of factual and legal issues that are reserved for the trier of fact. *See e.g., In re Interpublic Sec. Litig.*, No. 02 CIV. 6527 (DLC), 2003 U.S. Dist. LEXIS 19784, at *14 (S.D.N.Y. Nov. 6, 2003) ("Class certification of a broader class period is appropriate when questions of fact remain as to whether a purportedly curative press release effected a complete cure of the market or was itself fraudulent.") (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)). Therefore Mr. Kremser's full $555,000 in losses should be included in the calculation of the Kremser Group's losses.

Moreover, on January 31, 2008, the *Manson* action was filed in Maryland for a class period that ends on January 29th and a notice was issued to alert members of the Class to the longer class period.[11] The Courts routinely face lead plaintiff motions involving varying or

---

[10] The drop in MuniMae shares on January 29th following the final curative disclosure also satisfies the loss causation requirement. In fact, Mr. Kremser suffered over $80,000 in losses on his January 29th MuniMae purchases. That is all that is required under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), and its progeny. In *Dura,* the Court recognized that loss causation can be satisfied by a partial disclosure. *See* 544 U.S. at 342-43. Thus, a complete corrective disclosure is not required to precede a stock's decline for loss causation purposes. *See id.*

[11] The MMA Investor also point out that there was a mistake in the *Engel* and *Manson* complaints filed in Maryland. *See* MMA Memo. at 15. First, none of the Kremser Group

overlapping class periods and appoint a lead plaintiff to represent the longest period alleged. *See, e.g., Kaplan,* 240 F.R.D. at 91 (consolidating different class periods).[12]

Further, now that Defendants have moved the Multidistrict Panel to consolidate all cases with all class periods in a single forum, any argument by other movants that Class members who purchased on January 29th do not have a claim, amounts to nothing more than a willingness by these putative fiduciaries to sacrifice the claims of a segment of the Class to be appointed lead plaintiff. This constitutes a classic conflict of interest rendering these movants inadequate.[13]

## CONCLUSION

Based upon the foregoing and the prior submissions of the movants herein, the Kremser group should be appointed lead plaintiff and its selection of lead counsel should be approved.

Dated: April 28, 2008

---

members is a party to those actions and, therefore, they cannot be held responsible for anything alleged in those pleadings. Second, the error, once brought the attention of counsel for Manson and Engel, was promptly corrected by amended complaints. *See Manson* Dkt. 33; *Engel* Docket 36. It is clear that an amended complaint supersedes all prior complaints. *See, e.g., In re Initial Public Offering Sec. Litig.,* No. 21 MC 92 (SAS), 2008 U.S. LEXIS 24148, at *30 n. 96 (S.D.N.Y. Mar. 26, 2008) (noting that amended complaint that eliminated allegation that had resulted in class certification being reversed by the Second Circuit was effective to eliminate the prior defect in pleading). Therefore, while a law firm word processing error is certainly embarrassing to counsel, and all efforts should be made to avoid them, the errors have been corrected with no affect on the Class or its claims. *Cf., Meadows v. Pacific Inland Sec. Litig.,* 36 F. Supp. 2d 1240, 1243 (S.D. Cal. 1999) (permitting plaintiff to amend in response to motion to dismiss based, in part, on plaintiffs' counsel inadvertently copying allegation from another complaint).

[12] *See also Olsen,* 233 F.R.D. at 105 (consolidating cases despite different class periods and defendants, noting that the differences could be resolved with the filing of a consolidated complaint); *In re Olsten Corp. Sec. Litig.,* 3 F. Supp. 2d 286, 292-93 (E.D.N.Y. 1998) (same); *Lax v. First Merchants Acceptance Corp.,* No. 97 C 4237, 1997 U.S. Dist. LEXIS 11866 *23 (N.D. Ill. Aug. 11, 1997) (same).

[13] Indeed, although too late to be included as part of his lead plaintiff motion, *see, e.g., Rozenboom v. Van Der Moolen Holding, N.V.,* No. 03 Civ. 8284, 2004 U.S. Dist. LEXIS 6382, at *14-15 n.4 (S.D.N.Y. Apr. 14, 2004), Mr. Slater also claims losses from purchases made on January 29th. The Kremser Group doubts Mr. Slater would wish those claims abandoned.

Respectfully submitted,

BROWER PIVEN
  A Professional Corporation

_____/s/ David A.P. Brower_____
David A.P. Brower
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

BROWER PIVEN
  A Professional Corporation
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile: (410) 685-1300

-and-

KAHN GAUTHIER SWICK, LLC
Kim E. Miller (KM-6996)
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone:  (212) 696-3730
Facsimile:   (504) 455-1498

KAHN GAUTHIER SWICK, LLC
Lewis S. Kahn
650 Poydras St., Suite 2150
New Orleans, Louisiana 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Counsel for the Kremser Group and
Proposed Lead Counsel for the Class*

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Memorandum was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 28, 2008.


_____/s/ David A.P. Brower_____
David A.P. Brower

# EXHIBIT A



EFiled: Mar 6 2008 4:56PM EST
Transaction ID 18888163
Case No. 1525-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE SS&C TECHNOLOGIES, INC. | ) | Consolidated |
| SHAREHOLDERS LITIGATION. | ) | C.A. No. 1525-VCL |

### *MEMORANDUM OPINION AND ORDER*

**Submitted: February 22, 2008**
**Decided: March 6, 2008**

Norman M. Monhait, Esquire, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Paul Geller, Esquire, Jonathan M. Stein, Esquire, COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP, Boca Raton, Florida; Richard B. Brualdi, Esquire, John F. Keating, Esquire, THE BRUALDI LAW FIRM, New York, New York, *Attorneys for the Plaintiffs.*

R. Judson Scaggs, Jr., Esquire, John P. DiTomo, Esquire, Jean Rousseau Biondi, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, Delaware; Jeffrey B. Rudman, Esquire, Emily Shulman, Esquire, WILMER CUTLER PICKERING HALE AND DORR, LLP, Boston, Massachusetts; David Z. Seide, Esquire, Anthony Pellegrino, Esquire, WILMER CUTLER PICKERING HALE AND DORR, LLP, Washington, D.C., *Attorneys for Defendants SS&C Technologies, Inc., Joseph H. Fisher, David W. Clark, Jr., William C. Hunter, Albert L. Lord, and Jonathan M. Schofield.*

Raymond J. DiCamillo, Esquire, Jennifer Veet, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; James E. Brandt, Esquire, Noreen Kelly-Najah, Esquire, Sabrina Hassan, Esquire, LATHAM & WATKINS LLP, New York, New York, *Attorneys for Defendant Sunshine Acquisition Corp.*

Lawrence C. Ashby, Esquire, Philip Trainer, Jr., Esquire, Richard L. Renck, Esquire, ASHBY & GEDDES, P.A., Wilmington, Delaware; Gregory A. Markel, Esquire, Stacey A. Lara, Esquire, CADWALADER, WICKERSHAM & TAFT LLP, New York, New York, *Attorneys for Defendant William C. Stone.*

LAMB, Vice Chancellor.

In this opinion, the court considers a motion to impose sanctions on the plaintiffs and their counsel. The occasion for this request is (i) a motion filed by the plaintiffs for leave to withdraw, but only on notice to the putative class and (ii) their related opposition to a request that the discovery record pertaining to the plaintiffs (other than personal information of a confidential nature) be made part of the public record. On the record before it, the court concludes that the plaintiffs and their counsel acted in bad faith in connection with their motion to withdraw and should be required to reimburse the defendants for their attorneys' fees and costs incurred in connection with this aspect of the litigation.

I.[1]

A.    <u>Procedural History</u>

This litigation began in 2005 when Carlyle Investment Management L.L.C. sponsored a deal to acquire SS&C Technologies Inc. The SS&C board of directors approved the Carlyle transaction on July 27, 2005. SS&C publicly announced the terms of the transaction and filed a preliminary proxy statement the following day. The SS&C stockholders approved the acquisition, and it closed on November 23, 2005.

---

[1] The facts of the transaction underlying this matter are addressed in a summary fashion in this court's prior opinion. *See In re SS&C Techs., Inc. S'holders Litig.*, 911 A.2d 816 (Del. Ch. 2006).

1

1.    The 2006 Proposed Settlement

Following the announcement of the Carlyle transaction, Paulena Partners and Dr. Stephen R. Landan, filed lawsuits in this court on July 28, 2005, and on August 3, 2005.[2] This court consolidated the two actions and appointed The Brualdi Law Firm and Coughlin Stoia Geller Rudman & Robbins as co-lead counsel on August 31, 2005.[3] In late September, the lawyers for the parties began settlement discussions and, on October 18, 2005, the parties entered into a memorandum of understanding to settle the consolidated action. This agreement provided for the dismissal of the litigation in exchange for supplemental disclosures and the payment of attorneys' fees.

The parties never advised the court of this agreement and never sought leave to present the settlement after the closing of the acquisition. In the months following the closing, the parties performed confirmatory discovery and on, July 7, 2006, submitted the stipulation of settlement for court approval.

At the September 2006 settlement hearing, nearly a year after the closing of the transaction, the parties asked this court to approve the settlement, which had

---

[2] *Paulena Partners, LLC v. SS&C Techs., Inc.*, C.A. No. 1525-VCL (Del. Ch. filed July 28, 2005); *Landen v. SS&C Techs., Inc.*, C.A. No. 1541-VCL (Del. Ch. filed Aug. 3, 2005).
[3] Significantly, "the plaintiffs did not move for expedited treatment and never sought preliminary injunctive relief. Instead, evidently on the basis of their review of the preliminary proxy materials and discussions with an expert consultant, 'the plaintiffs came to the view that certain disclosures were materially misleading and incomplete.'" *In re SS&C Techs.*, 911 A.2d at 819 (quoting Pls.' Opening Br. 12).

2

been fully performed in all respects except for the payment of the plaintiffs' counsel fees. In light of the procedural posture of the settlement, this court declined to approve it "as having been untimely presented."[4] Relying on Chancellor Duffy's decision in *Chickering v. Giles*,[5] this court noted the "necessity" in presenting settlements quickly and advising the court "when some exigent circumstance makes it difficult or impossible to give the necessary notice and seek formal approval before the performance of some part of the settlement."[6]

This court also declined to approve the settlement because the record did not support a finding that "the plaintiffs' counsel adequately represented the interests of the class or that the settlement terms [were] fair and reasonable."[7] Indeed, the plaintiffs' counsel failed to "correctly identify basic terms of the transaction or the basic set of legal issues thereby raised."[8]

2.    The Subsequent Proceedings

Despite this court's disapproval of the settlement, the plaintiffs and their counsel chose to continue prosecuting the case. Their interest in pursuing the litigation ended, however, after several damaging facts emerged regarding the adequacy and credibility of the named plaintiffs, and the accuracy of numerous

---

[4] *Id.*
[5] 270 A.2d 373 (Del. Ch. 1970).
[6] *In re SS&C Techs.*, 911 A.2d at 819.
[7] *Id.* at 820.
[8] *Id.*

3

statements made in court filings. Consequently, on November 28, 2007, the plaintiffs moved to withdraw. In response, on January 8, 2008, the defendants filed a motion seeking sanctions and an award of all the fees they incurred in connection with the litigation. The defendants also demanded the removal of the confidentiality restrictions placed on the plaintiffs' deposition transcripts and other discovery materials.

At oral argument, this court concluded that the action should be dismissed without prejudice and without notice to the putative class.[9] In reaching this decision, the court noted the stockholders' convincing approval of the transaction and the apparent adequacy of the disclosures in the proxy materials that were revised as part of the rejected settlement proposal.[10] Indeed, even with the benefit of fairly extensive discovery following the closing of the transaction, the plaintiffs make no substantial added challenges to the proxy statement.[11] The court also

---

[9] Tr. 64.

[10] While approximately 38% of stockholders did not vote in the transaction, only 50,000 voted against it. *Id.* 53-54.

[11] For the sake of completeness, the plaintiffs' counsel did raise the possibility of a further disclosure claim at oral argument, arguing:

> [SS&C's CEO's] involvement in the pairing of the list of potential buyers to contact is really not asserted in the proxy statement at all. That gets kind of obscured by a statement in the proxy statement to the effect that [SS&C's advisors] discussed numerous potential acquirers of the corporation and developed a list of five strategic purchasers and two financial purchasers to approach. So there's an arguable disclosure issues there as well.

*Id.* 9. Clearly, the plaintiffs' counsel gave this argument little weight and it appears to have been mentioned primarily to distract attention from the more relevant issues concerning the parties' motions.

4

relied on the lack of any stockholder interest regarding the proposed settlement and the fact that no stockholder sought to intervene in the case after the rejection of the settlement. In short, nothing about this case suggested the need to notify the putative class of a "without prejudice" dismissal. In addition, at the hearing the court learned that the discovery materials at issue had become part of the public record in the case, thus mooting the issue of continued confidentiality.

As a result, the only remaining claim is the defendants' request for attorneys' fees based on the plaintiffs' and their counsel's conduct in connection with aspects of the litigation.[12]

B.    Facts Pertinent To The Motion For Sanctions

Following this court's rejection of the proposed settlement, the defendants conducted discovery of the plaintiffs, including the deposition of Dr. Landan and Paulena's managing partner, Dean W. Drulias. The defendants argue that the facts they discovered reveal a disturbing pattern of conduct by the plaintiffs and their counsel in connection with this and other litigation. Most notably, they allege that Drulias manages a web of small investment partnerships for the sole purpose of bringing stockholder lawsuits primarily through his attorney in this action, Richard B. Brualdi. The defendants further contend that Drulias and Brualdi have

---

[12] While the defendants' brief refers to Court of Chancery Rule 11, their motion neither referred to that rule nor complied with its formal requirements.

attempted to conceal the existence of this enterprise from the court. The

defendants also challenge the adequacy of both plaintiffs, but particularly Landan,

due to their inability to recall basic aspects of the SS&C litigation at their

depositions.

    1.    Drulias And The Web Of Investment Partnerships

The disturbing nature of Drulias's investment partnerships came to light

after his counsel informed the defendants that the complaint had incorrectly

identified Paulena as the plaintiff, when the actual SS&C stockholder was another

entity that Drulias manages, Bamboo Partners (since renamed DD Equity

Trading).[13] This notice evidently led the defendants to inquire into the nature of

these partnerships.

At his deposition, Drulias stated that he believed he currently manages four

partnerships, but he also conceded to some degree of current or past managerial

control at two other partnerships.[14] Drulias owned a roughly 2% interest, mostly

---

[13] Drulias also changed the name of Paulena to Vision Partners. According to Drulias, the name changes were done to "differentiate the time when Paul Berger was managing" and not "driven by litigation in any way." Drulias Dep. 71. Berger stopped managing Bamboo and Paulena around January 2007, when Drulias took over. *But see infra* 63. Brualdi notified counsel for the defendants of Drulias's error in naming Paulena on July 18, 2007, stating, in pertinent part:

> [W]hile gathering documents to respond to defendants' discovery requests, my client contact discovered that this lawsuit was originally inadvertently filed in the name of Paulina [sic] Partners when the stock was actually held by another partnership he is involved with, Bamboo Partners. Further, in January 2007, Bamboo Partners changed its name to DD Equity Trading. Accordingly, we would propose to file a stipulation substituting DD Equity Trading for Paulina [sic] Partners as a plaintiff.

Pls.' Br. Ex. E.

[14] Drulias Dep. 113; 80; 86.

through other partnership interests,[15] in each entity.  The names of these

partnerships are Vision Partners, DD Equity Trading, Freeport Partners,

Momentum Partners, and Advantage Partners,[16] and one additional partnership, the

name of which he could not remember.[17]  While Drulias's total investment in these

entities is not clear, he paid roughly $4,000 for his interest in Bamboo and

Paulena.[18]  Each of these partnerships owns only a few shares (in this case 3) in

roughly 60 to 80 public companies.[19]  Thus, at any given time these partnerships

give Drulias a minuscule, indirect interest in several hundred publicly traded

companies.

  In explaining the purpose of these entities and the reason for having

numerous partnerships, Drulias claimed that it serves "to permit each of the

partners to have the opportunity to establish a track record on his own, with one or

two vehicles as a manager."[20]  He contended that the investment criteria was to

"look for undervalued companies" and to "hold them and watch them grow."[21]

This testimony, however, was undermined by Drulias's later admission that he did

not receive a significant amount of money for managing the investment

---

[15] *See id.* 35-37; 39; 44; 75; 86; 90.
[16] *Id.* at 80.
[17] *Id.* at 86.
[18] *Id.* at 39; 44.
[19] *Id.* at 82.
[20] *Id.* at 86-87.
[21] *Id.* at 111.

partnerships and that the investment vehicles are economically irrelevant to him.[22]
Nevertheless, Drulias continues to maintain that these partnerships were established and managed to make a profit, and he denies that they serve only to bring stockholder lawsuits.[23]

Not surprisingly, these partnerships have, in fact, filed an unusually large number of stockholder lawsuits. They are also consistently represented by The Brualdi Law Firm. Drulias testified that he was involved in bringing roughly 30 stockholder lawsuits on behalf of himself and many of these entities, although he could not be certain of the exact number.[24] Drulias attributed the large number of lawsuits to his interest in enforcing good corporate governance standards. More specifically, Drulias testified:

> I bring a lawsuit when I feel that there is some issue that needs correcting and there is some action which may affect the people, which includes me. Quite often my interest financially is not a huge stake, but I have spent a career in corporate law and my experience is that sometimes people do overreach. That troubles me not only from a financial standpoint where I may not have much of a financial stake, but also from the fact that that has been my business, and if it harms the kind of business I do I feel sort of a personal stake in harming myself.[25]

---

[22] *Id.* at 94.

[23] *Id.*

[24] *Id.* at 72; 82-83. *See* App. Dfs.' Br. Ex. 12. Drulias was evasive in response to the number of lawsuits that he had personally been involved in, aside from cases involving share ownership in public companies. While Drulias initially only admitted that he was a party in two lawsuits, he eventually acknowledged being a party in fourteen different proceedings. Drulias Dep. 16-25.

[25] Drulias Dep. 122-23.

8

Clouding this testimony is the fact that Drulias and his associate Berger made a number of false statements in documents filed with this court. These misstatements are easily susceptible to the inference that they were made to conceal the existence and nature of this web of partnerships and their evident litigation spawning purpose. These misrepresentations began with the naming of Paulena as the plaintiff. While there is no reason to think that this error occurred other than by inadvertence, this error appears to have precipitated the later, more problematic, statements.

First, at the time of the settlement, Berger was the managing partner of Paulena. He submitted a declaration in support of the settlement on September 8, 2006, representing that "[a]t the time of the filing of the complaint and at all relevant times hereto, Paulena owned the common stock of SS&C Technologies, Inc. . . . ."[26] The same representation was repeated at the settlement hearing.[27] Second, on February 8, 2007, pursuant to then newly adopted Court of Chancery Rule 23(aa), Drulias filed an affidavit identifying himself as the manager of DD Equity Trading, which he refers to in his affidavit as the "successor to Paulina [sic] Partners, one of the named plaintiffs in this litigation."[28]

---

[26] Dfs.' Br. App. Ex. 8 ¶ 2.
[27] Dfs.' Br. App. Ex. 10 at 7:5-7.
[28] Dfs.' Br. App. Ex. 11.

9

Thus, the first mention of DD Equity Trading falsely identifies it as Paulena's successor, thus suggesting that it had, by operation of law, succeeded to Paulena's interest in SS&C. This usage suggests to the court that, by identifying DD Equity Trading as Paulena's successor, Drulias (or his counsel who prepared the affidavit) were hoping to avoid having to disclose that Paulena was never a SS&C stockholder. Drulias contends that this misstatement was nothing more than an honest mistake.[29] In fact, Drulias's counsel largely assumes the blame for this error, attributing it to their mistaken belief that Paulena had become DD Equity Trading.[30] Nevertheless, the suggestion of misdirection is strong, and nothing Drulias or his counsel has submitted suggests that he ever thought that DD Equity Trading was the same entity as, or a legal successor to, Paulena.

---

[29] In Drulias's August 3, 2007 affidavit filed in support of the motion to substitute Paulena with DD Equity Trading, he stated that the false affidavit from Berger and his own February 2007 affidavit were simply due to his original mistake in naming Paulena as the appropriate plaintiff. More specifically, Drulias stated the following:

> [W]hile it has been several years since the original mistake was made and thus difficult to ascertain exactly what caused me to make it, I note that I acquired an ownership interest in both Bamboo and Paulena in the same time frame and that Mr. Berger was then the Manager/Managing Partner of both entities, and that these similarities likely caused my confusion.

[30] Letter from Richard B. Brualdi, filed February 22, 2008. Brualdi's letter states, as follows:

> The passage of time dimmed memories. However, as best I can ascertain at this point, the error arose because our firm mistakenly believed (based in large part on the filing of the original complaint in the name of Paulena Partners) that it was Paulena Partners that had become DD Equity and Mr. Drulias did not correct us. At this time [Drulias] cannot recall whether that was because he also was mistaken and did not check his records, or he did not focus on the error in the affidavit.

10

Drulias and his counsel claim that they did not discover the error in naming Paulena as the plaintiff until Drulias undertook to respond to the defendants' document requests in July 2007.[31] Brualdi notified the defendants of this fact on July 18, 2007 and asked if they would agree to a substitution.[32] The defendants withheld their consent, and the plaintiffs filed a motion to substitute on August 3, 2007.

Drulias's prior litigation history was a further source of serious misstatements to the court. Most remarkably, the plaintiffs' reply brief on the motion for sanctions flatly denies that Drulias was actively involved in previous litigation brought by Momentum Partners and Freeport Partners, stating "[w]hile Drulias may have investments in other partnerships that may have filed lawsuits, he does not manage those partnerships or determine when suit is instituted on their behalf."[33] The plaintiffs' counsel continued to downplay Drulias's litigation record at oral argument and rejected the defendants' contention that Drulias managed any investment partnerships besides Paulena and Bamboo (now DD Equity Trading).[34]

---

[31] At his deposition, Drulias stated: "I was requested to produce documents relating to the [defendants'] document request, among those documents were brokerage statements. I went to the file that I maintained of the brokerage statements and discovered that Paulena did not own shares of SS&C, but rather Bamboo did." Dfs.' Br. App. Ex. 5 at 117.

[32] *See supra* note 13.

[33] Pls.' Reply 20-21.

[34] *See* Tr. 18.

11

In response, at the hearing on the motion to substitute, the defendants' counsel presented the court with five affidavits signed by Drulias swearing that he is the manager of Momentum Partners and Freeport Partners. The affidavits were submitted in connection with five separate cases, four of which were filed in this court. In each of those cases, Drulias was represented by Brualdi and, in three of the four filed in this court, Rosenthal Monhait & Goddess appeared as Delaware counsel.

In light of these contradictions, this court, by letter dated February 8, 2008, asked the plaintiffs' counsel to "investigate the source of this inconsistency and submit a full explanation." In Brualdi's February 22 response, he assumes all of the blame for the errors, citing Drulias's deposition testimony that he managed these two entities. Brualdi's explanation, however, was utterly unsatisfying, stating "[m]ost of the reply brief was drafted in the first instance by my firm. I personally reviewed and edited a draft of the brief. However, regrettably we did not notice the error and hence did not correct it."

Needless to say, this response does not explain how the "error" found its way into the brief in the first place–instead passing it off as a mere editing problem. More importantly, the letter fails to explain how such an important factual misstatement could result from an error at all, particularly in light of the

12

plaintiffs' counsel's extensive representation of Drulias and the very partnerships in question.

## 2.    Dr. Stephen Landan

Landan's deposition gives rise to a different set of troubling issues. Landan demonstrated a striking lack of knowledge of the SS&C litigation and testified to very little participation in its prosecution. For example, he conceded that, despite having no knowledge of the terms of the proposed settlement, he signed a declaration, under oath, that the settlement was "fair, reasonable and adequate."[35] Landan also admitted that he never read the SS&C proxy, and therefore, could not describe what disclosures he challenged.[36] Further, he was unable to recite a single substantive aspect of the Carlyle transaction and he did not even understand investment concepts essential to formulating an informed objection to the acquisition.[37]

Additionally, in discussing his participation in the litigation, it was clear that Landan had little, if any, involvement. He remembered that he "filled out some kind of form on the internet," that stated "[s]omething about opposing the buyout of SS&C."[38] He could not recall how he came across the internet form and he did

---

[35] Landan Dep. 107.
[36] *Id.* at 89-90.
[37] *Id.* at 94-95.
[38] *Id.* at 9-10.

13

not remember seeing the complaint before his attorney filed it.[39]  Moreover,

Landan stated that his attorney never consulted him about the attorneys' fees he

was seeking and had no knowledge of the fee amount his attorney ultimately

negotiated with the defendants.[40]  Surprisingly, Landan thought the fee

arrangement was entirely up to his lawyer and the court.[41]

    3.    <u>The Motion To Withdraw On Notice</u>

    Following these depositions, both of the plaintiffs sought dismissal from this

litigation.  Drulias directed his counsel to withdraw Paulena and DD Equity

Trading immediately.  Landan and his counsel "mutually agreed" that he "might

not be perceived as an adequate class representative" and he authorized his

attorney to seek his dismissal.[42]

---

[39] *Id.* at 116-17.  Near the end of the deposition, Landan and his counsel took a short break, and when Landan returned he was able to recite far more information about the allegations in the complaint.  The defendants contend that Landan's sudden recollection was due to improper coaching by his attorney, an allegation Landan and his attorney deny.  While this court notes the suspicious circumstances and detail of this sudden recollection and the subsequent decision by Landan and his counsel to dismiss him from the litigation, Landan's testimony has little bearing on this court's ruling.  For the sake of completeness, Landan did file an affidavit explaining his inability to recall the details of the litigation.  That affidavit also included the following statement:

> I now recall that I did discuss the proposed settlement with [my attorney] prior to the time he attempted to settle my case, and that the proposed settlement dealt with the disclosure of additional information to the shareholders of SS&C.  I had several conversations with my lawyer about many aspects of the litigation, including the settlement, over the course of the past 2 ½ years.

Landan Aff. ¶ 7, filed January 31, 2008.
[40] Landan Dep. 85-87.
[41] *Id.* at 41.
[42] Landan Aff. ¶ 12 , filed January 31, 2008.

The plaintiffs' counsel notified the defendants that the plaintiffs intended to withdraw, but a conflict arose as to whether the discovery record concerning the plaintiffs would remain confidential. The plaintiffs and their counsel offered a "quiet" dismissal in return for maintaining the confidentiality restrictions. The defendants, however, wanted to unseal the record and use it to publicly criticize the plaintiffs, their counsel, and the current state of stockholder litigation. Eager to avoid such public criticism, the plaintiffs' counsel told the defendants' counsel that, if the defendants insisted on opening up the record, they would move for an order conditioning their withdrawal on notice to the class and would approach their institutional clients to intervene. When this gambit failed to secure an agreement to continue confidentiality, cross motions were filed: one by the plaintiffs to withdraw on notice, and a second by the defendants to unseal the record and for sanctions. As already mentioned, the only issue remaining is the availability of sanctions.

## II.

This court must decide whether to award the defendants a portion of their costs in defending this case. In support of their motion, the defendants argue that the plaintiffs (1) brought suit with no factual investigation, (2) improperly spearheaded the suit for inadequate plaintiffs, (3) submitted false statements to the court, (4) coached Landan at his deposition, (5) abandoned their duties to this court

15

and the class members by seeking a silent withdrawal to avoid public scrutiny of their conduct, and (6) threatened the defendants with approaching their institutional clients for a substitute plaintiff if the defendants did not agree to a quiet withdrawal.[43]

In response, the plaintiffs argue, relying in part on this court's opinion rejecting approval of the settlement, that shifting fees would be inappropriate because their claims are well-founded. The plaintiffs contend that they properly investigated the allegations in their complaints by reviewing "numerous" documents in the public record, including press releases, news articles and SS&C's filings with the Securities and Exchange Commission.[44] Further, the plaintiffs' counsel argue that before Landan's deposition they mistakenly, but reasonably, believed he would be an adequate plaintiff since he is a "highly educated professional," and he authorized the filing of the lawsuit on his behalf. The plaintiffs' counsel also base this position on Landan's production of documents and responses to interrogatories, their efforts to keep him apprised of the litigation, and the affidavits he executed in support of the settlement. With respect to Drulias, the plaintiffs' counsel assert that Drulias's deposition testimony demonstrates that he understood the basis for the lawsuit and actively participated in its prosecution.

---

[43] Dfs.' Br. 47-48.
[44] Brualdi Aff. ¶ 4, filed January 31, 2008; Stein Aff. ¶ 6, filed January 31, 2008; Pls.' Reply 17.

16

According to the plaintiffs' counsel, the nature of Drulias's investments and the number of lawsuits he has been involved in does not preclude him from serving as lead plaintiff.[45]

The plaintiffs largely ignore the defendants' accusations that Drulias, through his various partnership interests, operates a "litigation kennel" and acts as a "professional plaintiff." They do, however, argue that Drulias "uses litigation to seek review of possible self-dealing" and that is irrelevant to the issue of notice.[46] Further, the plaintiffs contend that Drulias's litigation experience "enhances, rather than detracts" from, a finding that Drulias is an adequate plaintiff.[47] The plaintiffs also argue that the size of a plaintiff's holdings is not a factor when considering adequacy.

The plaintiffs characterize the numerous misstatements to the court as "honest mistakes" that did not prejudice the defendants. The plaintiffs contend that these errors were due to carelessness and poor memory and were not motivated by any intent to deceive the court or the defendants. In addition, the plaintiffs' counsel and Landan strongly deny that Landan was "coached" at a break in his deposition. Finally, the plaintiffs defend their negotiation tactics in trying to

---

[45] Pls.' Reply 23.
[46] *Id.* at 13.
[47] *Id.* at 22.

17

withdraw from the litigation as entirely appropriate since "Delaware law permits, but does not require, notice prior to dismissal of a putative class action."[48]

### III.

Delaware follows the general rule that, regardless of the outcome of litigation, each party is responsible for paying his or her own attorneys' fees.[49] This is commonly referred to as the American Rule and it has several recognized exceptions, including the "bad faith" exception.[50] The United States Supreme Court established this exception in *Roadway Express v. Piper*.[51] Significantly, the bad faith exception "is not restricted to cases where the action is filed in bad faith."[52] Indeed, "'bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation. In such cases, the fees typically awarded are the additional fees incurred as a result of the bad faith conduct."[53]

This court has broad discretion to award attorneys' fees where litigation was brought in bad faith or where bad faith conduct by one of the parties increases the costs of the litigation.[54] This serves to "'deter abusive litigation in the future,

---

[48] *Id.* at 1.
[49] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).
[50] *Id.*
[51] 447 U.S. 752 (1980).
[52] *Id.* at 766.
[53] *Id.* (quoting *Hall v. Cole*, 412 U.S. 1, 15 (1973)).
[54] *See Abritrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997); *see also Openwave Systems, Inc. v. Harbinger Capital Partners Master Fund I, Ltd.*, 924 A.2d 228, 245 (Del. Ch. 2007) ("While the award of attorneys' fees is 'unusual' relief, the Court of Chancery has broad discretion in making such awards.").

18

thereby avoiding harassment and protecting the integrity of the judicial process.'"[55] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[56] "To award fees under the bad faith exception, the party against whom the fee award is sought must be found to have acted in *subjective* bad faith.  A finding of bad faith involves a higher or more stringent standard of proof, *i.e.*, 'clear evidence.'"[57]

## IV.

In this case, as the defendants' counsel conceded at oral argument, the record does not support a finding that the entire litigation was brought in bad faith.  Most obviously, the record supports a conclusion that the Coughlin Stoia firm had reason to believe that Landan would be an adequate representative plaintiff up until the time his deposition was taken.  Less significantly, the limited record available to the court on this motion does not permit the court to find by clear evidence that the nature of the partnerships that Drulias and Berger manage or their relationship with the Brualdi Firm is such that they can never serve as representative plaintiffs.  To be clear, those entities and that relationship raise very disturbing questions and

---

[55] *Kuang v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Brice v. State*, 704 A.2d 1176, 1178 (Del. 1998)).
[56] *Johnston*, 720 A.2d at 546 (footnotes and citations omitted).
[57] *Arbitrium*, 705 A.2d at 232 (emphasis in original).

may well disqualify those partnerships or the persons associated with them from

serving in a representative capacity in the future; nevertheless, the court cannot

conclude from the sparse record before it here that the standard for finding bad

faith litigation is met in this case.

There is, however, clear evidence that the plaintiffs acted in bad faith in

bringing the motion to withdraw conditioned on notice to the putative class. As the

plaintiffs' counsel conceded at oral argument, they were ready to withdraw without

notice if the defendants would only agree to maintain the confidentiality

restrictions on the discovery materials. According to the plaintiffs' counsel, they

informed the defendants that if they "persisted in making the plaintiffs' discovery

public . . . [they] would seek leave to send notice to the class."[58] The plaintiffs

defend these tactics as entirely appropriate, arguing:

> [I]t was obvious that defendants were not satisfied with an end to the
> case and intended to embarrass and attack plaintiffs and their counsel
> personally and professionally. Seeking to serve as a class plaintiff or
> class counsel does not obligate a shareholder or lawyer to make
> himself a target for opponents' vindictiveness. Nor is a withdrawing
> plaintiff who is receiving no payment required or even expected to
> provide notice to class members; cases are regularly dismissed
> without notice and the relatively few decisions on dismissal notice
> demonstrate how rare the procedure is. Plaintiffs' counsel proposed a
> meritorious application that is available under the case law and
> entirely discretionary in an effort to avoid the unpleasantness redolent
> in defendants' papers. That is a threat only in the sense that it is well
> grounded in decisional law and the record developed in this case, and

---

[58] Tr. 29.

20

raises the prospect of a consequence defendants would prefer to avoid.[59]

This position makes clear that the plaintiffs' motion to withdraw on notice was not based on a good faith belief that notice was required—or even likely to advance the best interests of the former SS&C stockholders. Instead, the decision to demand notice to the putative class was simply part of an effort to maintain the confidentiality of the discovery record relating to Drulias, the partnerships he and Berger manage, and Landan. Not only is the plaintiffs' willingness to completely change their legal argument to further their interests in concealing the record of dubious propriety,[60] their motion was not meritorious and served only to advance their selfish motives.[61] That conduct amounted to an abuse of the judicial process and clearly evidences bad faith.[62]

---

[59] Pls.' Reply 13 (citations omitted).

[60] Cf. *Arbitrium*, 705 A.2d at 235 (holding that the defendants conducted their defense in bad faith, in part, because they "disavowed their previous litigation positions to justify an indisputable breach" of a standstill agreement).

[61] See *id.* (finding bad faith where the defendants contested an action for "ulterior reasons unrelated to the merits" to protect their self-interest at a time when they knew the claim was valid).

[62] The plaintiffs' counsel's attempt at oral argument to justify their original intention to withdraw without notice is unpersuasive, particularly in light of the plaintiffs' counsel's conduct in this litigation. Counsel argued that, notwithstanding the concerns about the confidentiality of the discovery record, they felt notice became necessary when they learned about the defendants' intended public campaign. According to counsel, this would have created confusion about the status of the litigation, making notice necessary to properly inform the former SS&C stockholders. However, the plaintiffs' counsel made clear at oral argument and in their briefs that the impetus for their motion was to deter removal of the confidentiality restrictions, and this last minute attempt to interject a proper basis for their sudden change in position does not justify their motion.

21

This conclusion of bad faith is buttressed by the series of misstatements made in filings that tended to misrepresent or downplay the facts relating to Drulias's numerous "investment" partnerships and their (and his) role in other litigation filed by The Brualdi Firm. Most importantly for this purpose, the plaintiffs' reply brief filed in connection with the pending motions significantly mischaracterized Drulias's litigation history and his connection to those partnerships. Those false statements, when considered in the context of the plaintiffs' and their attorneys' other less serious misstatements,[63] demonstrate a pattern of, at best, carelessness, and, at worst, a deliberate effort to mislead the court. The confusion created by these submissions imposed additional and unnecessary burdens on the defendants and the court, further warranting shifting fees for the plaintiffs' motion to withdraw and for the motion to unseal and for sanctions.

---

[63] In Drulias's August 3, 2007, affidavit he states that "on or about October 1, 2006" Bamboo Partners changed its name to DD Equity Trading, but in the plaintiffs' reply brief they state, "[i]n January 2007, Bamboo Partners changed its name to DD Equity Trading Company. . . ." Drulias Aff. ¶ 2, filed August 3, 2007; Pls. Reply 18 n.11. In Drulias's February 8, 2007 affidavit, the notary caption states "before me . . . personally appeared Stephen Landan . . . ."

## V.

As noted, and in recognition of the well settled principle that fees should only be shifted in exceptional cases, this court will not grant the defendants' request for all fees incurred in defending the litigation.[64] This court has "broad discretion in fixing the amount of attorney fees to be awarded,"[65] and, so, will limit the award to the fees the defendants reasonably incurred in defending the motion to withdraw and in bringing the motion to unseal and for sanctions.[66] To date, the defendants have not provided the court with a statement detailing the attorneys' fees, and other litigation expenses incurred in connection with those motions. Therefore, further proceedings are needed to determine the proper amount of the award. The parties are directed to confer and, within 10 days, submit a schedule to bring this matter to a conclusion. IT IS SO ORDERED.

---

[64] The plaintiffs' primary argument against the application of bad faith centers on their position that the underlying allegations in their complaint are meritorious. The plaintiffs argue that "after post-settlement hearing briefing in which defendants vigorously advocated that the claims were meritless, the Court found the claims asserted to be sufficiently meritorious to warrant rejection of a therapeutic settlement." Pls.' Reply 21. The plaintiffs' reliance on this court's rejection of the settlement they proposed is misguided. That decision should not be read as any sort of determination of the merits. Indeed, both bases for rejecting the settlement depended on the court's criticism of the plaintiffs' counsel's conduct of the litigation and presentation of the proposed settlement. Finally, this court is only granting the defendants the fees they incurred in connection with the plaintiffs' motion to withdraw and the related motion to unseal and for sanctions and does not rest on a finding that the underlying merits of the plaintiffs' claims were unfounded. *Cf. Batson*, 805 F.2d at 550 ("[W]hile the presence of merit in a claim or defense may negate any finding of bad faith in its filing, it cannot justify abuse of the judicial process in the method of prosecution.").

[65] *Johnston*, 720 A.2d at 547.

[66] *See Judge v. City of Rehoboth Beach*, 1994 WL 198700, at *7 (Del. Ch. Apr. 29, 1994) ("Plaintiffs are entitled to an award . . . including time spent on a petition for attorneys fees.").

23

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| )<br>)<br>)<br>) | Case No. CV 07-428-N-EJL-MHW |
| IN RE ATLAS MINING COMPANY )<br>SECURITIES LITIGATION ) | **MEMORANDUM DECISION** |
| ) | **AND ORDER** |
| )<br>)<br>)<br>_____ ) | |

Currently pending before the Court are motions filed by four different investors/investor groups to consolidate three pending lawsuits, be appointed lead plaintiff of the class action, and for approval of lead plaintiff's selection of counsel. Two of these motions, one filed by a group known as the Kipphut Movants (Docket No. 13) and the other by Rudy Rodriguez (Docket No. 15) have been withdrawn. *See* Docket No. 16 and Docket No. 45. Accordingly, those motions are MOOT. Still to be addressed are the motions of the O'Hern Group (Docket No. 12) and the Atlas Investors (Docket No. 17) to be appointed as lead plaintiff.

On January 22, 2008, Judge Lodge entered an order (Docket No. 29) consolidating the

**Memorandum Decision and Order- Page 1**

three lawsuits, *Benson v. Atlas Mining Co.*, Case No. 07-428-N-EJL, *Berger v. Atlas Mining Co.*, Case No. 07-449-N-MHW, and *O'Hern v. Atlas Mining Co.*, Case No. 07-503-N-LMB, into a lead case to be captioned *In re Atlas Mining Securities Litigation*, Case No. CV 07-428-N-EJL.

## I.
### Factual Background

Atlas Mining Company ("Atlas Mining") is a natural resources company based in Osborn, Idaho, that engages in the acquisition, exploration, and development of its mineral, timber and resource properties in Idaho and Utah. Atlas Mining develops the Dragon Mine in Juab County, Utah which is principally exploited for halloysite clay. The company also provides contract mining services and specialized civil construction services for mine operators, exploration companies, and construction and natural resource industries. Atlas Mining owns approximately 900 acres of fee-simple property and patented mining claims and 260 acres of mineral rights and unpatented claims located in the Coeur d'Alene mining district in Shoshone County, Idaho.

This litigation against Atlas Mining and certain Atlas Mining officers stems from Atlas Mining's allegedly improper accounting manipulations of reported earnings. On October 9, 2007, before market open, the company revealed that its prior financial statements for the fiscal years ended December 31, 2004, 2005 and 2006, along with the company's quarterly reports issued for March 31, June 30 and September 30, for the years 2005, 2006 and 2007 were materially false, misleading and had to be restated. The company admitted the restatements were necessary because Atlas Mining had inflated its revenues and under-reported net losses and long-term liabilities by improperly recognizing as revenues *future* deliveries of halloysite clay from Atlas Mining's Dragon Mine that were never delivered. Atlas Mining also announced that its

**Memorandum Decision and Order- Page 2**

previously reported net losses for the quarter and fiscal year ended 2004 were materially misstated with net losses being $1,196,274, instead of the reported net losses $946,274.

These disclosure caused the company's stock prices to fall. On October 8, 2007, the company's stock closed trading at $1.64 per share with 52,700 shares trading that day. On October 9, 2007, the day of the press release, the company's stock opened the day trading at $1.06 and closed the day at $.80 a share, or down over 51% from the previous days' close, on over 6,418,299 shares traded.

## II.
## Procedural Background

The first lawsuit commenced in this jurisdiction on October 11, 2007 was *Benson v. Atlas Mining Co., et al.*, Case No. CV 07-428-N-EJL.[1]  Pursuant to 15 U.S.C. § 78u-4(a)(3)(A), on October 12, 2007, the first notice that a class action had been initiated against defendants was published over a widely circulated national business-oriented wire service, *Market Wire*, advising members of the proposed class of their right to move the Court to serve as lead plaintiff within 60 days. *Declaration of Joseph J. DePalma, "DePalma Dec.,"* Ex. B (Docket No. 14-3).

On December 11, 2007, several motions to serve as lead plaintiff were filed in this class action lawsuit. First, at 4:43 p.m. MST, James O'Hern and John O'Hern (the "O'Hern Group") filed a motion seeking appointment as lead plaintiff. (Docket No. 12). The O'Hern Group had selected the law firms of Lite DePalma Greenberg & Rivas, LLC ("Lite DePalma") as lead counsel and Holland & Hart as liaison counsel. Next, at 4:50 p.m. MST, the Kipphut Movants[2]

---

[1] A second lawsuit was filed on October 19, 2007, *Berger v. Atlas Mining Co., et al.*, Case No. 07-449-N-MHW. A third lawsuit was filed on November 26, 2007, *O'Hern v. Atlas Mining Co., et al.*, Case No. 07-503-N-LMB.

[2] The Kipphut Movants consisted of Michael B. Kipphut, Anna D. Kipphut, and Robert B. Stonesifer.

requested that they be appointed lead plaintiffs. (Docket No. 13). The Kipphut Movants had selected the law firms of Federman & Sherwood as lead counsel and Gordon Law Offices as liaison counsel. The next filing for lead plaintiff status was made by Rudy J. Rodriguez at 5:05 p.m. MST. (Docket No. 15). Mr. Rodriguez selected the law firms of Kahn Gautheir Swick, LLC ("KGS") and Brower Piven as co-lead counsel and Cosho Humphrey as liaison counsel. Subsequently, at 8:47 p.m. MST, the Kipphut Movants withdrew their motion for lead plaintiff status, noting their motion had been filed prematurely and inadvertently. (Docket No. 16). Then, a group calling themselves the "Atlas Investors" filed a motion to be appointed lead plaintiff at 8:53 p.m. MST. (Docket No. 17). The Atlas Investors consist of Frank and Margaret Cardy, Laurence Wang, Jacob Shank, Howard Nair, Robert B. Stonesifer, and Michael Kipphut.[3] The Atlas Investors seek to have the Rosen Law Firm appointed as lead counsel and Gordon Law Offices appointed as liaison counsel. On the day of the hearing in this matter, March 12, 2008, Mr. Rodriguez withdrew his motion to be appointed lead plaintiff. (Docket No. 45).

### III.
### Motions to Appoint Lead Plaintiffs and Approve Selection of Counsel

The Private Securities Litigation Reform Act ("PSLRA") sets forth a procedure for the selection of a lead plaintiff to oversee securities class actions brought pursuant to the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a).

First, the plaintiff who files the initial action must publish notice to the class informing class members of their right to file a motion for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(I). Within 60 days after publication of the notice, any member of the proposed class may move the court to serve as lead plaintiff of the purported class. 15 U.S.C. § 78u-

---

[3] These last two members of the Atlas Investors group were also members of the Kipphut Movants group.

**Memorandum Decision and Order- Page 4**

4(a)(3)(A)(i)(II).

Next, the PSLRA provides that within 90 days after publication of notice, "the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints" and shall appoint as lead plaintiff the member or members that the court determines to be "most capable of adequately representing the interests of class members..." 15 U.S.C. § 78u-4(a)(3)(B)(i).

The PSLRA also provides a rebuttable presumption that the most adequate plaintiff is the person or group of persons that:

> (aa) has either filed the complaint or made a motion in response to a notice...
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). This presumption can be rebutted only upon proof by a member of the purported plaintiff class that the presumptive plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The Ninth Circuit has recognized that a district court must follow a three-step process to determine the lead plaintiff in these actions. *In re Cavanaugh*, 360 F.3d 726, 729 (9th Cir. 2002). First, the court must determine whether the procedural requirements are satisfied. *Id.* The procedural requirements demand that a motion for appointment as lead plaintiff be filed within 60 days of the published notice of the class action. 15 U.S.C. § 78u-4(a)(3)(A). Each prospective plaintiff must also provide a sworn certification that he or she has read the

**Memorandum Decision and Order- Page 5**

complaint, did not purchase the security at the direction of counsel or in order to participate in any private action and is willing to serve as a representative party. *Id.* § 78u-4(a)(2)(A). Second, the court must determine who has the largest financial interest by comparing the financial stakes of the parties. *In re Cavanaugh*, 360 F.3d. at 729-30. Once the individual or group of individuals with the largest financial interest is identified, the court must "focus its attention on *that* plaintiff" and determine whether the Rule 23 requirements are met. *Id.* at 730 (emphasis in original). If the person or group with the largest financial interest meets Rule 23's requirements, they become the presumptive lead plaintiff. *Id.* The last step of the process is to give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's representations that it satisfies the requirements of Rule 23. *Id.*

### A.    Procedural Requirements

Both the O'Hern Group and the Atlas Investors have complied with the procedural requirements. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa). The motions for appointment as lead plaintiff were both filed on December 11, 2007, within 60 days of the published notice. Additionally, all the individual members of the groups have filed certifications along with their motions. *See DePalma Dec.*, Ex. A; *Declaration of Philip Gordon, "Gordon Dec.,"* Ex. 2 (Docket No. 17-3).

### B.    Largest Financial Interest

PSLRA's requirement that the presumptive lead plaintiff have the "largest financial interest in the relief sought by the class" means the district court must compare the financial stakes of the various plaintiffs and determine which has the most to gain from the lawsuit. *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002).

**Memorandum Decision and Order- Page 6**

The O'Hern Group, consisting of brothers James and John O'Hern, claim aggregate losses of $92,589.75.[4] *DePalma Dec.*, Ex. C.   The Atlas Investors[5] claim aggregate losses of $181,469.20. *Gordon Dec.*, Ex. 3.

The deciding question for the determination of who will serve as lead plaintiff is whether a group of unrelated investors[6] are able to aggregate their losses so that they have the largest financial interest in the litigation.

The PSLRA expressly states the presumptive lead plaintiff may be a  "person or group of persons." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  What it does not state is whether individuals, particularly unrelated individuals, may aggregate their losses as a group for the purpose of becoming the lead plaintiff. *See In re Cavanaugh*, 306 F.3d 726, 731 n.8 (9th Cir. 2002) (noting that although the statute states a "group of persons" can serve as a lead plaintiff, the court would not be determining in that case whether a group could aggregate losses to satisfy the "largest financial interest" requirement).

The O'Hern Group contends that the only reason for the Atlas Investors existence as a "group" is to serve as a "vehicle for counsel to artificially increase the amount of investor losses." *O'Hern Group's Response Memorandum*, p. 5 (Docket No. 23).  It is also pointed out that two members of the Atlas Investors group were members of another group, represented by

---

[4] James O'Hern claims losses of $78,202.99; John O'Hern claims losses of $14,386.76.  James O'Hern has the largest individual amount of losses.

[5] As noted earlier, two members of the "Atlas Investors" group, Robert B. Stonesifer and Michael Kipphut, were previously part of the now-withdrawn "Kipphut Movants" group.  The Kipphut Movants claimed aggregate losses of $54,386.70.

[6] The members of the Atlas Investors group claim the following losses: Frank and Margaret Cardy, $68,510.00; Laurence Wang, $35,900.00; Jacob Shank, $11,450.00; Howard Nair,  $11,368.00; Michael Kipphut, $26,594.20; and Robert Stonesifer, $26,647.00. *See Gordon Dec.*, Ex. 3.

**Memorandum Decision and Order- Page 7**

different counsel,[7] just hours before the filing of the Atlas Investors' motion. Lastly, the O'Hern

Group argues that permitting groups like the Atlas Investors to aggregate losses of unrelated

individuals allows lawyers to direct litigation and is problematic when there is no established

mechanism for making lead plaintiff decisions.

      The Atlas Investors group maintains that a group such as itself is advantageous because it

is far less likely that any potential defenses would successfully rebut a finding of typicality.  It

also argues that the class is better represented and stronger when the lead plaintiff is a group.

The group also cites to several cases that have explicitly rejected the need for pre-litigation

relationships and have appointed groups of unrelated investors as lead plaintiffs.  *See Atlas

Investors' Reply Memorandum*, p. 4 (Docket No. 30).

      Some courts will not aggregate the losses of a group of unrelated persons so that group

may serve as lead plaintiff.  These courts observe that one of the principal purposes of the

PSLRA was to "prevent lawyer-driven litigation and to allow for institutional plaintiffs with big

financial stakes to serve as lead plaintiff and control the litigation."  *Ruland v. InfoSonics Corp.*,

2006 WL 3746716, *3 (S.D. Cal. Nov. 7, 2006).  *See also In re Razorfish, Inc. Sec. Litig.*, 143 F.

Supp. 2d 304 (S.D.N.Y. 2001).  Interpreting the word "group" to include an unrelated group of

individuals does not further these objectives.  *Ruland v. InfoSonics Corp.*, 2006 WL 3746716, *3

(S.D. Cal. Nov. 7, 2006).  *See also Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845, 853 (S.D.

Ind. 1999) (finding it was not an accurate interpretation of PSLRA to select a group of investors

"who have the largest aggregate losses but who have nothing in common with one another

---

[7] The Kipphut Movants' lead counsel was Federman & Sherwood and liaison counsel was Gordon Law Offices.  (Docket No. 16).  Federman and Sherwood is now listed as "additional counsel" for the Atlas Investors group.

**Memorandum Decision and Order- Page 8**

beyond their investment" as lead plaintiff); *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 231 F.R.D. 207, 213 (D. Md. 2000) (a "group of persons" under PSLRA "should consist of more than a mere assemblage of unrelated persons who share nothing other than the fact that they suffered losses and entered into retainer agreements with the same attorneys"); *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1153-54 (N.D. Cal. 1999) (adopting a narrow definition of "group" to mean individuals who had a meaningful relationship preceding the litigation and who are united by more than the mere happenstance of having bought the same securities).

Other courts have allowed unrelated individuals to form a group and aggregate their losses. *In re Universal Access, Inc. Sec. Litig.* took a plain meaning approach to interpreting the statute. 209 F.R.D. 379 (E.D. Tex. 2002). Noting that the PSLRA expressly stated "person or group of persons," that court appointed a group as lead plaintiff because it was appropriate under the statute and "sometimes favored in light of the diversity of experience and interests of group members." *Id.* at 384.[8] *See also In re Advanced Tissue Sci. Sec. Litig.*, 184 F.R.D. 346 (S.D. Cal. 1998) (appointing "sub-group" of six unrelated individuals as lead plaintiff out of a group consisting of 250 members). To combat the concern that a group of unrelated individuals will not be able to manage the litigation effectively, some courts have taken a case-by-case approach and allowed a group to serve as lead plaintiff only upon a showing of how the group can effectively manage the litigation. *See In re Versata, Inc. Sec. Litig.*, 2001 WL 34012374 (N.D. Cal. Aug. 20, 2001) (noting group had shown it had a regular meeting calendar, a procedure to resolve disagreements, etc.); *Local 144 Nursing Home Pension Fund v. Honeywill Int'l, Inc.*, 2000 WL 33173017 (D.N.J. Nov. 16, 2000) (same). *See also Schonfield v. Dendreon Corp.*,

---

[8] Notably, in that case, the group that was appointed as lead plaintiff included an individual whose losses alone were larger than the aggregated losses of the other group competing for lead plaintiff status. *Id.*

2007 WL 2916533, *2 (W.D. Wash. Oct. 4, 2007).

It is clear that groups may be appointed as lead plaintiff under PSLRA. What remains undecided by the Ninth Circuit is whether a group of unrelated individual can aggregate their losses for the purposes of determining who has the largest financial interest. The Court finds the former cases cited above to be more persuasive will not aggregate the losses of a group that does not have a pre-existing relationship. The PSLRA was enacted to combat a race to the courthouse by plaintiffs' lawyers in class action lawsuits. *See In re E.Spire Commc'ns, Inc. Sec. Litig.*, 231 F.R.D. 207, 210 (D. Md. 2000) (citing S.Rep. No. 104-98 (1995) reprinted in 1996 U.S.C.C.A.N. at 679). The Atlas Investors appear to be purely lawyer-driven. Two of the members were members of another group, with different counsel, four hours prior to the filing of the Atlas Investors' motion. There is no connection between the individuals in this group. When a group does not have a pre-existing relationship, appointing that group as lead plaintiff would not best serve the class. It would also defeat the PSLRA's purpose to prevent lawyer-driven litigation. The Court finds that the O'Hern Group[9] has the largest financial interest in the pending litigation and has a pre-existing familial relationship as brothers.

---

[9] At the hearing held March 11, 2008, the Atlas Investors claimed that James O'Hern had purchased 300,000 shares of stock pre-class period and therefore he made a profit. Courts typically apply the "Olsen-Lax" factors to determine who has the largest financial interest. *See Richardson v. TVIA, Inc.* 2007 WL 1129344 (N.D. Cal. April 16, 2007). These factors consider the number of shares purchased *during the class period*, the number of net shares purchased *during the class period*, the total net funds purchased *during the class period* and the approximate losses suffered. *Id.* at *3. Any pre-class period purchase of shares by James O'Hern is not relevant to the losses he claims he suffered from the decreased value in the shares purchased *during* the class period.

C.    **Rule 23 Requirements**

Rule 23 requires that the Court find that:

> (1) the class is so numerous that joinder of all members is
> impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical
> of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the
> interests of the class.

The requirements of "typicality" and "adequacy" of representation are the key factors in

determining the appropriate lead plaintiff under the PSLRA.  *See In re Cavanaugh*, 306 F.3d

726, 730 (9th Cir. 2002).

The "typicality requirement" is satisfied when "the claims or defenses of the

representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

The test of typicality is "whether other members have the same or similar injury, whether the

action is based on conduct which is not unique to the named plaintiffs, and whether other class

members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976

F.2d 497, 508 (9th Cir. 1992).  In cases arising under the PSLRA, courts have found the

typicality requirement satisfied when the lead plaintiff's alleged injuries arise from "the same

course of conduct complained of by the other plaintiffs and his causes of actions are founded on

similar legal theories." *Schonfield v. Dendreon Corp.*, 2007 WL 2916533, *4 (W.D. Wash. Oct.

4, 2007).

The O'Hern Group satisfies the typicality requirement because they purchased Atlas

Mining stock during the class period in reliance on Defendants' misrepresentations and

subsequently suffered damages.  The group's losses arise from the same course of conduct

**Memorandum Decision and Order- Page 11**

complained of by the other plaintiffs. Additionally, there is no evidence that the O'Hern Group is subject to any unique defenses.

The adequacy requirement is satisfied "if there are no conflicts between the representative and class interests and the representative's attorneys are qualified, experienced, and generally able to conduct the litigation." *Richardson v. TVIA, Inc.*, 2007 WL 1129344, *4 (N.D. Cal. 2007). The O'Hern Group's interests appear aligned with those of the other class members and there is no evidence of conflict between the representative and class interests. In reviewing the record, it appears the O'Hern Group has retained qualified and experienced attorneys. *See Gordon Dec.*, Exs. 4-5. Because the O'Hern Group satisfies the requirements of 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), it is the presumptive lead plaintiff.

**D.      Rebuttal of Lead Plaintiff Presumption**

The PSLRA provides that the lead plaintiff presumption may be rebutted upon proof that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The Atlas Investors attempt to rebut this presumption by arguing that the counsel chosen by the O'Hern Group, Lite DePalma, filed a "copy-cat" lawsuit with named plaintiff Daniel J. O'Hern, Sr. ("O'Hern Sr.") The Atlas Investors claim that O'Hern Sr. had no standing to bring the class action and has not suffered any losses. They claim the filing of this lawsuit by Lite DePalma is tantamount to a Rule 11 violation. Secondly, the Atlas Investors believe that James O'Hern's listed trades in his certification and loss chart are incomplete.

In response to the first argument made by the Atlas Investors, the O'Hern group submits

**Memorandum Decision and Order- Page 12**

that the standing of O'Hern Sr. is irrelevant because he is not moving for lead plaintiff status.[10] As to the second argument, the O'Hern Group submits its belief that the class period ended on October 8, 2007, because the fraud was revealed prior to the opening of the market on October 9, 2007. They maintain there is no requirement to reveal pre- and post-class period transactions.

The Atlas Investors attack of the presumption favoring the O'Hern Group fails. The standing of O'Hern Sr. is not before the Court because he is not a member of the O'Hern Group. Secondly, the Court agrees, as stated above in footnote 9, that any pre- or post-class period transactions would be irrelevant in calculating losses. Lastly, the Atlas Investors have not offered proof that the O'Hern Group cannot "fairly and adequately protect the interests of the class" or "is subject to unique defenses." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## E.    Selection of Counsel

The PSLRA provides that the most adequate plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). The O'Hern Group has requested that the Court approve their selection of Lite DePalma as lead counsel and Holland & Hart as liaison counsel.

The O'Hern Group submits that Lite DePalma and Holland & Hart are very qualified litigators with extensive experience in prosecuting complex securities actions. *See DePalma Dec.*, Exs. D and E. Having reviewed both firm's resumes, the Court finds that Lite DePalma and Holland & Hart are both sufficiently qualified and experienced to serve, respectively, as lead and liaison counsel. The Court will approve the lead plaintiffs' selection of counsel.

---

[10]  The O'Hern Group also submits that it believes the class period began in 2004 rather than on March 31, 2005 and if that is the case, O'Hern Sr. would have standing.

**Memorandum Decision and Order- Page 13**

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      Motion of the O'Hern Group to be Appointed Lead Plaintiff, and for Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel (Docket No. 12), be **GRANTED;**

2)      The Kipphut Movants' Motion for Appointment of Lead Plaintiffs and for Approval of Choice of Lead and Liaison Counsel for the Class (Docket No. 13), be found **MOOT;**

3)      Motion of Rudy Rodriguez for Appointment of Lead Plaintiff and Approval of Selection of Lead Plaintiff's Choice of Lead Counsel and Liaison Counsel (Docket No. 15), be found **MOOT;**

4)      Motion of Atlas Investors to Appoint Lead Plaintiffs and Approve Lead Plaintiffs' Selection of Counsel (Docket No. 17), be **DENIED.**



DATED: March 25, 2008

_Mikel H. Williams_

Honorable Mikel H. Williams
Chief United States Magistrate Judge

**Memorandum Decision and Order- Page 14**